# EXHIBIT D

# TRANSCRIPT OF JULY 27, 2006
# HEARING

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life          )
Term Parole Consideration          )          CDC Number C-60825
Hearing of:                        )
                                   )
STEPHEN LIEBB                       )
_____     )

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

July 27, 2006

COPY
INMATE

PANEL PRESENT:

Mr. Archie Biggers, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Stephen Liebb, Inmate
Mr. Jim Brosnahan, Attorney for Inmate
Ms. Nyoki Sacramento, Attorney for Inmate
Ms. Alexis DelaGarza, Deputy District Attorney
Mr. Arthur Diller, Brother of Victim
Mr. Mike Gunning, Observer
Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No          See Review of Hearing
_____   Yes         Transcript Memorandum

B. Billington Northern California Court Reporters

ii

INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 34 |
| Post-Commitment Factors | 43 |
| Parole Plans | 63 |
| Closing Statements | 106 |
| Recess | 140 |
| Decision | 141 |
| Adjournment | 145 |
| Transcriber Certification | 146 |

--oOo--

1

1    P R O C E E D I N G S

2    **DEPUTY COMMISSIONER BLONIEN:**  We are on record.

3    **PRESIDING COMMISSIONER BIGGERS:**  Okay.  This is a

4    Subsequent Parole Consideration Hearing for Stephen

5    Liebb, L-I-E-B-B.  CDC number is C-60825.  Today's date

6    is July the 27th, 2006, and we're located at San Quentin

7    State Prison.  The inmate was received on February the

8    15th, 1983, from Los Angeles County.  The life term began

9    on February the 15th, 1983, and the minimum eligible

10   parole date was -- again, we -- let's go off because I

11   don't have a -- a MEPD here.

12                    (Off the Record)

13   **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Let's go

14   back on record.  The minimum eligible parole date is --

15   is January the 19th, 1990 -- 1997?

16   **DEPUTY COMMISSIONER BLONIEN:**  1997.

17   **PRESIDING COMMISSIONER BIGGERS:**  1997.  The

18   controlling offense for which the inmate has been

19   committed is Murder in the First Degree, with -- the case

20   number is A, that's Alpha, 083014, one count, and that's

21   a violation of the Penal Code Section 187.  That was

22   enhanced by Use of a Weapon, which is 12022.(b).  The --

23   and then there was also a -- another offense which was

24   Assault with a Deadly Weapon, which is a violation of the

25   P 245(a), same county, same case number, and that -- and

26   that was count two, and that was stayed.  The inmate

27   received a term of 25 years to Life plus one year, and

1   again, the -- the minimum eligible parole date was

2   January the 19th, 1997.  Now this hearing is being tape

3   recorded, and for the purpose of voice identification

4   each of us will state our first and last name, spelling

5   our last name.  When we get to your turn, Mr. Liebb,

6   would you please give us -- after spelling your last

7   name, please give us your CDC number.  I will start and

8   move to my left.  My name is Archie Joe Biggers, B-I-G-G-

9   S-R-S, and I'm a commissioner with the Board of Parole

10  Hearings.

11         DEPUTY COMMISSIONER BLONIEN:  I'm Noreen Blonien,

12  B-L-O-N-I-E-N.  I'm a Deputy Commissioner.

13         MR. DILLER:  My name is Arthur Diller.  Diller,

14  D-I-L-L-E-R.

15         DEPUTY DISTRICT ATTORNEY DELAGARZA:  Alexis

16  DelaGarza, D-E-L-A-G-A-R-Z-A, Deputy District Attorney,

17  Los Angeles County.

18         ATTORNEY SACRAMENTO:  Nyoki Sacramento, S-A-C-R-

19  A-M-E-N-T-O, attorney for Stephen Liebb.

20         MR. BROSNAHAN:  Jim Brosnahan of Morrison and

21  Forester, for Mr. Liebb.

22         PRESIDING COMMISSIONER BIGGERS:  Okay.

23         DEPUTY COMMISSIONER BLONIEN:  Mr. Brosnahan, will

24  spell your last name.

25         MR. BROSNAHAN:  I will, thank you.  B-R-O-S-N-A-

26  H-A-N, just like it looks, Brosnahan.

27         DEPUTY COMMISSIONER BLONIEN:  Sacramento was

1   easier.

2        MR. BROSNAHAN:  Yes.

3        DEPUTY COMMISSIONER BLONIEN:  Okay.

4        INMATE LIEBB:  Stephen Liebb, L-I-E-B-B, C-60825.

5        PRESIDING COMMISSIONER BIGGERS:  Okay.  Thank

6   you.

7        MR. GUNNING:  Mike Gunning, G-U-N-N-I-N-G, and

8   I'm observing.

9        PRESIDING COMMISSIONER BIGGERS:  Okay.  Mr.

10  Gunning, our records -- let the record reflect that Mr.

11  Gunning was shown as your legal representation, was your

12  counsel, until we found out yesterday that that would be

13  a change, and that's why I'm allowing him to -- to be in

14  here to observe the hearing.

15       DEPUTY DISTRICT ATTORNEY DELAGARZA:  Your Honor -

16  - Commissioner, I did speak with Mr. Diller, and Mr.

17  Diller and I both join in basically indicating that we do

18  not believe that Mr. Gunning has the right to be at this

19  hearing, and we oppose him being here.

20       PRESIDING COMMISSIONER BIGGERS:  On what grounds?

21       DEPUTY DISTRICT ATTORNEY DELAGARZA:  That he has

22  no right to be here.  The only people by law that are

23  allowed to be in the hearing are the inmate, the inmate's

24  attorney, a DA, a victim, a victim's family, law

25  enforcement.  There's -- by law those are the only people

26  that are allowed in the hearing.  Mr. Gunning has no

27  right to be in this hearing.  We did hear from Mr.

4

1   Gunning this morning, but he did confer with counsel

2   yesterday, and we believe it is inappropriate to have him

3   in this hearing.

4          PRESIDING COMMISSIONER BIGGERS:  Okay.  Let's go

5   off record.  And would you all excuse us.  Let's take him

6   back out, please, for us to do a discussion here.

7                    (Off the Record)

8          DEPUTY COMMISSIONER BLONIEN:  We're back on

9   record.

10         PRESIDING COMMISSIONER BIGGERS:  Okay.  I'm going

11  to ask Mr. Liebb, do you have any objection to Mr.

12  Gunning being present at your hearing?

13         INMATE LIEBB:  No, sir.

14         PRESIDING COMMISSIONER BIGGERS:  You do not.

15     Okay.  In accordance with Title 15, Section

16  2029.1:

17             "Visitors and observers may attend

18             individual case hearings if prior

19             permission has been obtained from any

20             commissioner, deputy commissioner, person

21             assigned to the hearing panel, the

22             chairman, or the executive officer subject

23             to the authority of the hearing panel to

24             exclude visitors and observers upon the

25             request of the prisoner or parolee, or

26             upon the panel's own motion attendance may

27             be permitted."

5

1    So if you don't have objections, please bring Mr.

2    Gunning back in.   Okay.   Let the record reflect that

3    there are two correctional officers present for

4    security purposes only who will not be participating

5    in the hearing.   In front of you there, Mr. Liebb,

6    there's an ADA statement.   Would you please read that

7    out loud for us?

8         INMATE LIEBB:   Yes, sir.

9         "The Americans with Disabilities Act, ADA,

10        is a law to help people with disabilities.

11        Disabilities are problems that make it

12        harder for some people to see, hear,

13        breathe, talk, walk, learn, think, work,

14        or take care of themselves than it is for

15        others.   Nobody can be kept out of public

16        places or activities because of a

17        disability.   If you have a disability, you

18        have the right to ask for help to get

19        ready for your BPT hearing, get to the

20        hearing, talk, read forms and papers, and

21        understand the hearing process.   BPT will

22        look at what you ask for to make sure that

23        you have a disability that is covered by

24        the ADA and that you have asked for the

25        right kind of help.   If you do not get

26        help, or if you don't think you got the

27        kind of help you need, ask for a BPT 1074

6

1          Grievance Form.  You can also get help to

2          fill it out."

3     PRESIDING COMMISSIONER BIGGERS:  Okay.  Sir, I

4  understand that, in looking at the records here, that you

5  signed a 1073 on 6/13/06, indicating that you did not

6  have any disabilities.

7     INMATE LIEBB:  Yes, sir.

8     PRESIDING COMMISSIONER BIGGERS:  Okay.  Is that

9  information still correct?

10    INMATE LIEBB:  Yes, it is.

11    PRESIDING COMMISSIONER BIGGERS:  Okay.  Did

12 you -- you wear glasses at all?

13    INMATE LIEBB:  Just sometimes to read --

14    PRESIDING COMMISSIONER BIGGERS:  To read.

15    INMATE LIEBB:  -- when I'm typing.

16    PRESIDING COMMISSIONER BIGGERS:  Okay.  Did you

17 have glasses on when you went through your C-File?

18    INMATE LIEBB:  Yes.

19    PRESIDING COMMISSIONER BIGGERS:  Okay.  You don't

20 have them here with you today.  Is there a reason why you

21 don't have them with you?

22    INMATE LIEBB:  Oh, no, what -- I -- I don't need

23 them for big print --

24    PRESIDING COMMISSIONER BIGGERS:  Okay.

25    INMATE LIEBB:  -- you know, just small print.

26    PRESIDING COMMISSIONER BIGGERS:  So you don't

27 need a magnifying glass or anything --

7

1          INMATE LIEBB:  No.

2          PRESIDING COMMISSIONER BIGGERS:  -- of that

3   nature?  Do you have any hearing impairments?

4          INMATE LIEBB:  No, sir.

5          PRESIDING COMMISSIONER BIGGERS:  Okay.  Have you

6   ever been included in a Triple CMS or EOP program?

7          INMATE LIEBB:  No, I haven't.

8          PRESIDING COMMISSIONER BIGGERS:  Do you know what

9   those are?

10         INMATE LIEBB:  Yes.

11         PRESIDING COMMISSIONER BIGGERS:  Okay.  What are

12  they?

13         INMATE LIEBB:  They're for people with

14  psychiatric disorders and get medication.

15         PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you

16  suffer from any disability that would prevent you from

17  participating in today's hearing?

18         INMATE LIEBB:  No, I don't.

19         PRESIDING COMMISSIONER BIGGERS:  Counsel, do you

20  feel that your client's ADA rights have been met?

21         ATTORNEY BROSNAHAN:  I do.

22         PRESIDING COMMISSIONER BIGGERS:  Okay.  Thank

23  you.  This hearing is being conducted pursuant to Penal

24  Code Sections 3041 and 3042 and the rules and regulations

25  of the Board of Prison Terms governing parole

26  consideration hearings for life inmates.  The purpose of

27  today's hearing is to once again consider the number and

8

1   the nature of the crime you were committed for, your

2   prior criminal and social history, and your behavior and

3   programming since your commitment.  We've had the

4   opportunity to review your Central File and your prior

5   transcript, and you will be given the opportunity to

6   correct or clarify the record.  We will reach a decision

7   today and inform you whether or not we find you suitable

8   for parole and the reason for our decision.  If you are

9   found suitable for parole, the length of your confinement

10  will be explained to you.  Nothing that happens here

11  today will change the finding of the court.  This panel

12  is not here to retry your case; this panel is here for

13  the sole purpose of determining your suitability for --

14  for parole.  Do you understand this?

15          INMATE LIEBB:  Yes, sir.

16          PRESIDING COMMISSIONER BIGGERS:  Okay.  This

17  hearing will be conducted in two phases.  I will discuss

18  with you the crime for which you were committed, your

19  prior criminal and social history.  The deputy

20  commissioner will then discuss your post-conviction

21  factors, to include also your parole plans and your

22  letters of support or opposition that may be in the

23  files.  Once that is concluded, both commissioners, the

24  district attorney and your attorney will be given the

25  opportunity to ask you questions.  Questions from the

26  district attorney shall be asked through the Chair, and

27  you will direct your answers to the panel.  Next, the

1    district attorney, then your attorney, and then you will

2    be given the opportunity to make a final statement

3    regarding your parole suitability.  Your statement should

4    address why you feel you are suitable for parole.  Do you

5    understand that?

6              INMATE LIEBB:  Yes.

7              PRESIDING COMMISSIONER BIGGERS:  And at -- and

8    then we'll have -- the victim's next-of-kin will then

9    have the opportunity to give a statement regarding the

10   crime and your responsibility.  The panel will then

11   recess, clear the room and deliberate.  Once the

12   deliberations are complete, the panel will resume the

13   hearing and announce its decision.  Now the California

14   Code of Regulations states that regardless of time

15   served, a life inmate shall be found unsuitable for and

16   denied parole if in the judgment of the panel the inmate

17   would pose an unreasonable risk of -- of danger to

18   society if released from prison.  You have certain

19   rights.  Those rights include a right to a timely notice

20   of this hearing, the right to review your Central File,

21   which you indicated to me that you had, and the right to

22   present relevant documents.  So again, I'm going to ask

23   your attorney if he feels that your rights have been met?

24             ATTORNEY BROSNAHAN:  We do.  There are some --

25   there is a habeas piece of litigation pending, and all

26   that.  We're maintaining whatever is in that case.  But

27   we're ready to proceed here --

10

1          PRESIDING COMMISSIONER BIGGERS:  Okay.

2          ATTORNEY BROSNAHAN:  -- and we have no objection

3    to this proceeding.

4          PRESIDING COMMISSIONER BIGGERS:  Okay.  Then I'm

5    assuming that you're saying that your client's rights

6    have been met as far as this -- these proceedings?

7          ATTORNEY BROSNAHAN:  That is correct.

8          PRESIDING COMMISSIONER BIGGERS:  Okay.  Thank

9    you.  You have an additional right to be heard by an

10   impartial panel.  Do you have any objection to the panel

11   members?

12         INMATE LIEBB:  No, I don't.

13         PRESIDING COMMISSIONER BIGGERS:  Okay.  Thank

14   you.  I'm going to ask the deputy commissioner if any

15   confidential material will be used?

16         DEPUTY COMMISSIONER BLONIEN:  There is no

17   confidential information that will be used.

18         PRESIDING COMMISSIONER BIGGERS:  All right.  I'm

19   going to pass to your attorney and also to the district

20   attorney a copy of what I've marked "Exhibit One" to

21   ensure that we're all operating off the same set of

22   documents.

23         ATTORNEY BROSNAHAN:  Do you have the psychiatric

24   report?  It's -- it's not checked.  That's the only

25   reason I asked.

26         DEPUTY COMMISSIONER BLONIEN:  Yes.

27         ATTORNEY BROSNAHAN:  Yeah.

11

1            INMATE LIEBB:  Yes, we do.

2            ATTORNEY BROSNAHAN:  Okay.  All right.

3            PRESIDING COMMISSIONER BIGGERS:  Do you have

4    those documents?

5            ATTORNEY BROSNAHAN:  We do, and -- and we also

6    have the psychiatric report.

7            PRESIDING COMMISSIONER BIGGERS:  Okay.

8            ATTORNEY BROSNAHAN:  Thank you.

9            DEPUTY COMMISSIONER BLONIEN:  Do you have the

10   current psych report?

11           DEPUTY DISTRICT ATTORNEY DELAGARZA:  I received

12   it this morning.  I will indicate that I have reviewed

13   the form.  I have received all the documents.  I received

14   the -- the most current psych report this morning.

15           PRESIDING COMMISSIONER BIGGERS:  All right.

16   Thank you.  Thanks to both of you.  Are there any

17   additional documents to be submitted other than the ones

18   that you gave us earlier?

19           ATTORNEY BROSNAHAN:  I don't think we have

20   anything else.  Thank you --

21           PRESIDING COMMISSIONER BIGGERS:  Okay.

22           ATTORNEY BROSNAHAN:  -- Commissioner.

23           PRESIDING COMMISSIONER BIGGERS:  Are there any

24   preliminary objections?

25           ATTORNEY BROSNAHAN:  No, sir.

26           PRESIDING COMMISSIONER BIGGERS:  Okay.  Will the

27   inmate be speaking to the panel?

12

1          **ATTORNEY BROSNAHAN:**  Yes.

2          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Would you

3   please -- at this point, Mr. Liebb, would you please

4   raise your right hand.  Do you solemnly swear or affirm

5   that the testimony you give at this hearing will be the

6   truth and nothing but the truth?

7          **INMATE LIEBB:**  I do.

8          **PRESIDING COMMISSIONER BIGGERS:**  All right.

9   Thank you very much.  I'm going to read into the record a

10  summary of the crime from the appellate decision, and I'm

11  going to start on page 17.

12               "On the evening of July the 11th, 1981,

13               Jody Popkin, P-O-P-K-I-N, saw Michael

14               Diller, D-I-L-L-E-R.  She had known him

15               for about three years and had dated him,

16               but she had seen him three months before

17               July the 11th.  On that evening he picked

18               her up at her residence and took her to

19               his apartment.  Arthur Diller and Joe Gold

20               and two other friends were there.  He took

21               her home at one a.m., and they made plans

22               that -- that Michael would pick her up at

23               her apartment at two p.m. the next day.

24               She said she would come downstairs because

25               there would be no parking spaces.  That

26               afternoon she came downstairs and entered

27               the passenger door of Michael's car just

13

1    after Michael drove up." It says
2    "appellant," but I will substitution the
3    word "inmate." "Grabbed the door and
4    pulled it open. Before she could close
5    it, he jumped on her lap and hit her and -
6    - and Michael. Michael looked frightened
7    and repeatedly asked, 'Stephen, what are
8    you doing?' The inmate had the tinted
9    face shield of the motorcycle helmet
10   covering his face. Michael accelerated
11   the car, and the inmate grabbed the wheel,
12   causing the car to crash into a
13   condominium building. After the crash
14   Michael jumped out of the driver's side
15   and ran towards the park. The inmate got
16   out and ran after him. Miss Popkin got
17   out of the car and was carried across the
18   street where she waited for an ambulance.
19   She saw the inmate walk calmly back as if
20   nothing had happened and ride away on his
21   motorcycle. When Michael and the inmate
22   got out of the car, the inmate chased
23   Michael towards the park. Michael was
24   yelling, 'I didn't do it,' and, 'He's
25   going to kill me. Somebody help me.' One
26   witness called the police. Michael ran
27   into the park office and dove through a

14

1    half-open window.  The inmate had a helmet
2    on and laid on the windowsill facing
3    Michael.  The inmate had a knife, and
4    Michael grabbed it and -- and cut his
5    hand.  Michael was pleading with the
6    inmate, saying that he had not done
7    anything, but the inmate was quiet.  The
8    inmate pulled the knife away from Michael
9    and stabbed him through the chest, then
10   ran."
11   And I think that summarized what I wanted to get into
12   the record.  Is that pretty much what transpired, Mr.
13   Liebb?
14        INMATE LIEBB:  Yes, it's pretty much what
15   transpired.  I don't remember, you know, some specific
16   details.  The wound to his hand happened after I
17   stabbed him in the chest.
18        PRESIDING COMMISSIONER BIGGERS:  Okay.
19        INMATE LIEBB:  Number one.  The -- the second
20   thing that is in that appellate court summary that
21   didn't occur is, I leapt into the car, but I didn't
22   strike either the female passenger or Michael Diller.
23        PRESIDING COMMISSIONER BIGGERS:  Okay.  Well,
24   until such time as that changes, you realize that I'm
25   going to have to go on what the appellate --
26        INMATE LIEBB:  Yes, sir.
27        PRESIDING COMMISSIONER BIGGERS:  -- decision

15

1  has said.

2          INMATE LIEBB:  Yes, sir.

3          PRESIDING COMMISSIONER BIGGERS:  In reading

4  the files also, I also understood that you knew the

5  victim --

6          INMATE LIEBB:  Yes.

7          PRESIDING COMMISSIONER BIGGERS:  -- is that

8  correct?

9          INMATE LIEBB:  We were friends.

10          PRESIDING COMMISSIONER BIGGERS:  You were

11  friends.

12          INMATE LIEBB:  For several years.

13          PRESIDING COMMISSIONER BIGGERS:  Okay.

14          INMATE LIEBB:  We both went to UCLA together.

15  I think from about 1979 up until the time of the

16  murder I had known him.

17          PRESIDING COMMISSIONER BIGGERS:  And this

18  apparently -- let's get a little background for this,

19  and again, I'm going on the appellate decision.  There

20  appeared to have been a -- this all -- all of these

21  actions stemmed from the fact that you were being

22  asked to move out of the -- the apartment that you had

23  been living there rent free?

24          INMATE LIEBB:  Yes.

25          PRESIDING COMMISSIONER BIGGERS:  Okay.  And

26  you felt that for some reason that you didn't want to

27  move?

16

1      **INMATE LIEBB:**  No, I -- I had already moved.

2      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Then

3  why don't you tell me why it escalated to something

4  where a man lost his life.

5      **INMATE LIEBB:**  Okay.  Sure.  I had known

6  Michael Diller ever since I came to California to

7  attend law school and he was attending UCLA as well,

8  and I met him and his family, and I met his sister,

9  Brigette, and we had gone out for a year.  I also had

10 another friend who was attending UCLA named Joe

11 Harriton, and at some point we -- I was living in this

12 apartment building that I managed and so was my other

13 friend, Joe Harriton's girlfriend, so we were all in

14 this apartment building near Beverly Hill, you know,

15 often, at different times.  At one period of time my

16 friend, Joe Harriton, and his girlfriend, Diane, and I

17 had come back, and we were in the apartment building,

18 and Arthur Diller, who also used an apartment in that

19 building, was present, and he, without provocation,

20 insulted Joe Harriton and his girlfriend and that

21 caused some ill feelings between them, and I became

22 caught in the middle.  Things escalated, too, between

23 a friend of Arthur Diller's named Joe Gold.

24     **PRESIDING COMMISSIONER BIGGERS:**  No, no, I

25 don't want to get to that point yet.  I want to know

26 how you got involved with being able to live in the

27 apartment from the very beginning --

17

1          INMATE LIEBB:  Oh, from the very beginning.

2          PRESIDING COMMISSIONER BIGGERS:  The very

3    beginning.

4          INMATE LIEBB:  Okay.  I was --

5          PRESIDING COMMISSIONER BIGGERS:  And we'll get

6    to the other later.

7          INMATE LIEBB:  Sure.  Okay.  I -- when I came

8    to California, I was living near UCLA in a -- in an

9    apartment that I rented.  After I became friends with

10   Mike, he mentioned that his father had a -- a building

11   on Doheny not too -- not too far from UCLA that needed

12   someone to manage it and collect rent receipts.  So

13   that's how I moved from where I was living into that

14   apartment.

15         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

16   then as -- and you lived there for how long?

17         INMATE LIEBB:  I'd say approximately a year.

18         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

19   then there was a discussion about the fact that you

20   had lived there for rent-free.  Then they decided that

21   they wanted to start collecting rent from --

22         INMATE LIEBB:  Yes, sir.

23         PRESIDING COMMISSIONER BIGGERS:  -- you for

24   that place, and at somewhere in the neighborhood of

25   180 bucks or something like that?

26         INMATE LIEBB:  I think it was less than that.

27         PRESIDING COMMISSIONER BIGGERS:  Less than

18

1  that. And from reading this, and again, my facts may

2  be wrong, but you indicated -- and I read somewhere in

3  your file where you indicated that the amount that

4  they were going to not charge you was not enough

5  because you feel you did more work and it was worth

6  more than that to you?

7          INMATE LIEBB:  Well, yeah, I guess that

8  summarizes it, plus I was -- already had graduated

9  school and I was looking to move to a better place

10  anyway.

11          PRESIDING COMMISSIONER BIGGERS:  But anyway,

12  but that's --

13          INMATE LIEBB:  Yeah.

14          PRESIDING COMMISSIONER BIGGERS:  So that

15  could've started the -- that's when the disagreement

16  sort of started, from the fact that you felt that you

17  should get more?

18          INMATE LIEBB:  That was one -- that wasn't

19  really what started the --

20          PRESIDING COMMISSIONER BIGGERS:  That's --

21          INMATE LIEBB:  -- the --

22          PRESIDING COMMISSIONER BIGGERS:  Well --

23          INMATE LIEBB:  -- the conflict.  But that --

24          PRESIDING COMMISSIONER BIGGERS:  Okay.

25          INMATE LIEBB:  -- that -- that wasn't -- it

26  was an issue -- that was an issue that was resolved,

27  because eventually I spoke to Michael Diller, and he

19

1   spoke to his father, and I met with his father, and he

2   said just continue -- I met with his father, I

3   indicated that I was thinking of moving anyway.  He

4   said, "Look, go ahead, stay on these terms that you're

5   there now and do what's best for you."  So he didn't

6   charge me rent.

7           PRESIDING COMMISSIONER BIGGERS:  Well, what

8   about the situation where you subleased the apartment?

9           INMATE LIEBB:  Okay.  That -- that's a -- a

10  separate thing.  I had collected rent deposits --

11          PRESIDING COMMISSIONER BIGGERS:  For

12  (inaudible).

13          INMATE LIEBB:  -- for -- for a unit that I

14  didn't turn in.

15          PRESIDING COMMISSIONER BIGGERS:  It was not

16  the same unit you were living in?

17          INMATE LIEBB:  No, it was a different unit.

18          PRESIDING COMMISSIONER BIGGERS:  Okay.  Tell

19  me how the situation escalated to where you went down

20  the office and attacked Mr. Dillard.

21          INMATE LIEBB:  Well, I -- I had worked in this

22  office in the hospital building that Mr. Diller own --

23  owned and I had met Joe Gold, and he confronted me.

24          PRESIDING COMMISSIONER BIGGERS:  And what did

25  he confront you for?

26          INMATE LIEBB:  He confronted me about wanting

27  to get the job managing this apartment.

20

1          PRESIDING COMMISSIONER BIGGERS:  I don't see

2     where he confronted you in the appellate decision.

3          INMATE LIEBB:  Well, could you tell me what

4     the appellate decision says?

5          PRESIDING COMMISSIONER BIGGERS:  Did you get a

6     copy?  You have not received --

7          INMATE LIEBB:  I -- I --

8          PRESIDING COMMISSIONER BIGGERS:  -- a copy --

9          INMATE LIEBB:  -- no, I mean --

10         PRESIDING COMMISSIONER BIGGERS:  -- of it?

11         INMATE LIEBB:  -- I haven't read it since, you

12    know, it came out over 20 years ago.

13         PRESIDING COMMISSIONER BIGGERS:  Who was Mr.

14    Altschuler?

15         INMATE LIEBB:  He was an --

16         PRESIDING COMMISSIONER BIGGERS:  A-L-T-S-C-H-

17    U-L-E-R.

18         INMATE LIEBB:  He was an employee of Mr.

19    Diller's at the hospital.

20         PRESIDING COMMISSIONER BIGGERS:  I'll get to

21    that in just a minute.  But from what -- from what

22    I've been able to read from the appellate decision, it

23    appears that -- that -- and I'll start on page nine --

24    that you informed Mr. Altschuler that it took more

25    time to manage the building than the proposed rent

26    reduction was worth, and that his time was worth a

27    hundred dollars an hour, that he had given -- he had

1  not been given 30 days notice of this change, and that

2  he will continue to act as manager in exchange for

3  free rent until March 31st, 1981, then he would

4  voluntarily vacate the apartment, which is different

5  from what you said that Mr. -- the owner of the

6  apartment --

7       INMATE LIEBB:  Right.

8       PRESIDING COMMISSIONER BIGGERS:  -- had

9  indicated.

10      INMATE LIEBB:  Right.  Mr. Diller told me to

11 just remain there, and Mr. Altschuler told me

12 something else.

13      PRESIDING COMMISSIONER BIGGERS:  Okay.  "And

14 then, in fact, appellate did not move out on that day.

15 Shortly before March the 31st, he spoke with Joseph

16 Martin Gold and said that he did not intend to move

17 out of -- of 303," which is where you were staying.

18 And then after you did vacate his apartment, at the

19 end of April 1931 [sic], Mr. Altschuler found that the

20 apartment had been badly damaged, with chairs turned

21 over, windows broken, stains on the floor, and the

22 sinks and fix -- fixtures were filthy.  Okay.  They

23 had really initially selected somebody else to be the

24 manager, but then Joe Gold was finally selected.  Is

25 that correct?

26      INMATE LIEBB:  I believe so, yes.

27      PRESIDING COMMISSIONER BIGGERS:  Okay.  And

1    there was a Joyce relative that was also in the

2    running for the -- and had been selected.  And in

3    February 1981 Sara Hartman rented apartment 103 on

4    behalf of Dr. Eugene Landy, L-A-N-D-Y.  Says she

5    signed a receipt for deposit of money, and made it out

6    to Steven Claymore, who was told that he was a

7    professional boxer.  Was that you?

8         INMATE LIEBB:  Well, I took the money from --

9    the rent receipt for that apartment from Mr. Landy.

10        PRESIDING COMMISSIONER BIGGERS:  Okay.  Did

11   you -- did you at that point indicate to her that you

12   were Steven Claymore?

13        INMATE LIEBB:  You know, I honestly don't

14   recall.

15        PRESIDING COMMISSIONER BIGGERS:  Okay.  March

16   -- May the 4th, 1981, after he had moved out, the

17   inmate called Dr. Landy and said that to close the

18   deal for longer rental he would take 100 dollars a

19   month -- per month for rent; is that correct?

20        INMATE LIEBB:  Yeah, that's substantially true

21   -- that -- for that apartment I collected the rent.

22        PRESIDING COMMISSIONER BIGGERS:  On May the 11

23   he called and left a message about the same rental and

24   said that soon he would not be the manager and -- and

25   he wanted Dr. Landy to get a good deal.  When Dr.

26   Landy paid the inmate for six months' rent in advance,

27   Ms. Hartman noticed that the inmate had signed the

23

1   receipt with different names.  Dr. Landy had the
2   inmate make out new receipts, which he signed as
3   Steven Liebb.  And you said Stephen [pronouncing it
4   "Steffen"].  Which were you -- is it Stephen or
5   Steven?

6           INMATE LIEBB:  Stephen.

7           PRESIDING COMMISSIONER BIGGERS:  Stephen.
8   Okay.  After February 1981, the inmate's accounts
9   showed apartment 103, which he had rented to Dr.
10  Landy, to be vacant.  Okay.  And then I guess the Gold
11  incident sort of bothers us, bothers me, because in --
12  on page 11 of the appellate decision it indicates that
13  you went down to Mr. Altschuler's office and -- and
14  they asked you to leave, and Mr. Gold was there, and
15  as you were leaving, you spoke angrily to Mr. Gold,
16  saying, "Do you want it next?"  Do you remember that
17  incident?

18          INMATE LIEBB:  I remember the incident, but
19  the way it's described there isn't the way that it
20  happened with Mr. Gold.

21          PRESIDING COMMISSIONER BIGGERS:  Well --

22          INMATE LIEBB:  Mr. Gold was the one that
23  initiated contact with me.  I worked for a time in
24  that -- the office where Mr. Altschuler was located
25  was a -- a hospital building, and I had worked there,
26  and that's where Mr. Diller worked, so I was there
27  many times, turning in rent receipts, I was there

24

1    often with Mike.

2            PRESIDING COMMISSIONER BIGGERS:  Were you

3    asked to leave by Mr. Altschuler -- and there was

4    another guy by the name of Mr. -- and I'll spell the

5    name for the record, K-A-M-O-R-N-I-N-K, Kamornink, an

6    attorney who shared the office, asked you to leave,

7    but you continued to derail [sic] and insult

8    Altschuler, and refused to leave.  "He left after a

9    few minutes, but as was he was leaving, he spoke

10   angrily to Joe Gold, saying, 'Do you want it next?'"

11   After Mr. Gold had remained at his desk for about five

12   minutes, he went to the elevator in the hall to go to

13   another floor for business.  As he was standing there,

14   you came out of the office loudly and started

15   threatening and swinging at him.  Is that correct?

16           INMATE LIEBB:  What's correct -- I didn't have

17   any altercation or argument with Mr. Altschuler.

18   What's correct is that I had an altercation with Joe

19   Gold.

20           PRESIDING COMMISSIONER BIGGERS:  Okay.  Did

21   you - were -- well, why were you in the office, you

22   know, insulting Mr. Altschuler?

23           INMATE LIEBB:  I -- I -- I deny insulting him.

24   My whole confrontation was with Joe Gold.

25           PRESIDING COMMISSIONER BIGGERS:  Okay.  Okay.

26   Did you hit Mr. Gold on the side of the head?

27           INMATE LIEBB:  Yes.

1          PRESIDING COMMISSIONER BIGGERS:  Okay.  Okay.

2     And there was a Dr. Jose Nessin, N-E-S-S-I-N, that

3     witnessed that you put hand around Mr. Gold's neck and

4     pushed him towards the door at the waiting room with

5     great force.  Is that correct?

6          PRESIDING COMMISSIONER BIGGERS:  Okay.  The

7     time -- and then it has it a little bit further down

8     in this appellate decision also: On May the 11th, at

9     about three or four p.m., the inmate had telephoned

10    Dana Turner and told her that someone was fooling with

11    the locks of Dr. Landy's apartment and that she

12    shouldn't go check it -- she -- she -- she should go

13    and check it out; drove to 303 South Doheny and found

14    that the keys no longer worked at the apartment.  I

15    guess they had changed the key to the locks.  Is that

16    correct?

17         INMATE LIEBB:  I -- I imagine so.  I mean, I

18    wasn't part of that --

19         PRESIDING COMMISSIONER BIGGERS:  Okay.

20         INMATE LIEBB:  -- process.

21         PRESIDING COMMISSIONER BIGGERS:  At about

22    seven p.m., on May the 11, Joe Gold left 303 South

23    Doheny with Arthur and Michael Diller.  Arthur and

24    Michael left a few seconds later.  It was still light

25    at the time.  As Gold walked out the front door, he

26    saw the inmate charging up the front stairs out of the

27    bushes next to the front door, wearing a white shirt,

1  a suit vest and slacks, and carrying a baseball bat.

2  And it says here you hit Mr. Gold 15 times over the

3  head with the bat.  Is that correct?

4          INMATE LIEBB:  No, that's not correct.

5          PRESIDING COMMISSIONER BIGGERS:  Okay.

6          INMATE LIEBB:  I had a baseball bat and I

7  swung at him, but I -- I might've struck him one time.

8          PRESIDING COMMISSIONER BIGGERS:  Okay.  It

9  says here you hit him 15 times over the head with the

10  bat.  You also had hit various parts of Gold's body

11  very hard.  Mr. Gold could not run away because of the

12  eight- to ten-foot-tall bushes beneath the front tree.

13  Were you in the bushes?

14          INMATE LIEBB:  No.  I came out of a car with -

15  - that was across from the apartment, and he was in

16  front of the apartment.  I wasn't in the bushes.

17          PRESIDING COMMISSIONER BIGGERS:  Okay.  Well,

18  it says here Joe Gold went to Los Angeles New Hospital

19  after the attack, where a soft cast was put on his

20  left hand and arm.  He had five bumps on his head and

21  was still suffering headaches as a result.  Filed a

22  complaint, pressed charges, and the case was still

23  pending when Mr. Diller -- Diller was murdered.

24  During the attack on Joe Gold, Mr. Arthur Diller, who

25  is here today, tried to approach the inmate but was

26  unable to stop the attack, and it also said you hit

27  Arthur Diller on the thigh and several times on the

27

1    shoulder with the baseball bat.  Is that correct?

2            INMATE LIEBB:  No, that's not correct.

3            PRESIDING COMMISSIONER BIGGERS:  Okay.  It

4    says here Mr. Arthur Diller ran away and you begin

5    striking Mr. Gold again.  You ran back again -- he ran

6    back again to help Mr. Gold but you chased him away.

7    At that point Mr. Gold was able to get away, and you

8    chased him for about 30 yards, then turned and left

9    the scene.  And I see here also that there was also an

10   altercation with Mr. Arthur Diller.  Is that correct?

11           INMATE LIEBB:  Yes.

12           PRESIDING COMMISSIONER BIGGERS:  Okay.  You

13   want to tell me about that one?

14           INMATE LIEBB:  Could you -- is that -- could

15   you give me the date of that?

16           PRESIDING COMMISSIONER BIGGERS:  Around about

17   July the 9th.

18           INMATE LIEBB:  Yes, sir.

19           PRESIDING COMMISSIONER BIGGERS:  Okay.

20           INMATE LIEBB:  I was at my apartment, the one

21   I had moved to, and I had come out, and I had a -- a

22   dog that I was walking.  Arthur Diller came out of a

23   Porsche that was driven by a girl, he was dressed in

24   black, and he approached me with a claw hammer in his

25   hand and began trying to strike me.  I fell to the

26   ground.  There was a -- a Sparkletts truck driver

27   there, and he yelled something, and then Arthur Diller

28

1    started running. I ran after him, and I tackled him,

2    and I took the hammer from him, and then I -- I struck

3    him with my fists --

4            PRESIDING COMMISSIONER BIGGERS: Okay.

5            INMATE LIEBB: -- until a -- a traffic officer

6    came, and he took off, and I returned to my apartment.

7            PRESIDING COMMISSIONER BIGGERS: Okay. Well,

8    again, I'm just going on what I see in the record

9    here. It indicated that you were in fact walking your

10   dog, you were called by -- Mr. Arthur Diller called

11   you, and you came towards him with clenched -- with

12   clenched fists. He hit you a coup -- two or three

13   times, and you hit him several times. At this time,

14   supposedly the hammer was still in his pocket, and you

15   fell to the ground. Then Arthur tried to flee, but

16   you came after him. He pulled out the hammer, and you

17   stopped, then two steps back and fell again. When

18   Arthur tried to get into the Porsche, running --

19   running away from where -- where you were -- were

20   located, he reached the passenger door and you were

21   still running at him from about five feet away.

22   Arthur then continued to run, but as he did not have

23   time to get in the car, you caught up with Arthur and

24   you started hitting with a piece of pipe. Is that

25   correct?

26           INMATE LIEBB: No, sir. What happened was

27   this -- he came to where I was living --

1   PRESIDING COMMISSIONER BIGGERS:  I understand

2   that.

3   INMATE LIEBB:  -- and he surprised me.  He

4   began running through a -- an alleyway, and I just

5   pursued him.

6   PRESIDING COMMISSIONER BIGGERS:  Did you all

7   have -- didn't you all fight before then?

8   INMATE LIEBB:  I tackled him.  I tackled him.

9   He took a pipe out of his pocket, and I took that pipe

10  from him.  I didn't have a pipe on me.

11  PRESIDING COMMISSIONER BIGGERS:  I thought it

12  was a hammer.

13  INMATE LIEBB:  He had a hammer and a pipe.

14  PRESIDING COMMISSIONER BIGGERS:  Well, you

15  mentioned this Sparklers water truck driver, and he

16  said that he saw Arthur Diller and Ms. Fox standing

17  near a yellow Porsche.  It was about nine a.m. on July

18  the 10th, 1981.  Didn't see how the fight started, but

19  he looked back and saw two men wrestling on the ground

20  for a hammer.  Mr. Rodriquez ran over, and both men

21  saw him and ran away.  Arthur Diller got the hammer

22  and was waving it at the inmate.  Arthur ran, followed

23  by the appellant, which was the inmate.  Ten minutes

24  later the inmate returned and reported his version of

25  the incident to a traffic officer who had -- had seen

26  the last part of the fight, and Arthur told the

27  officer the -- that you were lying.  Okay.  And the

30

1    reason I'm going through all of this is because it

2    appeared that this thing just kept escalating.

3        INMATE LIEBB:  Yes, sir.

4        PRESIDING COMMISSIONER BIGGERS:  And -- and

5    all of this started over something as trivial as a --

6    they asked you to move out, you didn't want to move,

7    and then it escalated to a man losing his life.

8        INMATE LIEBB:  Yes, sir, it -- it did

9    unfortunately continue to escalate.

10        ATTORNEY BROSNAHAN:  There -- there's a little

11    bit more to that, but I -- I don't want to interrupt

12    if it's not the right procedure.

13        PRESIDING COMMISSIONER BIGGERS:  You have the

14    right to do that, sir.  Please.

15        ATTORNEY BROSNAHAN:  The only other things

16    that might be inquired into is whether there was name-

17    calling from the Diller family --

18        PRESIDING COMMISSIONER BIGGERS:  Okay.

19        ATTORNEY BROSNAHAN:  -- and what those names

20    were --

21        PRESIDING COMMISSIONER BIGGERS:  Yeah.  I'm

22    going to get to that.

23        ATTORNEY BROSNAHAN:  -- and so -- but there --

24    there's other stuff.  Okay.  Sorry.

25        PRESIDING COMMISSIONER BIGGERS:  All right.

26    My point is, all of this started escalating.  Now

27    there was some talk also that there were some phone

31

1  calls between your family and the Diller family; is

2  that correct?

3       INMATE LIEBB:  Yes, sir.

4       PRESIDING COMMISSIONER BIGGERS:  Okay.  Who

5  instigated those phone calls?

6       INMATE LIEBB:  I believe that the Diller --

7  Mrs. Diller initiated those phone calls to my parents.

8       PRESIDING COMMISSIONER BIGGERS:  Okay.  And

9  for what purpose do you believe that she was doing

10  that?

11       INMATE LIEBB:  I -- well, I'd have to just,

12  you know, speculate, but I -- what Mrs. Diller told me

13  -- well, my parents told me it was that Mrs. Diller

14  called, she was very upset, and they used the term she

15  was ranting and raving, and said you owed -- you owed

16  money, and they asked me if I needed any money or

17  needed any help.

18       PRESIDING COMMISSIONER BIGGERS:  At no time

19  did you call Miss Diller and ask her not to call your

20  parents?

21       INMATE LIEBB:  Yes.  Yes.  After I received

22  that phone call, I called Mrs. Diller and I asked her

23  please not to upset my family, and she said that she's

24  going to let my family know what type of -- she used

25  the Yiddish term fagala -- what type of fagala I was

26  and that I -- I had hurt her Arthur, and she kept

27  repeating this.  I said, "Look, Mrs. Diller, I'll

32

1  return whatever money I owe, just please leave my

2  family alone."

3       ATTORNEY BROSNAHAN:  Maybe everybody knows.

4  What's a fagala?

5       PRESIDING COMMISSIONER BIGGERS:  Yeah.  Would

6  you please -- that's the term --

7       INMATE LIEBB:  Oh.

8       PRESIDING COMMISSIONER BIGGERS:  -- that

9  were --

10       INMATE LIEBB:  Oh.

11       PRESIDING COMMISSIONER BIGGERS:  -- using.

12       INMATE LIEBB:  Oh.

13       PRESIDING COMMISSIONER BIGGERS:  So please

14  explain --

15       ATTORNEY BROSNAHAN:  Yeah.

16       INMATE LIEBB:  Yeah.

17       PRESIDING COMMISSIONER BIGGERS:  -- for the

18  record.

19       ATTORNEY BROSNAHAN:  Right.

20       INMATE LIEBB:  It's a -- a -- a Yiddish

21  epithet meaning a -- a -- a faggot or homosexual, the

22  equivalent of calling someone those terms.

23       PRESIDING COMMISSIONER BIGGERS:  Okay.  Does

24  that satisfy your --

25       ATTORNEY BROSNAHAN:  Yes.  Thank you.

26       PRESIDING COMMISSIONER BIGGERS:  Okay.  Thank

27  you.  So you indicated that you did in fact call Miss

33

1    Diller --

2              INMATE LIEBB:  Yes, sir.

3              PRESIDING COMMISSIONER BIGGERS:  -- and asked

4    her.  Because the -- the -- the way I read it, it was

5    the fact that you called her.  It was not that you

6    were telling her -- it was as if to say that you

7    didn't want your family to know what -- what was

8    taking place.  Is that not a --

9              INMATE LIEBB:  No, my family had already --

10   are the ones who told me that she called and told them

11   this.

12             PRESIDING COMMISSIONER BIGGERS:  Okay.

13             INMATE LIEBB:  I -- I called and respond -- I

14   -- I called my family regularly.  They were in New

15   York.  And when I -- I -- when I called, they had

16   mentioned that she had called, and it was in response

17   to my family telling me this that I called Mrs.

18   Diller.

19             PRESIDING COMMISSIONER BIGGERS:  Okay.  Well,

20   again, like I say, I'm not here to retry your case.

21   I'm going to ask Miss Blonien if she has any -- Deputy

22   Commissioner Blonien if she had any --

23             DEPUTY COMMISSIONER BLONIEN:  Not at this

24   time --

25             PRESIDING COMMISSIONER BIGGERS:  -- things

26   that --

27             DEPUTY COMMISSIONER BLONIEN:  -- I don't.

34

1          PRESIDING COMMISSIONER BIGGERS:  Okay.  I'm

2    going to move into your --

3          DEPUTY COMMISSIONER BLONIEN:  I'm going to

4    turn the tape.

5          PRESIDING COMMISSIONER BIGGERS:  Thank you.

6          [Thereupon, the tape was turned over.]

7          DEPUTY COMMISSIONER BLONIEN:  Okay.  We're

8    back on side two of tape one.

9          PRESIDING COMMISSIONER BIGGERS:  Okay.  You

10   were 25 years old when you committed this crime; is

11   that correct?

12         INMATE LIEBB:  Yes, sir.

13         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

14   you were also -- I'm going to go over your -- your

15   social history.  You're the second of five children

16   born to Harry Liebb?

17         INMATE LIEBB:  Yes, sir.

18         PRESIDING COMMISSIONER BIGGERS:  He was a

19   stockbroker?

20         INMATE LIEBB:  Yes.

21         PRESIDING COMMISSIONER BIGGERS:  And what was

22   your mother's name?

23         INMATE LIEBB:  Anna Alabahari.

24         PRESIDING COMMISSIONER BIGGERS:  And Albahari

25   is spelled A-L-B-A-H-A-R-I?

26         INMATE LIEBB:  Yes.

27         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

35

1   she was a schoolteacher, New York City public schools?

2          INMATE LIEBB:  Yes.

3          PRESIDING COMMISSIONER BIGGERS:  Okay.  You

4   were born in New York and raised by your parents in a

5   united home.  And that was in Brooklyn, New York?

6          INMATE LIEBB:  Yes, sir.

7          PRESIDING COMMISSIONER BIGGERS:  You have an

8   older sister named Diana?

9          INMATE LIEBB:  Yes.

10         PRESIDING COMMISSIONER BIGGERS:  And she's

11  employed by the Governor of Israel?

12         INMATE LIEBB:  She was working for the state

13  of Israel.

14         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

15  you have a sister Rose?

16         INMATE LIEBB:  Yes.

17         PRESIDING COMMISSIONER BIGGERS:  And she's

18  still a social worker?

19         INMATE LIEBB:  Yes.  Well, she's a teacher

20  now.  Excuse me.

21         PRESIDING COMMISSIONER BIGGERS:  And you got a

22  twin brother named Allen?

23         INMATE LIEBB:  Yes.  No, he's not my twin.

24  He's a twin to my sister Rose.

25         PRESIDING COMMISSIONER BIGGERS:  To your

26  sister Rose.  Okay.  And he's a real estate broker as

27  well?

36

1          INMATE LIEBB:  A stockbroker.

2          PRESIDING COMMISSIONER BIGGERS:   A

3    stockbroker.  And then you have another sister named

4    Ester.

5          INMATE LIEBB:  Yes.

6          PRESIDING COMMISSIONER BIGGERS:  And there --

7    and she was in the Israeli army?

8          INMATE LIEBB:  She's a schoolteacher now.

9          PRESIDING COMMISSIONER BIGGERS:  Now.  But she

10   was in the Israeli army --

11         INMATE LIEBB:  Yeah.

12         PRESIDING COMMISSIONER BIGGERS:  -- about the

13   time of this offense.  And it showed that you did come

14   from -- you came to L.A., Los Angeles, from New York

15   in 1977, and entered law school at the University of

16   California, UCLA.  And where'd you graduate from high

17   school?

18         INMATE LIEBB:  Yeshiva Flatbush.

19         PRESIDING COMMISSIONER BIGGERS:  Okay.  And we

20   need to spell that for the record.  Y-E-S-H-I-V-A,

21   Flatbush, F-L-A-T-B-U-S-H, and that was in Brooklyn.

22         INMATE LIEBB:  Yes.

23         PRESIDING COMMISSIONER BIGGERS:  You -- it

24   shows here that you also completed your high school

25   credit in a period of three years.

26         INMATE LIEBB:  Yes.

27         PRESIDING COMMISSIONER BIGGERS:  So a very

37

1     smart individual.  Then you entered Syracuse
2     University, where you attended between 1973 and '76,
3     and received your Bachelor of Science degree in
4     Marketing in 1976?
5          INMATE LIEBB:  Yes.
6          PRESIDING COMMISSIONER BIGGERS:  So you only -
7     - it took you only three years to get your Bachelor's;
8     is that correct?
9          INMATE LIEBB:  Three and a half.
10         PRESIDING COMMISSIONER BIGGERS:  Three and a
11    half years.  And you graduated from Syracuse magna cum
12    laude.  Congratulations.
13         INMATE LIEBB:  Thank you.
14         PRESIDING COMMISSIONER BIGGERS:  And then
15    entered the University of California law school in
16    August of 1977.  Graduated from law school in May of
17    1980, and -- and this was from the University of
18    California Los Angeles.  There's also something in
19    your package concerning an incident that happened at -
20    - while you were at UCLA.
21         INMATE LIEBB:  Yes, sir.
22         PRESIDING COMMISSIONER BIGGERS:  And that had
23    to do with a library monitor.  Is that a -- do you
24    remember that?
25         INMATE LIEBB:  Yes, sir, I do.
26         PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you
27    want to tell me about that one?

1    INMATE LIEBB:  Well, yeah.  First of all, I

2    want to say that you went over some things peripheral

3    to my crime and you asked me some questions, but I

4    want to indicate that, you know, I'm sorry and ashamed

5    for all those --

6    PRESIDING COMMISSIONER BIGGERS:  We'll get to

7    that.

8    INMATE LIEBB:  -- wrong actions.

9    PRESIDING COMMISSIONER BIGGERS:  We'll get to

10   that.

11   INMATE LIEBB:  The -- this incident you're

12   referring to, I was studying with a -- a girlfriend in

13   the library, and this monitor came up and told her to

14   leave, and she was cooperating, but he came up upon

15   her and rushed her out and called her an asshole, and

16   I reacted by kneeing him in the groin.

17   PRESIDING COMMISSIONER BIGGERS:  Right.  It

18   says here that, "Approached a female companion several

19   -- several times regarding the limited assets notice

20   of that particular floor of the library.  At one point

21   the inmate told the library monitor to stop being an

22   asshole."  You told him to stop being an asshole.

23   "The -- the monitor attempted to explain to -- to the

24   inmate he was just doing his job, and at this point

25   the inmate stood up and kneed the library monitor in

26   the groin," which is a little different from what you

27   just said.  You indicated that he called her an

39

1    asshole.

2        INMATE LIEBB:  Well, he -- he did -- he did,

3    and I called him one too.

4        PRESIDING COMMISSIONER BIGGERS:  Okay.  Okay.

5    It shows here that your last employment as an attorney

6    from October of 1980 to the date of your arrest was at

7    the law office of Kelly Bixby, B-I-X-B-Y, in Century

8    City.

9        INMATE LIEBB:  Yes.

10        PRESIDING COMMISSIONER BIGGERS:  Okay.  And

11    you also worked for Stanley Diller as a clerk to the

12    in-house counsel at Los Angeles New Hospital; is that

13    correct?

14        INMATE LIEBB:  Yes, sir.  That was prior.

15        PRESIDING COMMISSIONER BIGGERS:  Prior.  Did I

16    leave out anything on your social that you want to add

17    to the record?

18        INMATE LIEBB:  Nothing significant, sir.

19    Thank you.

20        PRESIDING COMMISSIONER BIGGERS:  Okay.  And I

21    see here that you've had -- the only priors that you

22    had was -- was -- one was pending when this -- when

23    this took place; is that not correct?

24        INMATE LIEBB:  I was --

25        PRESIDING COMMISSIONER BIGGERS:  Do you have

26    any -- well, do you have any -- you had one pending

27    and one was withdrawn; is that -- that (inaudible)?

40

1        INMATE LIEBB:  I was never arrested before

2    this, so I honestly don't know that I had anything

3    pending.

4        PRESIDING COMMISSIONER BIGGERS:  Well, wasn't

5    something pending in the attack of Mr. Gold?

6        INMATE LIEBB:  I know he with -- he -- we went

7    -- we went to a hearing, and nothing was filed.  We

8    went to a -- a hearing on it, DA investigative

9    hearing, and nothing was ever filed --

10        PRESIDING COMMISSIONER BIGGERS:  Well --

11        INMATE LIEBB:  -- until the time of the --

12    you're talking about the baseball bat, right?

13        PRESIDING COMMISSIONER BIGGERS:  Yes.

14        INMATE LIEBB:  Yeah.  Well, that -- that

15    incident I was charged and convicted of, you know,

16    with this case.

17        PRESIDING COMMISSIONER BIGGERS:  Okay.  Yeah.

18    So -- so one was pending.  Okay.  Your -- you started

19    to talk a little bit a few minutes ago about remorse,

20    and so tell me, how do you feel about what transpired

21    in all the incidents and how you felt that this would

22    probably should not have happened?

23        INMATE LIEBB:  Okay.  That's a few questions.

24    First --

25        PRESIDING COMMISSIONER BIGGERS:  Well, then

26    take them one at a time.

27        INMATE LIEBB:  Okay.  Sure.  First of all, you

41

1  know, I'm deeply sorry to all the Diller family, and

2  there's nothing I could say to make this right.  I

3  mean -- I have no excuse.  I might not remember some

4  details, you know, exactly.  I don't go over and study

5  the appellate decision.  But I -- I admit and accept

6  complete responsibility, without excuse, for

7  everything here, and -- and it certainly is ugly and

8  something I'm ashamed of.  You asked how this could

9  have been avoided; is that right?

10      PRESIDING COMMISSIONER BIGGERS:  I asked you,

11  thinking about it now, that you've been incarcerated,

12  how could that have been avoided?

13      INMATE LIEBB:  You know, it's -- it's

14  amazingly simple, you know, 25 years later to say how

15  this could have been avoided.  I knew Arthur and I

16  knew Michael, and all we had to do is communicate and

17  talk.  I think, you know, I was very headstrong and

18  young at the time, and, you know, I felt I needed to

19  act a certain way when I -- I was wronged.  I was

20  facing a -- a difficult time in my life with just

21  having learned my brother, younger brother had cancer.

22  I was in a city away from my family with the -- my

23  closest friends who were -- was basically Michael

24  Diller and my other friend, Joe Harriton, basically at

25  odds, and I was in the middle, so I -- I didn't have a

26  support system out there or anybody to talk to to try

27  to gain a perspective and do things that you learn in

1    here, like take a time out and not transfer

2    aggression.  So this could've been avoided just by

3    being humble and -- and talking.

4         PRESIDING COMMISSIONER BIGGERS:  Well, you

5    know, there are a couple things that you said that I

6    want to just point out to -- to you.  First of all,

7    you were 25 years old, smart guy.

8         INMATE LIEBB:  Yes.

9         PRESIDING COMMISSIONER BIGGERS:  Graduated

10   magna cum laude, so you had college experience, and

11   you -- you should know people say things all the time

12   that -- and I'm sure that everything that happened to

13   you even at school was not pretty; you know, there

14   were some times where you had the same type of

15   problems.  Let me finish, please.

16        INMATE LIEBB:  Sure.

17        PRESIDING COMMISSIONER BIGGERS:  In addition

18   to that, you indicated you didn't have a support

19   system, but you mentioned earlier that you called your

20   parents regularly.  So if you had a problem like that,

21   why didn't you just pick up the phone and call your

22   parents?

23        INMATE LIEBB:  Okay.  The rea --

24        PRESIDING COMMISSIONER BIGGERS:  Or -- or talk

25   to -- you knew the whole family and the Dillers, you

26   know.  All you had to -- you can go and maybe try to,

27   you know, work out a solution.

43

1           **INMATE LIEBB:**  Yes, sir.  Well, the -- the

2 reason I couldn't call my parents is they were really

3 fragile and overwhelmed by what was happening with my

4 brother, and my father spent most of his time taking

5 him to try to find the best, you know, cancer

6 treatment center, taking him to hospitals in Boston.

7 Later they found, you know, one in New York, Sloan-

8 Kettering.  But all their, you know, time and energy

9 was, you know, spent trying to help my brother, and I

10 -- I didn't want to add to their burden, so I couldn't

11 turn to my family at this time.

12           **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Okay.

13 That's all I have.  Do you have anything, Ms. Blonien?

14           **DEPUTY COMMISSIONER BLONIEN:**  No.  I'll --

15 I'll cover --

16           **PRESIDING COMMISSIONER BIGGERS:**  Okay.  At

17 this point then I'm going to ask Ms. Blonien to go to

18 your post-convictions factors here.  Thank you.

19           **INMATE LIEBB:**  Thank you.

20           **DEPUTY COMMISSIONER BLONIEN:**  Okay, Mr. Liebb,

21 this is your third Subsequent Hearing, and your last

22 appearance before the Board was July 17th of '03, and

23 the decision at that point was for a three-year

24 denial, and the panel recommended actually a lot.  I -

25 - I -- I read over the whole transcript of the

26 hearing, and they checked remain disciplinary free,

27 update vocationally, participate in self-help, and

44

1    cooperate with a new psych, and they had some very
2    specific issues that they wanted covered in the new
3    psych report that I -- I will cover with you.  So in
4    order to do this, I've read the new psych report by
5    Dr. Michel, M-I-C-H-E-L, Inaba, I-N-A-B-A, dated 7/20
6    of '06; I read your counselor's report by counselor
7    Zanni, Z-A-N-N-I, dated July of '06; I've gone through
8    the Board Report, you have three volumes of your C-
9    File, and I've looked through the three volumes of
10   your -- your C-File; then I went back and read some
11   other -- other psych reports.  And as you know, it's
12   my job to go over what you've done in the institution
13   since your last hearing, and I'll cover disciplinary,
14   education, vocation, work experience, self-help and
15   therapy.  And your counselor really did a very good
16   job on -- on his or her report.  I don't know --
17            INMATE LIEBB:  She.  Yeah, she did.
18            DEPUTY COMMISSIONER BLONIEN:  A -- a really
19   good job, so I'll be using that.  But if we need to
20   refer, I've got your last volume of your C-File right
21   here.  And I've going to go over your parole plans and
22   the 3042 notice -- notices.  And if you take a deep
23   breath, I think you're going to be a little bit
24   better.  I mean, this is -- the hearings don't change,
25   so --
26            INMATE LIEBB:  All right.  Thank you.
27            DEPUTY COMMISSIONER BLONIEN:  You've had two

1    115s.  The last one was in 1991 for refusal to work.

2    You did have a serious one in '89 that was a mutual

3    combat.  You've had one CDC 128 in 1991 for refusing

4    to work.  There's a 128 chrono about -- dated 6/5/02

5    that you're restricted from participating in the San

6    Quentin --

7              INMATE LIEBB:  Oh, that was removed from my

8    file.

9              DEPUTY COMMISSIONER BLONIEN:  Well, if you let

10   me finish --

11             INMATE LIEBB:  Oh.

12             DEPUTY COMMISSIONER BLONIEN:  -- I'll even say

13   that.

14             INMATE LIEBB:  Okay.

15             DEPUTY COMMISSIONER BLONIEN:  It is in your

16   file, and -- and this should be removed from your file

17   --

18             INMATE LIEBB:  Yeah.

19             DEPUTY COMMISSIONER BLONIEN:  -- and it's not.

20   So when you do an Olson review, you know how to 602 to

21   get this out.

22             INMATE LIEBB:  I have --

23             ATTORNEY BROSNAHAN:  We -- we do object to any

24   reference to that.  It was expunged by a federal judge

25   and --

26             INMATE LIEBB:  No, that's something else.

27             ATTORNEY BROSNAHAN:  Oh, I see.  I see.

46

1    That's all right.

2          DEPUTY COMMISSIONER BLONIEN:  But maybe they

3    really did that --

4          ATTORNEY BROSNAHAN:  Okay.

5          DEPUTY COMMISSIONER BLONIEN:  -- because I

6    don't see anything.

7          ATTORNEY BROSNAHAN:  Okay.

8          DEPUTY COMMISSIONER BLONIEN:  But there is a

9    chrono on September 7th, 2002, signed by Ito Neinhuis,

10    N-E-I-N-H-U-I-S, that -- the chrono that I mentioned

11    of 6/5/02, restricting you from participation, is

12    rescinded.  The investigation concerning your role in

13    violation of policies and procedures has been

14    completed, and there was insufficient information to

15    support any allegations.  So both of those could be

16    expunged.

17          INMATE LIEBB:  Thank you.

18          DEPUTY COMMISSIONER BLONIEN:  But since they

19    were there, I put them on the record.  In terms of

20    education, since your last hearing you've been working

21    on your Paralegal certification?

22          INMATE LIEBB:  Yes, ma'am.

23          DEPUTY COMMISSIONER BLONIEN:  And you've taken

24    courses starting on 12/29/03, which was right after

25    your hearing, on Paralegal Orientation, and you've

26    completed I think the whole --

27          INMATE LIEBB:  Yes, ma'am.

47

1    **DEPUTY COMMISSIONER BLONIEN:**  -- process,

2    right, as of 2/13/06.  There's over 15 modules, and

3    each module has at least two components, so that is a

4    major accomplishment since your last hearing.  I --

5        **INMATE LIEBB:**  Thank you.

6        **DEPUTY COMMISSIONER BLONIEN:**  -- I know you're

7    an attorney, but you've been in prison a long time and

8    procedures change --

9        **INMATE LIEBB:**  Yeah, they do.

10       **DEPUTY COMMISSIONER BLONIEN:**  -- so I know you

11   had to study that.  In terms of laudatory chronos, you

12   have since your last hearing several, and Mr. -- Mr.

13   Branton, B-R-A-N-T-O-N, the Food Services

14   Department -- or is it Ms.?

15       **INMATE LIEBB:**  It's Mr. Branton.

16       **DEPUTY COMMISSIONER BLONIEN:**  You're his

17   Custody Clerk.  He notes that you're an excellent

18   worker, you manage your responsibilities.  Ms.

19   Echeveria, E-C-H-E-V-E-R-I-A, also of the Food

20   Department, on 04/04 wrote that you're trustworthy,

21   responsible, willing to work, respectful.  I will note

22   that I looked at every chrono, and some of these are

23   letters, but your counselor captured the essence of

24   each, and that -- that's what I'm repeating.

25   Correctional officer Byrne, B-Y-R-N-E, reported that

26   you behave appropriately, you're respectful, outgoing,

27   friendly, avoids over-familiarity with staff, gets

48

1    along well with everyone regardless of race, age,

2    creed, is an excellent candidate for parole.  T.

3    Calvo, C-A-L-V-O, from the Food Service Department,

4    wrote that on 4/26/04 that you perform assignments

5    efficiently with little or no supervision, that you're

6    committed to a crime free lifestyle and would adjust

7    well to society.  Correction officer Brucell, B-R-U-C-

8    E-L-L, wrote on 5/13/04 you're honest, respectful,

9    mature, an excellent work ethic, you're polite, you

10   have positive energy, well-organized, and that writer

11   believes that you would maintain these positive

12   attributes in a free society.  M. Berry, B-E-R-R-Y,

13   also of the Food Service Department, notes that you're

14   trustworthy, responsible, never complain, perform task

15   in an efficient, timely manner, and this writer

16   believes that you'd be an excellent candidate for

17   parole.  Again from the Food Service Department, N.C.

18   Salazar, S-A-L-A-Z-A-R, has known you for over ten

19   years and supervised you in many jobs.  Mr. -- is it

20   Mr. or Ms. Salazar?

21          INMATE LIEBB:  Mister.

22          DEPUTY COMMISSIONER BLONIEN:  Mr. Salazar

23   believes that you're highly capable, that you complete

24   tasks with minimum supervision, that you get things

25   done effectively and calmly in very stressful

26   situations, that you can communicate, that you've

27   expressed remorse for the victim, that you've used

1   educational background to help others less fortunate,
2   and you're committed to your faith and will make a
3   positive contribution to any community.  Correctional
4   sergeant -- sergeant Solis, S-O-L-I-S, has supervised
5   you for seven years.  The sergeant notes that you have
6   an easygoing manner that allows you to work well with
7   inmates and staff members in the Food Service
8   Department; you follow instructions, you're a team
9   player, self-motivator, you -- "This sergeant has
10  rarely encountered an inmate who is as mature and
11  well-focused" as you are in the 12 years that he has
12  been a peace officer and believes that you would be an
13  excellent candidate for release.  Correctional officer
14  Snodgrass says that he's known you for 16 years --
15  he's been a correctional officer for 16 years, and he
16  will -- will without reservation recommend Liebb for
17  parole, that you have excellent leadership skills,
18  honest, faithful, you have a can-do attitude and help
19  other inmates address grievance issues so that they --
20  so you can do -- you do this on your own time without
21  any negative affiliations.  So that's a lot of praise
22  from correctional staff that usually don't write memos
23  and chronos and letters like that, and I guess the --
24  the thread throughout all of these chronos -- or these
25  are all people who know you, that you've worked for,
26  and came forward to speak for you.  At the last Board
27  hearing you had a lot of discussion with Ms. Daley

1    about self-help --

2            INMATE LIEBB:  Yes, ma'am.

3            DEPUTY COMMISSIONER BLONIEN:  -- and her

4    concern that you hadn't participated enough, and you

5    explaining away why you really didn't have to.  But

6    you listened to her, and since your last hearing you

7    have completed an Insight Meditation class, you've

8    gone through the various sessions of Impact, which

9    include Violence Prevention, Time Out, Body Signals,

10    Self-Taught, Conflict Resolution, several components

11    on Addiction, Relationships, the Dynamics of a

12    Relationship, Cultivating Successful Relationships,

13    you've had a hundred hours of Hatha Yoga.  I saw a

14    certificate in there.

15            INMATE LIEBB:  Yes, ma'am.

16            DEPUTY COMMISSIONER BLONIEN:  Had you had Yoga

17    before?

18            INMATE LIEBB:  No.  They just started that

19    program about almost three years ago.

20            DEPUTY COMMISSIONER BLONIEN:  And you've --

21    you've attended that faithfully.  In November of '05

22    you went through the Friends Outside Creative Conflict

23    Resolutions Workshop covering Anger Management,

24    Communication, Conflict Resolution, the ongoing

25    participation in Friends Outside courses, Parenting

26    Education, more Creative Conflict Resolution.  So I

27    think you took Miss Daley's mandate quite seriously.

51

1        INMATE LIEBB:  I do.

2        DEPUTY COMMISSIONER BLONIEN:  So now that you

3    have, was she right?

4        INMATE LIEBB:  Yes, definitely.

5        DEPUTY COMMISSIONER BLONIEN:  And tell me why.

6        INMATE LIEBB:  There were things I've learned

7    from participating in the -- these different programs,

8    you know, especially Impact, things about

9    communication, about ways to resolve disputes.  Going

10   through these modules and workshops, it made me look

11   at the things that I did wrong years ago and -- and

12   wish I had some of those tools and even the vocabulary

13   to express some of the anger, some of the feelings

14   that I had at that time.  So it definitely benefited

15   me.  It also helps being in a -- in a group setting

16   where people share their own problems and you see that

17   there's a commonality to all people, that you're not

18   the only one facing a certain problem in life, and

19   people come up with solutions.  One of the things with

20   Impact is they don't give you an answer, the

21   participants come up with suggested solutions, so you

22   could sort through the advice and take what fits you.

23       DEPUTY COMMISSIONER BLONIEN:  Commissioner

24   Biggers asked me if I had any questions about your

25   commitment offense, and my question is, you got this

26   brand-new motorcycle, which is one of the happiest

27   times in a young man's life, I'm told, and you go over

52

1    and you see Michael.  Where did all that anger come

2    from so instantaneously and how could you not have

3    controlled it?

4         INMATE LIEBB:  That's a good question.  You

5    know like you say, getting, you know, a new

6    motorcycle, it -- it should be a happy time, but I

7    wasn't a happy person.  You know, I was -- I was

8    depressed, I was disappointed in my life, I was, you

9    know, saddened by what my brother was going through

10   and wondering how that could happen to him.  A lot of

11   the things that I was brought up to believe, things

12   with my faith, I was questioning very strongly because

13   it -- it was my first, you know, exposure to -- to

14   that type of a situation, you know, someone being, you

15   know, grievously ill, so, you know, I didn't have any

16   happiness, I didn't have a perspective, I was just

17   focusing on the negative, and, you know, I did have

18   anger, and I didn't have a way to, you know,

19   acknowledge it or express it or, you know, outlets to

20   relieve it in a positive way.

21        DEPUTY COMMISSIONER BLONIEN:  So in the last

22   three years you've taken several courses that relate

23   to anger, Anger Management.

24        INMATE LIEBB:  Yes.

25        DEPUTY COMMISSIONER BLONIEN:  So what are your

26   strategies now when situations in this institution get

27   you angry?

1    INMATE LIEBB:  Oh, sure, and, you know, that

2    could happen almost on a daily basis.  You know, first

3    through the courses, and even thing -- through

4    something like Yoga, which, you know, you might think

5    of it as an exercise program, but it -- it helps you -

6    - first of all, you know, like you like you just told

7    -- gave me the advice to take a deep breath, you know,

8    that's one of the principles to no -- for Yoga

9    practice and for recognizing the onset of anger is, is

10   to monitor your breathing, to recognize the -- the

11   symptoms of anger, to recognize body language, to have

12   constructive outlets to relieve stress.  So those are

13   all, you know, tools that unfortunately I didn't have

14   25 years ago that I have now.  So when I'm faced with,

15   you know, disappointment or frustration, or even

16   anger, I have ways to relieve stress, I have, you

17   know, friends here that I could talk to, and you know,

18   choosing my friends wisely.  They're not people that

19   are going to try exacerbate a -- a bad situation, you

20   know.  We try to minimize things for each other, to,

21   you know, quell things, and, you know, I lacked all

22   that, unfortunately, when I was in Los Angeles a long

23   time ago.

24        DEPUTY COMMISSIONER BLONIEN:  Okay.  In terms

25   of work experience, you're currently working --

26        INMATE LIEBB:  As a Food Service Clerk.

27        DEPUTY COMMISSIONER BLONIEN:  And you've been

1    there --

2         INMATE LIEBB:  For about five years in this

3    position.

4         DEPUTY COMMISSIONER BLONIEN:  And you have the

5    numerous chronos from your supervisors that support

6    your good work, and in looking at your evaluations

7    that your supervisors give you, you have all

8    exceptionals.  And I sort of went back, and even as

9    far as '03 there were exceptionals.  And then your C-

10   File gets out of chronological orders, and the ones

11   from '02 aren't here, but you have a pattern.  Also,

12   just an observation, lots of information in here about

13   you helping other inmates with legal issues, and

14   that's not always the most popular kind of inmate with

15   staff, a inmate attorney, but with all of the positive

16   chronos that you have from different levels of

17   supervision, it speaks to the fact that you comport

18   yourself in a -- in a very good manner.

19        INMATE LIEBB:  Thank you.

20        DEPUTY COMMISSIONER BLONIEN:  In terms of --

21   have I -- have I missed anything of what you've been

22   doing in terms of education, vocation, work

23   experience, self-help?

24        INMATE LIEBB:  No.

25        DEPUTY COMMISSIONER BLONIEN:  I looked through

26   all the -- all of these.  I didn't -- I didn't think

27   your counselor missed anything.  So I'm going to talk

1   about the psych report, and I'm going to go back to

2   the Board Report when you were talking to Miss Daley.

3        **INMATE LIEBB:**  Yes, ma'am.

4        **DEPUTY COMMISSIONER BLONIEN:**  And she said:

5        "We're asking for a new psychological eval

6        -- evaluation, and stating that the panel's

7        belief is that the prisoner's current

8        mental health is an important issue, and in

9        the new full evaluation, the panel requests

10        the clinician specifically address the

11        following: the prisoner's violence

12        potential in the free community, and the

13        extent to which the prisoner has explored

14        the commitment offense and come to terms

15        with the underlying cause of the need for

16        further therapy programs while

17        incarcerated, and we're also asking the

18        psychologist to read the transcript of the

19        hearing to understand the concerns and

20        questions that have been raised by the

21        panel members and by the district attorney

22        with regard to the commitment offense and

23        the acceptance or understanding of the

24        underlying reasons."

25   And then she talked about self-help, but we

26   already discussed that.  So in the psych report --

27   and we'll probably have to turn the tape, so don't

1    let that interrupt you.  Dr. Inaba noted that

2    under "Current Clinical Diagnosis," under Axis I:

3    Adult Antisocial Behavior by History and Identity

4    Problem by History; under Axis II: No Diagnosis;

5    and under assessing your Global Assessment

6    Functioning Score, she notes it's in her opinion

7    80, which is a well-functioning individual in the

8    community, and a excellent-functioning inmate in a

9    institution.  She -- she talks about that there is

10   no evidence of mood instability or depressed mood,

11   and you expressed little emotion when discussing

12   either the loss of your father or the crime.  Is

13   that because you're basically stoic?

14            INMATE LIEBB:  No.  And I read that

15   sentence and, you know, I cried when I was talking

16   about my father in the interview, and I was

17   emotional, I felt, you know, when I was talking

18   about the crime.  I am like somewhat stoic.  I

19   mean, that's how I -- I try to get through, you

20   know, this time here, you know, not complaining,

21   or, you know, accepting what comes my way and

22   dealing with it.  But I didn't -- you know, it was

23   curious to me that she had that sentence in there.

24            DEPUTY COMMISSIONER BLONIEN:  She says

25   that your judgment appeared good for most

26   situations, your manner was cooperative, and no

27   indication of irritation, arrogance, or attempts

1  to control the direction of the interview.  You

2  demonstrate a capacity for insight into external

3  forces that were operating at the time of your

4  offense but had much less understanding of the

5  internal dynamics that contributed to his

6  homicidal act.

7          "For example, he was able to recall and

8          relate the sequence of events in precise

9          detail, but seemed not to be less aware

10         that anger was a significant factor in the

11         aggressive acts that occurred during this

12         same time period."

13  When she talked about the causative factors, she

14  notes that you:

15         "Admitted becoming angry with the victim,

16         and attacked him, first by forcibly

17         entering the car, and then by pursuing him

18         and stabbing him, that this showed a -- a

19         lack of impulse control.  For whatever the

20         reason, encountering the victim in the

21         presence of a female companion who was

22         apparently unknown to Mr. Liebb produced

23         an emotional state in which Mr. Liebb lost

24         his judgment and was unable to control his

25         aggression.  The presence of the other

26         party was not enough to constrain Mr.

27         Liebb.  This act combined with other

58

1          instances when Mr. Liebb was involved in

2          assaultive behavior in the presence of

3          witnesses would suggest that he was not

4          able to control his anger or aggression

5          under certain circumstances, even at times

6          when he was not directly threatened by the

7          victim.  Although Mr. Liebb was under

8          stress at the time of -- of his offense,

9          this does not explain why he became a

10         violent individual when he had shown no

11         previous history of interpersonal

12         violence.  It would seem that part of his

13         confusion of identity was around how to

14         conduct himself as a young man vis-à-vis

15         other young men in maturely expressing his

16         sexuality."

17  What do you think about that?

18          INMATE LIEBB:  I thought it was off.  I

19  mean, part of it's right, that at the time I

20  didn't, you know, recognize my anger and know how

21  to deal with it.  That -- that part is true.  But

22  like this theory that it had anything to do with,

23  you know, any kind of sexual orientation or

24  identity, that wasn't a part of anything here, not

25  with Michael and not with me, we were just

26  friends.

27          DEPUTY COMMISSIONER BLONIEN:  Well --

1        INMATE LIEBB:  But --

2        DEPUTY COMMISSIONER BLONIEN:    -- she

3   must --

4        INMATE LIEBB:   -- one part is --

5        DEPUTY COMMISSIONER BLONIEN:    -- have

6   known --

7        INMATE LIEBB:   -- true.

8        DEPUTY COMMISSIONER BLONIEN:    -- about

9   the -- the name-calling.

10       INMATE LIEBB:   Right.   Okay.   Part of what

11  she wrote -- like, you know, if we learn about in

12  -- in these classes, about the male role belief

13  system, so that if you're insulted or, you know,

14  you're called a name, you typically react in a

15  hostile manner.  I was operating under that

16  assumption.   That's true at that time.

17       DEPUTY COMMISSIONER BLONIEN:   She goes on

18  to say that you had had an inappropriate

19  conversation with the victim's mother at one point

20  during the conflict.  And I -- and that alludes to

21  the ongoing conflict, not the single incident?

22       INMATE LIEBB:   Yes.

23       DEPUTY COMMISSIONER BLONIEN:   And the

24  behavior was strikingly immature for a man in his

25  mid 20s.  "As part of his identity crisis, Mr.

26  Liebb seemed to have developed a hyper-aggressive

27  persona as so to be someone to be reckoned with.

1    It should be noted that this quality is not

2    evident in him today."  In assessing your

3    dangerousness she used several tools, and one was

4    the PCL dash R, which would be a level one, very

5    low, indicating lack of psych -- psychopathy.

6            "Based on actuarial probability, the

7            probability of violent recidivism over a

8            seven-year period would be zero point one

9            two.  This method is not predictive for

10           any one individual but gives a probability

11           based on the performance of a group of

12           individuals with similar characteristics.

13           Mr. Liebb has not received a rules

14           violation since 1991.  He received a CDC

15           115 for violent behavior in 1989 when he

16           was involved in a fight with another

17           inmate.  Since that, he has been violent

18           free for 15 years.  He would be at low

19           risk of violent behavior in a controlled

20           environment.  Based on actuarial

21           assessment, Mr. Liebb would be considered

22           a low risk for violent recidivism.  As

23           stated previously, Mr. Liebb's potential

24           for violence would be low in a controlled

25           setting.  If released to the community"

26   Let me turn it.

27            [Thereupon, a new tape began.]

1    **DEPUTY COMMISSIONER BLONIEN:**  Okay.  We're

2    back on tape two, side one, and we were talking

3    about Dr. Inaba's pysch report, and I was just

4    concluding with her clinical observations.

5              "And if released to the community, there

6              is no reason to believe that his risk for

7              future violence would be greater than that

8              of the average parolee.  He has the means

9              to support himself in the community

10             without resorting to criminal behavior.

11             Mr. Liebb has job skills, a history of

12             good work performance and a supportive

13             family.  He is willing to comply with all

14             conditions of parole.  Given that there is

15             no clear motivation for Mr. Liebb's

16             unprovoked pursuit and stabbing of the

17             victim, it would be beneficial for Mr.

18             Liebb to obtain therapy to further explore

19             the reasons for the fatal assault as well

20             as other instances of assaultive behavior.

21             There is no evidence that Mr. Liebb's

22             presentation of any severe mental disorder

23             at this time.  He has, however, spent much

24             of time conforming to strict religious and

25             cultural expectations that allowed him

26             little room to develop an authentic sense

27             of self.  He has gained a sense of purpose

1    while incarcerated by assisting other

2    inmates with legal matters.  He also uses

3    writing as a means of self-expression.  It

4    would appear that he is better able to

5    tolerate insults, has a better sense of

6    who he is, and is more sensitive to the

7    needs of others."

8 Now I think the one thing that I didn't talk about

9 in terms of what you're doing in the institution

10 is that you do assist other inmates in filing

11 lawsuits, and one of the ones that is throughout

12 your file is one revol -- revolving around

13 classification and putting all white inmates

14 together?

15   INMATE LIEBB:  Well, the one that I filed

16 has to do with -- I'm -- I'm Jewish, and it has to

17 do with segregating me as a Jew with inmates who

18 might have swastikas or who'll be skinheads, who

19 will have anti-Semitic attitudes, so it has to do

20 with having my classification changed from white

21 to other, which is a category they use in the

22 institution.

23   DEPUTY COMMISSIONER BLONIEN:  And are

24 there any other that you want to put on record

25 that you've helped other people with?

26   INMATE LIEBB:  Well, I -- I've helped an

27 inmate who paroled, was given a date by the panel,

63

1    Rico Amedio, you know, in filing a writ that

2    helped get him a parole date.

3         **DEPUTY COMMISSIONER BLONIEN:** The -- and

4    the reason I asked you is because it's, you know,

5    my job to ask you what you're doing while you're

6    in the institution.  So I know you've been working

7    on your paralegal, I know you work, I know you've

8    been taking self-help, so I know you're busy.

9         **INMATE LIEBB:** Yes, ma'am.

10         **ATTORNEY BROSNAHAN:** Have you help others

11    -- other people?

12         **INMATE LIEBB:** Yeah.  You know, at least -

13    - at least two dozen, the things relating to --

14    you know, these are just lawsuits.  There's a lot

15    of people who have problems where they just need

16    to 602 or a letter written, or even some people,

17    like for parole plans, they don't know what

18    agencies to write if they don't have -- you know,

19    fortunately, I have a family that stills supports

20    me and loves me, but a lot of people don't have

21    that and they're denied because they don't have

22    parole plans, so I'll get a list of resources in

23    their county and write letters for them.

24         **DEPUTY COMMISSIONER BLONIEN:** Okay.  And -

25    - and that brings us to your parole plans and

26    letters of support that you have.  And as you

27    know, the Board can allow you or -- to parole

64

1    anywhere in the state of California.  Where you

2    would be most successful is our objective to place

3    you, and I know you have lots of support from New

4    York, and as you -- as you probably know, we can't

5    parole you to New York.  You would parole to

6    California, and then there would be paperwork that

7    you could submit if New York is part of the

8    Interstate Compact, and you could petition to move

9    your parole to New York, but it's a -- a drawn out

10   process.  You also have parole plans that are

11   viable in Israel, and again, we have no authority

12   to parole you to Israel.  So let's talk about

13   California and what's you number one place where

14   you'd want to live.

15       INMATE LIEBB:  The number one place would

16   be the Bay Area, and I have support from an

17   attorney, Charles Carbone, with California Prison

18   Focus, and he's offered me a job, you know, with

19   his group doing paralegal work and research.

20       DEPUTY COMMISSIONER BLONIEN:  And if you

21   were paroled to San Francisco area, where would

22   you live?

23       INMATE LIEBB:  I have a residence with

24   Sterling Scott, there's a letter there.  He's in

25   San Francisco, and he'd provide me with a place to

26   live.  I also have, you know, offers of assistance

27   with housing from the Asian Prisoners Support

65

1    Committee, and from -- they're in the Bay Area.

2    They've offered to help me with housing as well.

3            DEPUTY COMMISSIONER BLONIEN:  Okay.  So

4    there is a -- a letter from Mr. Carbone offering

5    you --

6            INMATE LIEBB:  A job.

7            DEPUTY COMMISSIONER BLONIEN:  -- a job,

8    and the panel's familiar with Mr. Carbone.  He

9    does appear before us regularly, and we know he

10   has a fine, outstanding business, and he's very

11   busy, so he could use help.  In terms of living, I

12   have the letter from the Asian Prisoner Support

13   Committee that is signed by Diana Pei, P-E-I, Wu,

14   W-U, and she says that the Asian Support --

15   Prisoner Support Committee, along with other

16   organizations, will be able to support you in

17   finding housing, medical and other support, and

18   talks about the job offer that you have with Mr.

19   Carbone.  I tried to arrange the list of the

20   numerous letters of support that you have in

21   geographic area, but it was harder than -- than --

22   I didn't have time to do that, so I'm just going

23   to go through the letters after we noted that the

24   main place where you live.  You also have the

25   opportunity to parole to Los Angeles, and you've

26   found Choices Recovery Services that provides

27   sober living conditions, and they would accept

1  you. You would have to send them a deposit for a

2  hundred dollars, and they would help you into

3  successful reentry into the community. You have a

4  letter from Sabra, which is in New York, and they

5  offered you a job in customer service or sales

6  that would pay you 35 thousand to 80 thousand,

7  depending on what position they gave you --

8      INMATE LIEBB: Excuse me, ma'am. That's

9  in California too.

10     DEPUTY COMMISSIONER BLONIEN: Yeah, and I

11 was just going to read that. "The position will

12 be in our New York office, or in an Israel office,

13 which is the parent company, or at one of our

14 major distributors in California," and that's

15 signed by Yehuda, Y-E-H-U-D-A, Pearl, P-E-A-R-L,

16 who's the chairperson of Sabra. Then there's a

17 letter from Joanna Duffy of Edelman Media, and

18 she's your cousin, and she talks about how much

19 she's learned for you, and she'll be there to help

20 you financially, emotionally, and she lives in New

21 York, and she could help you get a job. You have

22 a letter from Helena Goldstein, who's also your

23 cousin, and they all know what you've doing in the

24 prison, they're very familiar of the work that

25 you've done. They all are familiar with your

26 crime and your remorse, and they're sorry also

27 that you did this to another family, and they talk

67

1    -- a lot of them talk about your dad and how hard

2    that's been on the family, but she'll be there and

3    help you with money.  Your sister, Ester, will

4    take a leave of absence from her job as a -- an

5    educator, and she will help you reenter and

6    reintegrate wherever you -- you parole to.  Your

7    sister, Rose, will be there for you and support

8    you emotionally, financially, whatever you need.

9    Your friend Jamie Goldstein -- who's a doctor?

10          INMATE LIEBB:  Yes.

11          DEPUTY COMMISSIONER BLONIEN:  You've

12   helped him a lot.  He works at Colum --

13          INMATE LIEBB:  She.

14          DEPUTY COMMISSIONER BLONIEN:  She.  You --

15   you've helped her a lot.  She'll be -- she works

16   in Columbia University, and she not only feels

17   compelled but is looking forward to giving back in

18   order to help Stephen when he comes home -- excuse

19   me -- and she can help support you financially.

20   Your cousin-in-law, Larry Goldstein, is there for

21   you, will support you.  Yoav, Y-O-A-V, Kiesler --

22   Kiesler, K-I-E-S-L-E-R, is prepared to offer you

23   employment.  He's a businessman in Marin County,

24   and he visits you, he's knows your family, and he

25   knows that -- you've told him you committed a

26   terrible crime and that you pray that God'll

27   forgive you.  How did you meet him?

68

1          **INMATE LIEBB:**  He heard about my case over

2    the Internet dealing with the classification of me

3    as a Jew as white, and he wrote to me.  He prays

4    with a -- a Jewish group, Chabad, in Marin, and --

5    and part of their beliefs, you know, similar to

6    like Christian principles, is to visit people in

7    prison, so he wrote me, and then began visiting

8    me.

9          **DEPUTY COMMISSIONER BLONIEN:**  And you can

10   -- he'd -- he'd even offer you a place in his

11   home.

12         **INMATE LIEBB:**  Yes.

13         **DEPUTY COMMISSIONER BLONIEN:**  You have a

14   letter from Dylan Rodriguez, who is a professor at

15   UC Riverside?

16         **INMATE LIEBB:**  Yes.

17         **DEPUTY COMMISSIONER BLONIEN:**  And he's --

18   he'll be supportive of you, and if you end up in

19   the L.A. region, he'll help get you a job as a

20   paying research position with salary and benefits,

21   or assistance with admission into -- he wants you

22   to become a teacher and wants you to go back to

23   college, but you already have a Bachelor's, and

24   you already have a advanced degree.  If -- if you

25   wanted to be a teacher, you could probably use

26   those, you wouldn't have to start all over again.

27   But he's very supportive and writes you a -- a

69

1  very wonderful letter.  And then the parents of an
2  inmate that you're helping, Tung Ngo, N-G-O, and
3  Lan My Bu, B-U, they live in Alameda, and they
4  know that you don't have much chance of being
5  released by this Board because the Board's
6  composed of bureaucrats who have not -- who only
7  make non-release decisions, but they wrote --
8      ATTORNEY BROSNAHAN:  Will you put that to
9  one side?
10      DEPUTY COMMISSIONER BLONIEN:  But they
11  wrote this letter anyway --
12      ATTORNEY BROSNAHAN:  Don't help us any.
13      DEPUTY COMMISSIONER BLONIEN:  -- and they
14  talk about what a good person you are and how you
15  volunteer and help people and that -- you must
16  have talked to them, because they know how sorry
17  you are for your commitment offense.  And you
18  taught their son acupressure?
19      INMATE LIEBB:  Yeah.
20      DEPUTY COMMISSIONER BLONIEN:  And other
21  social skills, and they live on a very meager
22  pension, but they will guarantee that you can live
23  with them, you can eat their food, and they will
24  take very good care of you, so they are very,
25  very, very supportive.  Then your brother-in-law,
26  David -- does he live in Israel?
27      INMATE LIEBB:  Nucutramen (phonetic),

70

1   yeah, in Natania, in Israel, northern Israel.

2         DEPUTY COMMISSIONER BLONIEN:  So if you

3   get to Israel, he -- he's there for you.  You can

4   live with him.  He'll -- they're going to make

5   sure that you walk the straight and narrow path,

6   and there is a Prisoner Rehabilitation Center and

7   Services headed by -- in a Kibbutz, by A-Y-E-L-E-

8   T, Ayelet, Hashahar, H-A-S-H-A-H-A-R, and they

9   would help you reintegrate and educate you, Mr.

10  Heruitlapid, H-E-R-U-I-T-L-A-P-I-D, would take

11  personal responsibility.  Now is any -- has

12  anything happened to him?

13        INMATE LIEBB:  I believe he passed away

14  recently.

15        DEPUTY COMMISSIONER BLONIEN:  I heard

16  that, so I'm sure someone has taken his place.

17        INMATE LIEBB:  Yes.

18        DEPUTY COMMISSIONER BLONIEN:  Then you

19  have Pat McDonald and Phil McDonald, who are

20  retired, and they met you while you were in

21  Corcoran.

22        INMATE LIEBB:  Yes.

23        DEPUTY COMMISSIONER BLONIEN:  How'd they

24  meet you?

25        INMATE LIEBB:  Just through a

26  correspondence program, like Friends Outside.

27        DEPUTY COMMISSIONER BLONIEN:  And you're

71

1   welcome to live with them in Visalia, and they
2   will support you.  And then you have Friends
3   Outside.  You've been writing them, and they have
4   locations in the Bay Area, in L.A., and they have
5   a coordinator here, and there's a personal note, I
6   -- I can't read it.  I can read the note, but I
7   can't read who signed it.
8       INMATE LIEBB:  Oh, Bill Klinke, K-L-I-N-K-
9   E.  He's the counselor here for Friends Outside.
10      DEPUTY COMMISSIONER BLONIEN:  And they
11  would definitely help you and help you reintegrate
12  back into the community.  And then the letter from
13  Mr. Carbone and the California Prison Focus,
14  talking about the job we already talked about.
15  Laurie Moss, who's a licensed clinical social
16  worker, Metro Counseling Resource Center, Jewish
17  Family Services of Los Angeles, and they just got
18  a contract with the California Department of
19  Corrections and Rehabilitation, and they would
20  definitely help you reintegrate back into the --
21  the community.  Your mom wrote a -- you have lots
22  of people in New York, lots of family.  You have -
23  - your mom wrote support, your -- AnnaLea --
24  that's your mom, right?
25      INMATE LIEBB:  Yes.
26      DEPUTY COMMISSIONER BLONIEN:  You have
27  Eddie E-H-E-R-G, and he was a lifer inmate that

72

1   you helped, and he -- he said something sort of --

2   very appreciative of the help you gave him, and he

3   says, "There's a Chinese idiom which says, 'It's

4   easy to behave well for one day, but it is

5   difficult to keep good behavior for a lifetime,

6   unless it comes from the heart,'" and knows that

7   you've spent over 20 years in prison and though

8   two decades are not a lifetime, you are

9   rehabilitated, you are remorseful, and you

10  continue to take responsibility for your actions.

11  So I thought that was very eloquent.  Allen Liebb,

12  your brother, offered financial assistance, a home

13  in New York; you've got the support of your mom;

14  you have your brother-in-law we talked about; you

15  have the transcripts from your paralegal classes.

16  Sterling Scott talks about -- he's a black

17  inmate, and they were having some trouble during

18  Ramadan having ice because of the fast, and you

19  helped him get ice, and he was appreciative and

20  you didn't have to do that, but -- but you help

21  everybody, you don't judge people, you help

22  people.  Henry McGee, who's a professor at Seattle

23  University, was one of your professors at UCLA,

24  and he is still supportive of you and would be

25  there for you.  Ernie Dixon, D-I-X-O-N, is a

26  pastor and -- what's WCG?

27          **INMATE LIEBB:**  Worldwide Church of God.

73

1    **DEPUTY COMMISSIONER BLONIEN:**  Worldwide

2    Church of God, and that you would never be alone

3    in the community, he would be there to help you.

4    And I think I covered all the letters.

5    **INMATE LIEBB:**  I think so.

6    **DEPUTY COMMISSIONER BLONIEN:**  We also sent

7    out 3042 notices to law enforcement, victim next-

8    of-kin, and although I had no written responses,

9    the L.A. District Attorney is represented here and

10   she will be able to make her statements at the

11   appropriate time, and we also have the family of

12   the victim represented here today, and they have

13   the absolute right to make a statement and will at

14   the appropriate time.  With that, I'd turn to the

15   chair.

16   **PRESIDING COMMISSIONER BIGGERS:**  Thank you

17   very much, Deputy Commissioner Blonien.

18   **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

19   Beverly Hills Police Department did send a letter.

20   The CDC sent the -- the letters to the wrong

21   agency, but (inaudible) --

22   **DEPUTY COMMISSIONER BLONIEN:**  Do you have

23   a copy?

24   **ATTORNEY BROSNAHAN:**  Yes.

25   **DEPUTY COMMISSIONER BLONIEN:**  I looked.

26   I --

27   **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And