74

1    it --

2         DEPUTY COMMISSIONER BLONIEN:  -- didn't

3    even see it.

4         DEPUTY DISTRICT ATTORNEY DELAGARZA:  And

5    it was sent.

6         DEPUTY COMMISSIONER BLONIEN:  Did you see

7    any?

8         PRESIDING COMMISSIONER BIGGERS:  I did not

9    see a copy in the records here.  What's the date

10   of it?

11        DEPUTY DISTRICT ATTORNEY DELAGARZA:  The

12   date is July the 7th, 2006.  And I would indicate

13   for the record that there are other copies of the

14   letter from Beverly Hills that had been sent in

15   years past.  In this particular case, for some

16   reason, San Quentin sent the original letter to --

17   I believe counsel has --

18        DEPUTY COMMISSIONER BLONIEN:  You have a

19   copy.

20        DEPUTY DISTRICT ATTORNEY DELAGARZA:

21   (inaudible).

22        ATTORNEY BROSNAHAN:  I have a copy.  Thank

23   you.

24        DEPUTY COMMISSIONER BLONIEN:  That was

25   going to be my concern, that you didn't have a

26   copy.

27        PRESIDING COMMISSIONER BIGGERS:  Okay.

75

1   Well, so put it in the record, please.

2       **DEPUTY COMMISSIONER BLONIEN:**   The --

3   sergeant Jack Douglas, of the Detective Bureau of

4   the Beverly Hills Police Department wrote and

5   describes the -- the crime, and:

6           "Stephen Liebb was not a victim of an

7           impoverished background, nor was he

8           lacking in education.  It is my

9           understanding that he was a practicing

10          attorney at the time.  He wantonly chose

11          to murder Michael Diller.  Despite all the

12          advantages Liebb possessed, he engaged in

13          a lifestyle more compatible with that of a

14          street thug.  Liebb had established a

15          pattern of assaultive and antisocial

16          behavior long before he married Michael

17          Diller -- murdered Michael Diller.  At the

18          time of his murder, Michael Diller was

19          just 23 years old.  He was a member of a

20          loving and supportive family.  Michael

21          Diller is survived by his parents, two

22          sisters and a brother.  All of these

23          family members have been forced to live

24          with the tragedy of Michael Diller's death

25          for the past 25 years.  They will continue

26          to do so the remainder of their lives."

27      **PRESIDING COMMISSIONER BIGGERS:**  Okay.

76

1  Thank you. Before I ask the district attorney if

2  they have -- if she has any questions, I just want

3  to follow up on something that you told the deputy

4  commissioner, and that had to do with your Anger

5  Management classes --

6       INMATE LIEBB:  Yes, sir.

7       PRESIDING COMMISSIONER BIGGERS:   -- that

8  you just recently started taking. Did I hear you

9  correctly that at one time prior to your last

10  hearing the -- the panel asked you to start taking

11  some self-help classes, which would have included

12  Anger Management; is that correct?

13      INMATE LIEBB:  And any available self-

14  help, yes --

15      PRESIDING COMMISSIONER BIGGERS:  Any of

16  it.

17      INMATE LIEBB:  sir.

18      PRESIDING COMMISSIONER BIGGERS:  Okay.

19  And you did not take them from the time that you

20  got in there until such time as they suggested

21  that you do that; is that correct?

22      INMATE LIEBB:  Yes, sir.

23      PRESIDING COMMISSIONER BIGGERS:  Okay.

24  Now that you've taken those, and I heard your

25  response, if you had taken those Anger Management

26  courses prior to the last three years, do you

27  think that would've kept you from getting the

77

1    115s?

2        INMATE LIEBB:  Well, the last 115 I had

3    was in 1991 --

4        PRESIDING COMMISSIONER BIGGERS:  I

5    understand that.

6        INMATE LIEBB:  -- and I -- I -- that --

7    that was for refusing to work.

8        PRESIDING COMMISSIONER BIGGERS:  You had

9    one for mutual combat too.

10       INMATE LIEBB:  Yeah, that was 1989.

11       PRESIDING COMMISSIONER BIGGERS:  Okay.

12   But my point is, when you first got into the

13   institution, you did not do any self-help other

14   than what you were -- things that you were helping

15   other inmates and doing all that.

16       INMATE LIEBB:  No, I -- I did one-on-one

17   therapy --

18       PRESIDING COMMISSIONER BIGGERS:  Okay.

19       INMATE LIEBB:  -- in -- one in 1986.

20       PRESIDING COMMISSIONER BIGGERS:  Okay.  My

21   question to you, sir, is, if you had taken those

22   courses that you've taken in the last three years,

23   how do you think they would've affected your

24   prison -- your conduct while you've been in

25   prison?  Would that have changed anything?

26   Because you did -- you know, you did get a couple

27   115s.  They may be older, but you -- that's

78

1    because you wasn't taking any self-help.

2         INMATE LIEBB:  Well, it -- it wouldn't

3    have changed the refusing to work because that

4    didn't have to do with an issue with anger, that

5    had to do with -- I was released from the SHU in

6    1991 and I went -- I was in Tehachapi max and

7    assigned to -- as a culinary worker, and the

8    people on the line -- they had Reception there.

9    They were deliberately short-serving the people in

10   Reception so they could take food home, so I saw a

11   bad situation.  I was new in the prison.  Just to

12   avoid problems, I refused to work, and to me, that

13   was the right decision --

14        PRESIDING COMMISSIONER BIGGERS:  Okay.

15   Well --

16        INMATE LIEBB:  -- even if I had taken

17   these classes.

18        PRESIDING COMMISSIONER BIGGERS:  All

19   right.  Then let me rephrase that then.  I'm not

20   talking about a particular incident.

21        INMATE LIEBB:  Oh.

22        PRESIDING COMMISSIONER BIGGERS:  What

23   would you have done differently in the institution

24   if you had started self-help classes similar to

25   the ones that you started three years ago?

26        INMATE LIEBB:  I think it would've helped

27   me live better because I would've had more

79

1  awareness of, you know, people's reactions, my own

2  ability to communicate, so the things that I

3  learned later, had I known them then, it would've

4  enhanced my ability to function in the institution

5  and to relate to people, definitely.

6        PRESIDING COMMISSIONER BIGGERS:  Okay.

7  That's all.  At this point I'm going to ask the

8  district attorney if she has any questions for the

9  inmate.

10        DEPUTY DISTRICT ATTORNEY DELAGARZA:  The

11  first question I have of the inmate is with

12  respect to the question that was just asked.  The

13  last CDC 115 the inmate got was for refusing to

14  work.  Today he's indicating that he refused to

15  work because of what was going on.  My reading of

16  prior reports, he indicated that he -- he refused

17  to work for religious reasons.  Is that correct?

18        ATTORNEY BROSNAHAN:  I object to the

19  question.  I didn't hear him say that.  He's

20  always said that it was the Sabbath work issue

21  that caused it in 1991.  That was the 115.  Is

22  that right?

23        INMATE LIEBB:  No, no, there's a 128 --

24        PRESIDING COMMISSIONER BIGGERS:  Okay.

25  Hold on.  Hold on.  One at a time, please, and let

26  me rule on --

27        ATTORNEY BROSNAHAN:  Well, I just wanted

80

1    to object --

2         PRESIDING COMMISSIONER BIGGERS:   Okay.

3    Let me --

4         ATTORNEY BROSNAHAN:   -- to the question.

5    It had an assumption in it --

6         PRESIDING COMMISSIONER BIGGERS:   Okay.

7         ATTORNEY BROSNAHAN:   -- that I didn't

8    think was right, but --

9         PRESIDING COMMISSIONER BIGGERS:   Let me --

10        ATTORNEY BROSNAHAN:   -- let's --

11        PRESIDING COMMISSIONER BIGGERS:   Okay.

12   (inaudible) out of hand.

13        ATTORNEY BROSNAHAN:   Yeah.

14        PRESIDING COMMISSIONER BIGGERS:   That's --

15   all right.  Your question is -- or let me rephrase

16   it.  Your question was that it was -- in reading

17   the record, you -- you indicated that there was a

18   115 there for refusing to work because of --

19        DEPUTY DISTRICT ATTORNEY DELAGARZA:

20   Religious reasons.

21        PRESIDING COMMISSIONER BIGGERS:   Religious

22   reasons.

23        DEPUTY DISTRICT ATTORNEY DELAGARZA:   And I

24   thought today he was saying that the reason he

25   refused to work was because of what was going on.

26        PRESIDING COMMISSIONER BIGGERS:   Was

27   that --

81

1          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  So I
2    was wondering what the --
3          **PRESIDING COMMISSIONER BIGGERS:**  Is that
4    the same 115 --
5          **INMATE LIEBB:**  No.
6          **PRESIDING COMMISSIONER BIGGERS:**  -- you
7    were talking about?
8          **INMATE LIEBB:**  No.
9          **PRESIDING COMMISSIONER BIGGERS:**  Okay.
10         **INMATE LIEBB:**  I think -- I think --
11         **PRESIDING COMMISSIONER BIGGERS:**  Then that
12   clarified it.
13         **INMATE LIEBB:**  -- probably the district
14   attorney -- in the Board Report it refers to the
15   115 refusing to work due to the Sabbath.  That was
16   actually a 128 for refusing to work on the
17   Sabbath.
18         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
19         **INMATE LIEBB:**  And the 115 was refusing to
20   work, and that wasn't an issue of the Sabbath, it
21   was an issue that people were doing things that
22   were wrong with the food, and, you know, I was
23   new.  The best way to not get involved was just to
24   take the write-up.
25         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
26         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  When
27   did that one --

82

1          **DEPUTY COMMISSIONER BLONIEN:**  There --

2    there was a 128 -- just to get it on the record,

3    6/22/91, and that was the religious refusing to

4    work, and then there is the 128, 7/07 -- [loud

5    voices outside]

6          **PRESIDING COMMISSIONER BIGGERS:**  Tell them

7    to knock it down -- knock it off down there.

8          **DEPUTY COMMISSIONER BLONIEN:**  -- I think

9    in '91 -- it's torn -- in '91, and that was also

10   refusal to work.

11         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

12         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  For

13   religious reasons?  Because that's what --

14         **DEPUTY COMMISSIONER BLONIEN:**  No.

15         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  -- my

16   form indicates.  So the form I received was

17   incorrect.  It has July 7, '91: refusal to work

18   due to religious reasons.  That's the only

19   rationale I have, so --

20         **DEPUTY COMMISSIONER BLONIEN:**  It says.

21         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  --

22   the information I have, that I was given, is

23   incorrect.

24         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

25   Fine.  We will --

26         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Okay.

27         **PRESIDING COMMISSIONER BIGGERS:**  We'll

83

1  take that under advisement.  Please continue.

2      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  With

3  respect the whole scenario involving -- that led

4  to the killing, the inmate indicated that it

5  occurred around the time he was asked to move out

6  of the apartment; however, the inmate actually

7  started embezzling from the Dillers in January of

8  that year, several months before he was asked to

9  move -- move out; isn't that correct?

10     **INMATE LIEBB:**  That's a question?  I -- I

11 assume so.  I mean, I don't have the dates, but I

12 assume it is correct.

13     **PRESIDING COMMISSIONER BIGGERS:**  Okay.

14     **INMATE LIEBB:**  The dates that you're

15 giving I assume are correct.

16     **PRESIDING COMMISSIONER BIGGERS:**  The

17 question -- then I'll rephrase it in general

18 terms.  Did anything -- were you taking money from

19 the -- the Dillers that should have been going to

20 the Dillers prior to this incident taking place?

21     **INMATE LIEBB:**  Well, the -- yeah, the

22 taking of the money happened prior to the --

23     **PRESIDING COMMISSIONER BIGGERS:**  Okay.

24     **INMATE LIEBB:**  -- homicide, yes.

25     **PRESIDING COMMISSIONER BIGGERS:**  That's

26 all we need to hear.  That's fine.  Continue,

27 please.

84

1      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And

2    it also occurred prior --

3      **PRESIDING COMMISSIONER BIGGERS:**  Through

4    us, please.

5      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  -- to

6    -- and it also occurred prior to the time he was

7    asked to move out; isn't that correct?

8      **INMATE LIEBB:**  I believe so.  I'm not

9    absolutely sure of the time.

10      **PRESIDING COMMISSIONER BIGGERS:**  You

11    believe so.  Okay.  Continue, please.

12      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Okay.

13    The inmate, when he was being asked the question

14    about going to Mr. Altschuler's office, and I'm

15    talking about the confrontation with Mr. Gold

16    where he assaulted Mr. Gold the first time, he

17    indicated that -- that he had worked there;

18    however, the inmate was not working there in March

19    of 1980, was he?

20      **PRESIDING COMMISSIONER BIGGERS:**  Okay.

21    You're directing the question to me, yeah.

22      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

23    (inaudible) --

24      **PRESIDING COMMISSIONER BIGGERS:**  Were you

25    working there prior to?

26      **INMATE LIEBB:**  I don't believe so.

27      **PRESIDING COMMISSIONER BIGGERS:**  Okay.

85

1          **INMATE LIEBB:**  March 1980.

2          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  What

3    was the inmate's purpose in being there in March

4    of 1980 if he was not working there?

5          **INMATE LIEBB:**  Well, I think this had to

6    do with the whole issue of whether, you know, I

7    was going to be charged for the apartment, and

8    this -- that whole issue was to resolve it with

9    Mr. Altschuler.

10          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

11          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  So he

12    did go to see Mr. Altschuler; is that correct?

13          **INMATE LIEBB:**  Yes.  Yes.

14          **PRESIDING COMMISSIONER BIGGERS:**  Wait till

15    she's finished because she has to ask them through

16    me.  Thank you.

17          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And

18    with respect to the actual killing of Michael

19    Diller, why did he kill Michael Diller?

20          **INMATE LIEBB:**  I -- I'd like that question

21    broken down.  I mean, you're asking --

22          **PRESIDING COMMISSIONER BIGGERS:**  She

23    asked --

24          **INMATE LIEBB:**  -- why I stabbed him or --

25          **PRESIDING COMMISSIONER BIGGERS:**  She's

26    asking the question why did you attack and murder

27    Mr. Diller?

86

1       **INMATE LIEBB:**  Okay.  She -- the que --
2    the question --
3       **PRESIDING COMMISSIONER BIGGERS:**  That's
4    two questions that I'm asking you right now.
5       **INMATE LIEBB:**  Okay.  Fine.  First of all,
6    I don't justify what I did, but what
7    precipitated --
8       **PRESIDING COMMISSIONER BIGGERS:**  I didn't
9    ask you to justify, I asked you to tell this panel
10   why you committed the act.
11      **INMATE LIEBB:**  I committed the act because
12   once I was in the car and he accelerated the car
13   and the car crashed, then I became angry at him
14   and I stabbed him.
15      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Why
16   did he assault Mr. Diller in his car to begin
17   with?
18      **INMATE LIEBB:**  I didn't go into the car to
19   assault him, I went in to confront him about what
20   had happened two days prior with Arthur and this
21   ongoing escalation between me and, you know,
22   Arthur, and Arthur's friends.
23      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  So
24   does the inmate today acknowledge that prior to
25   assaulting Mr. Diller in his car Mr. Diller had
26   not tried to run him off the road in his car?
27      **INMATE LIEBB:**  I don't know if he was

1    trying to run me off.  What I -- I indicated is

2    that he swerved the car toward me, but as I stated

3    to -- in the psychiatric interview today, I don't

4    believe he was actually trying to run me over.

5          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Going

6    now to the incident involving the dad, and I

7    believe that was in -- on May the 11th, 1980, this

8    would have been sometime before the actual

9    killing, the inmate had moved out of the apartment

10   at 303 Doheny the month before.  What was he doing

11   at the apartment complex on that evening at seven

12   p.m.?

13         **INMATE LIEBB:**  Well, I don't believe first

14   of all it was seven p.m., it was the early

15   afternoon, and --

16         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

17   Then I'll rephrase the question for the district

18   attorney.  What were you doing at the apartment

19   since you'd already moved out?

20         **INMATE LIEBB:**  I was driving with Joe

21   Harriton and we had passed the apartment and

22   happened to see Joe Gold in front of the

23   apartment.

24         **PRESIDING COMMISSIONER BIGGERS:**  All

25   right.

26         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Well,

27   so why did he get out of the car and assault Mr.

88

1  Gold?

2        **INMATE LIEBB:**  I was angry at Mr. Gold for

3  confronting me in the hospital.

4        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Does

5  the inmate acknowledge that he came out of the car

6  and came after Mr. Gold with a bat?

7        **INMATE LIEBB:**  Definitely, yes, I

8  acknowledge that.

9        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I'm

10  sorry -- may I have a moment?

11        **PRESIDING COMMISSIONER BIGGERS:**  All

12  right.  Let's take a five-minute recess, please.

13        **ATTORNEY BROSNAHAN:**  Okay.

14                    **(Off the Record)**

15        **DEPUTY COMMISSIONER BLONIEN:**  We're back

16  on tape.

17        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

18  Let the record reflect that everybody that was in

19  the room prior to us going through a short recess

20  is back in the room.  Please continue, Miss

21  DelaGarza.

22        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Thank

23  you, Commissioner.  Commissioner Biggers, we do

24  ask the inmate if at trial the inmate testified

25  and also presented other witness testimony

26  indicating that actually Mr. Gold had assaulted

27  him with a bat on that particular day?

1      **INMATE LIEBB:**  You know, I honestly don't
2  remember.
3      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  The
4  inmate doesn't remember that he lied --
5  Commissioner Biggers, will you ask the inmate if
6  he doesn't remember that he lied during the trial?
7      **ATTORNEY BROSNAHAN:**  Argumentative.
8      **PRESIDING COMMISSIONER BIGGERS:**  Okay.
9  But I think the question -- let's rephrase it.
10  Did you in fact tell the Court that Mr. Gold
11  attacked you with a bat?
12      **INMATE LIEBB:**  I -- you know, sir, I
13  honestly don't remember the trial testimony.
14      **PRESIDING COMMISSIONER BIGGERS:**  He
15  doesn't remember.
16      **INMATE LIEBB:**  If that what it says, then
17  that's what I did say.
18      **PRESIDING COMMISSIONER BIGGERS:**  Okay.
19  Please continue, ma'am.
20      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**
21  Commissioner Biggers, would you ask the inmate
22  when he says -- he said that Mr. Diller, Arthur
23  Diller, was living at the apartment complex and
24  that's how he came in contact with him.  When was
25  it that Mr. Arthur Diller supposedly lived at the
26  complex that he was managing?
27      **INMATE LIEBB:**  He used an -- during the

1   time that I lived there, there was an apartment on

2   the first floor that was vacant that he didn't

3   live there full-time during the week but he'd use

4   the apartment occasionally, it was available to

5   him.

6         **PRESIDING COMMISSIONER BIGGERS:**  When you

7   say occasionally, was it every weekend or --

8         **INMATE LIEBB:**  Like maybe --

9         **PRESIDING COMMISSIONER BIGGERS:**  -- once a

10  month, or --

11        **INMATE LIEBB:**  Like a few times a month.

12        **PRESIDING COMMISSIONER BIGGERS:**  A few

13  times a month.  Okay.  Okay, ma'am.

14        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Which

15  -- Commissioner Biggers, would you ask the inmate

16  which apartment number he claims was vacant

17  throughout the time period and that Mr. Diller

18  used?

19        **INMATE LIEBB:**  I don't remember the number

20  of the apartments.

21        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  After

22  Mr. -- Commissioner Biggers, would you ask the

23  inmate after he assaulted Mr. Diller in the car

24  and he ran after him, what happened once Mr.

25  Diller went through the window?

26        **INMATE LIEBB:**  Once Michael Diller lept

27  through the window, I lepta -- this was a shed and

91

1    it had a -- a shelf, and he was inside the shelf,

2    I leapt across the shelf and stabbed him once with

3    the knife that I had.

4        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

5    Commissioner Biggers, would you ask the inmate

6    what he did after he stabbed Michael Diller in the

7    chest?

8        **INMATE LIEBB:**  Well, I removed the knife,

9    and then he grabbed the blade of the knife, and I

10   let him releases the blade, and then we spoke

11   briefly, and there was a crowd of people that had

12   gathered, and I heard a siren.  I went back to my

13   motorcycle and drove away.

14       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

15   Commissioner Biggers, would you ask the inmate

16   what supposed conversation he had with Michael

17   Diller before he left the area?

18       **INMATE LIEBB:**  I said to -- I could see

19   the hurt in his eyes after I stabbed him, and he

20   grabbed the blade, and I could see like, you know,

21   he was cutting himself, so I didn't want to yank

22   the blade and -- and cut his hand anymore, so he

23   released it, and I -- and then I -- I realized

24   what I had done, and -- and I felt -- I felt

25   terrible, and I said to him, "I -- I never did

26   anything to you or your family," and he -- he just

27   responded, "I love you."

1          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

2          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

3    Commissioner Biggers, didn't the inmate already

4    indicate that he was embezzling from the family,

5    so when he said, "I never did anything to you or

6    your family," he didn't include embezzling as

7    something wrong to be doing?

8          **INMATE LIEBB:**  At -- at the time, after --

9    you know, this like, you know, explosive contact,

10   I wasn't thinking about embezzling.  I meant like

11   hurt, you know, us hurting each other physically

12   like that, like you know, attacking each other

13   like in this way.  That's what I mean by hurting.

14         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

15   Commissioner Biggers, would you ask the inmate

16   isn't it true that he spoke to a Dr. Vicory with

17   respect to his conduct during that time and

18   indicated that he was concerned that the Diller

19   family was going to prosecute him for embezzlement

20   and was going to turn him into the bar and that

21   that was the reason why he was so angry at the

22   Diller family?

23         **INMATE LIEBB:**  Well, I -- I don't remember

24   the conversation with Dr. Vicory, but I do

25   remember that, yeah, that they were going to

26   present the evidence of my embezzlement to the bar

27   certainly.

1          PRESIDING COMMISSIONER BIGGERS:  Okay.

2     But the question was, did you have any harsh

3     feelings about the Diller family concerning the

4     possibility of them going to the bar because of

5     your actions?

6          INMATE LIEBB:  Sure, I mean, but it wasn't

7     to really -- you know, I was wrong there, so I

8     mean it wasn't like, hey, they were doing -- if

9     they did it that was something like I blamed them

10    for.  I was wrong.

11         PRESIDING COMMISSIONER BIGGERS:  Okay.

12         DEPUTY DISTRICT ATTORNEY DELAGARZA:

13    Commissioner Biggers, would you ask the inmate,

14    after killing Michael Diller did he in fact call

15    Bixby Kelly and meet he and his wife and proceed

16    to have dinner with them?

17         INMATE LIEBB:  Not in that sequence at

18    all.  This happened on a early Sunday morning, and

19    after I left, I went back to my apartment.  I had

20    lost my car keys.  Later I learned -- my apartment

21    keys.  Later I learned I had dropped them in

22    Michael Diller's car, so I had nowhere to go.  My

23    other friend, Joe Harriton, wasn't home.  I went

24    to a -- a girlfriend's apartment in Santa Monica,

25    she wasn't home, and I spent most of that

26    afternoon just calling my family from a pay phone

27    somewhere on -- on a street in Santa Monica.  Then

1    this girl, Mona Lisa, came home, and I called

2    Kelly Bixby from her house that evening, and I

3    told him I did something terrible, and he met me

4    with his wife.  They were going out to dinner,

5    yes, and I went them to a restaurant --

6          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

7    You did in fact go to dinner?

8          **INMATE LIEBB:**  Yeah.

9          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

10   Next question, please.

11         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

12   According to the -- Commissioner Biggers,

13   according to the appellate decision, the killing

14   of Michael Gold occurred at approximately --

15   excuse me, Michael Diller occurred at

16   approximately two p.m., and according to Mr.

17   Bixby, the inmate called him between three and

18   four, and right after that met him; is that not

19   correct?

20         **INMATE LIEBB:**  Okay, first of all, I mean

21   if that's what the record says --

22         **PRESIDING COMMISSIONER BIGGERS:**  We're not

23   asking that.  We're trying to get a --

24         **INMATE LIEBB:**  No, this happened -- you're

25   saying that the incident happened at two.  [Tape

26   beeps.]  No, it wasn't.  It happ -- this thing

27   happened in the early morning --

95

1       **PRESIDING COMMISSIONER BIGGERS:**  Please

2   hold.  Time out.

3       [Thereupon, the tape was turned over.]

4       **DEPUTY COMMISSIONER BLONIEN:**  Okay.  We're

5   back on record, tape two, side two.

6       **PRESIDING COMMISSIONER BIGGERS:**  Okay, Mr.

7   Liebb, and I believe what the district attorney's

8   trying to establish is a time line here as a way

9   of -- of -- and I can't put words in her mouth,

10  but we're trying to establish remorse and

11  everything that took place there.  But on the --

12  the appellate decision it said something happened

13  between two and four, and you said it did not

14  happen, so --

15      **INMATE LIEBB:**  Well, I'm saying I don't

16  recall it happening.

17      **PRESIDING COMMISSIONER BIGGERS:**  Okay.

18      **INMATE LIEBB:**  This is my recollection.

19  And I haven't reviewed, you know, any of the facts

20  of this --

21      **PRESIDING COMMISSIONER BIGGERS:**  All

22  right.

23      **INMATE LIEBB:**  -- crime --

24      **PRESIDING COMMISSIONER BIGGERS:**  So you do

25  not --

26      **INMATE LIEBB:**  -- so --

27      **PRESIDING COMMISSIONER BIGGERS:**  -- you do

96

1    not --

2        **INMATE LIEBB:**  But know that I didn't meet

3    Kelly Bixby until that evening.

4        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

5    All right.  Next question, please.

6        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  After

7    meeting Mr. Bixby, did the inmate in fact go to

8    his house, go to Mr. Bixby's house, get a change

9    of clothes, and then proceed to go his apartment

10   and get his dog to try to leave the area?

11       **INMATE LIEBB:**  No, not to leave the area,

12   I just -- what's true is I did go with Mr. Bixby

13   to his house, and I had blood on my sweatshirt,

14   and he gave me a T-shirt to change into, and I

15   took a cab and went to back to my apartment, and I

16   just took my dog out.  I wasn't trying to flee or

17   -- or go anywhere.  I didn't really know what I

18   was going to do.  I was really, you know, kind of

19   upset and -- and shocked by what I did and what

20   happened.

21       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  How

22   was it that the -- Commissioner Bixby --

23   Commissioner Biggers, would you ask the inmate how

24   was it that he knew that the victim was going to

25   Jody Popkin's apartment?

26       **INMATE LIEBB:**  I -- I didn't know where he

27   was going.  I didn't know where he was going.  I

97

1    thought he was going to where Arthur was staying.

2    That's -- that's -- that's why when we happened to

3    meet on Wilshire, I believe, that I -- I followed

4    him, thinking he was going to where Arthur was.  I

5    didn't even know Jody Popkin or where she lived.

6         **PRESIDING COMMISSIONER BIGGERS:**  But you

7    did follow him?

8         **INMATE LIEBB:**  Yes.

9         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

10        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**

11   According to the testimony at the trial, Mary

12   Wess, who lived across from Jody Popkin, indicated

13   that the inmate actually got there three to ten

14   minutes before the victim and was standing by a

15   tree.  Commissioner Biggers, would you ask the

16   inmate how it was that he could've gotten to that

17   location before Michael Diller?

18        **INMATE LIEBB:**  Well, my answer is -

19   and -- and the truth is, it simply didn't happen.

20   This was a very elderly woman, and I do remember

21   her testimony --

22        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

23   Just --

24        **INMATE LIEBB:**   -- and I didn't arrive

25   there before.

26        **PRESIDING COMMISSIONER BIGGERS:**  Sir, just

27   answer the question, please.  Just --

98

1          **INMATE LIEBB:**  I wasn't -- I didn't

2   arrive --

3          **PRESIDING COMMISSIONER BIGGERS:**  You

4   didn't.

5          **INMATE LIEBB:**  -- arrive before him.

6          **PRESIDING COMMISSIONER BIGGERS:**  You

7   didn't arrive.  Okay.  Thank you.

8          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I

9   have no other questions.

10         **PRESIDING COMMISSIONER BIGGERS:**  All

11  right.  Thank you.  Now I'm going to ask your --

12  your turn, sir.

13         **ATTORNEY BROSNAHAN:**  Yes.

14         **PRESIDING COMMISSIONER BIGGERS:**  Do you

15  have any questions for the inmate?

16         **ATTORNEY BROSNAHAN:**  Yes, I have a few,

17  thank you, although an awful lot's been covered,

18  and I appreciate that.  I have less than I had

19  when I came in the door.

20         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

21  Continue.

22         **ATTORNEY BROSNAHAN:**  Have you been locked

23  up with white supremacists in San Quentin?

24         **INMATE LIEBB:**  Yes.

25         **ATTORNEY BROSNAHAN:**  How many times?

26         **INMATE LIEBB:**  I myself several times.

27         **ATTORNEY BROSNAHAN:**  How do you know

99

1  they're white supremacists?

2      **INMATE LIEBB:**  Well, I just assumed it.

3  They have swastikas tattooed on their chest, or

4  they have "White Pride" on their arms, or they

5  have these skinhead markings on their neck.

6      **ATTORNEY BROSNAHAN:**  Do you wear anything

7  that shows that you're Jewish?

8      **INMATE LIEBB:**  Yeah.  I wear a Star of

9  David.

10      **ATTORNEY BROSNAHAN:**  And do you in your

11  cell have anything that reflects the Jewish

12  religion?

13      **INMATE LIEBB:**  Yeah, I have numerous items

14  in my cell: the Hebrew calendar, Hebrew books,

15  Hebrew prayer books.

16      **ATTORNEY BROSNAHAN:**  Have you acted --

17  when you've been locked down with a white

18  supremacist in your view, did you act out and do

19  any physical violence to them, or get in fights

20  with them, or altercations, call them names, or

21  anything like that?

22      **INMATE LIEBB:**  No, sir.

23      **ATTORNEY BROSNAHAN:**  Why is that?  Because

24  I think everybody wants to know what you're like

25  now.  Why -- why is that?

26      **INMATE LIEBB:**  Because I -- I learn that -

27  - I've learned that, you know, differences of

1   opinions, conflicts even among friends and family,

2   and especially among people who, you know, might

3   have had certain racial or religious bigotries are

4   inevitable in life and that's it no solution to

5   try to use violence, force, or even, you know,

6   insulting language to try to prove your point,

7   that there's a way to try to avoid violent

8   conflicts, there's a way to even agree to

9   disagree.

10          **ATTORNEY BROSNAHAN:**  Are there other

11  occasions in San Quentin in your experience over

12  the last let's just say ten years where you've

13  been provoked by someone, by something they said,

14  something they did, those kind of incidents?

15          **INMATE LIEBB:**  Yeah, definitely.

16          **ATTORNEY BROSNAHAN:**  How do you react to

17  that?  I think the commissioners would like to

18  know.  What do you do in the yard or wherever you

19  might be when someone says something or acts in a

20  certain way that's kind of threatening to you?

21          **INMATE LIEBB:**  Well, it -- it doesn't even

22  necessarily have to be threatening.  You know,

23  people -- I work in the kitchen where you have

24  roughly 80 to a hundred other inmates working at

25  the same time, and I'm in an office where I'm

26  responsible for giving them gloves, towels,

27  cleaning supplies, sometimes they need boots,

1   sometimes plastic bags, and sometimes these items

2   aren't available, and sometimes people in here

3   when they don't get what they want, they lash out

4   verbally, or -- or, you know, make threatening

5   remarks, so I've learned to try to deflect these

6   things, sometimes wait till things cool down and

7   explain to the individual, "Hey, I just don't have

8   this right now; when I get it, you know, I'll --

9   I'll get with you, or come see me in a few days."

10  So I've learned really basically communication and

11  -- and recognizing if somebody says or does

12  something that's going to arouse any type of anger

13  or negative feelings, to back off, to do what's

14  simply called taking a time out and assess the

15  situation and letting things cool down and calm

16  down.

17      **ATTORNEY BROSNAHAN:**  May I ask through

18  Commissioner Biggers, I don't want to go into this

19  very much, but your -- your dad died this year?

20      **INMATE LIEBB:**  Yes.  He died during the

21  Passover, which was April of this year.

22      **ATTORNEY BROSNAHAN:**  What did he do as --

23  what was his work?  And I know that it says that

24  he was a stockbroker.  What did he do in New York?

25      **INMATE LIEBB:**  He was a -- a restaurant

26  broker.  He came from Lithuania and studied to get

27  a real -- a business broker's license, and because

102

1   his early experience was working in restaurants,

2   he was familiar with that business.  He bought and

3   sold, and -- and later on he participated in

4   designing, and then giving advice on the menus and

5   how much square footage you needed to have the

6   business be profitable.

7       **ATTORNEY BROSNAHAN:**  What did you get out

8   of the courses that you took at the suggestion of

9   the commissioner who was here three years ago?

10  What did -- what did -- what was the -- what were

11  the better things that you got out of those

12  programs?

13      **INMATE LIEBB:**  Well, I learned a lot from

14  the courses I took.  I mean, I just didn't, you

15  know, randomly take things, you know.  I asked

16  friends, you know, a lot of lifers, some who got

17  dates, who had taken programs, what they

18  recommended, because if I was going to spend my

19  time, I wanted to get things out of it.  So the --

20  the ones that I took basically taught me tools to

21  make up the deficiencies I had, like in errors in

22  communicating, and allowing maybe a difference of

23  opinion to exist without resorting to conflict,

24  tools for relieving stress, to building better

25  relationships, you know, to -- I have a lot of

26  young nieces and nephews and cousins, so I took

27  the Parenting class to learn how to relate to them

103

1   and -- during visits and hopefully one day when

2   I'm out.

3         **ATTORNEY BROSNAHAN:** Commissioner Blonien

4   referred to the paralegal courses that you took,

5   and of course you were actually practicing law.

6   If I may ask through the commissioner, when all

7   this happened, you were practicing law in Century

8   City; is that right?

9         **INMATE LIEBB:** Yes.

10        **ATTORNEY BROSNAHAN:** And the law has

11  changed a lot in 25 years. What did -- what are

12  some of the things that quick -- you quickly were

13  -- can tell us about in training to be a paralegal

14  in these courses that you took?

15        **INMATE LIEBB:** Well, the -- the main thing

16  was in the whole area of computerized legal

17  research and the use of the Internet to do

18  research, to like find expert witnesses to

19  different programs, like Microsoft, like Excel.

20  Through the work books I gained some familiarity,

21  not by any sense any kind of, you know, mastery of

22  it, but I -- I know what's there and -- and what's

23  available to enhance your ability to do this type

24  of work.

25        **ATTORNEY BROSNAHAN:** And now, if -- if I

26  may ask again, Yoav Kiesler sent me an email as

27  soon as I said I might represent you, and he sent

1    me a nice email talking about you.  How does he

2    know you?  We're interested, I think, in how do

3    these --

4         **INMATE LIEBB:**  Yeah.

5         **ATTORNEY BROSNAHAN:**  -- how do these --

6    you seem to have quite a support system here.  A

7    lot of people think that you should be outside.

8    How do you know these people and --

9         **INMATE LIEBB:**  Well --

10        **ATTORNEY BROSNAHAN:**  -- can you tell us a

11   little bit?

12        **INMATE LIEBB:**  -- Yoav is an Israeli who lives

13   in Marin with his wife and three young children.  He

14   finished his military service in the Golan Heights and

15   went to Australia and got a degree in Gemology, and he

16   works in the diamond business now in San Francisco,

17   but he also prays with Chabad, which is a -- a

18   religious group, and part of like their mission is to

19   help Jewish prisoners to -- he wanted to do what we

20   call a mitzvah, a commandment, to visit somebody in

21   prison, and he was -- he found about -- out about me

22   actually through Eddie Zang, whose letter you read.

23   Eddie Zang has his own website and he mentioned me as

24   -- as helping him, and gave my CDC number and ways to

25   contact me.  So through that link Yoav found me, wrote

26   me a letter, and we -- we began visiting and -- and

27   struck up a real friendship.

105

1        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Let's

2   go on.

3        **ATTORNEY BROSNAHAN:**  Okay.  You met with Dr.

4   Inaba, a Ph.D.  She's a contract psychologist.  Were

5   you forthcoming in that interview?  Did you tell her

6   about things and --

7        **INMATE LIEBB:**  Yes, sir, you know, I did,

8   because I knew that -- what the Board wanted in her

9   report, and I knew that the only way she could do this

10  report was by me to be honest.  You know, she told me,

11  you know, nothing's confidential, you don't have to

12  answer if you don't want to, and -- and I told her,

13  no, I want to cooperate with this.

14       **ATTORNEY BROSNAHAN:**  And one of the main

15  purposes of these proceedings, by law, is the question

16  of whether you would do this again.  That's it,

17  really.  And although you want to get out and you have

18  an interest in, of course, saying that you wouldn't do

19  it again, I think the commissioners might be

20  interested in hearing you say, suppose you're in a bad

21  situation, somebody's provoking you, they're calling

22  you a faggot, or whatever they might be doing -- it

23  doesn't excuse any of this -- but that -- that

24  happens, in happens in life, that's what happens out

25  there, are you going to do this again?

26       **INMATE LIEBB:**  No, of course not.

27       **ATTORNEY BROSNAHAN:**  And if -- if not, why?

106

1          **INMATE LIEBB:**  First, you know, the pain that

2     it's caused to the victim's family, and to my family,

3     and to people that care about me.  You know, that's

4     number one.  So even if I was stupid, you know, I -- I

5     -- I -- I'm, at the least, one of those people that

6     learns the hard way, so that would be first.  But the

7     other thing is just it's not my motivation at all in

8     life to ever hurt somebody, to have even verbal

9     conflicts with, so if I was in a situation like that,

10    I know ways to avoid it, to get out of it, you know, I

11    don't need to prove that I'm right.

12         **ATTORNEY BROSNAHAN:**  Thank you, commissioners.

13    That's all I have.

14         **PRESIDING COMMISSIONER BIGGERS:**  All right.

15    Thank you, sir.  And I apologize for not getting your

16    last name.

17         **ATTORNEY BROSNAHAN:**  Brosnahan, with a "B."

18         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Mr.

19    Brosnahan.

20         **ATTORNEY BROSNAHAN:**  It's Brosnahan, yes.

21         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

22         **ATTORNEY BROSNAHAN:**  Thank you.

23         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  At

24    this point I'm going to ask the district attorney,

25    Miss DelaGarza, to close, please.

26         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Thank

27    you, Commissioner.  The District Attorney's Office of

107

1    Los Angeles County opposes the granting of a parole
2    date for this inmate, and beginning -- well, actually
3    even predating the life crime the inmate acts -- and
4    there are things that state as if this was a -- an
5    aberrant act by the inmate.  However, the evidence at
6    trial clearly pointed out that this inmate was a
7    violent individual and who had attacked or threatened
8    other people for little or no reason.  Commissioner
9    Biggers talked about the incident at UCLA.  Besides
10   the UCLA incident, in the appellate -- appellate
11   decision there are references to several other
12   incidents.  One of them involved a -- one of the
13   tenants at the apartment complex where the inmate was
14   the manager, and when she asked that some work be
15   done, he not only didn't do the work but he threatened
16   her, told her that he was part of the Mafia and that
17   if she -- if she kept bothering him that something was
18   going to happen to her.  There was a security guard at
19   L.A. -- Los Angeles New Hospital, and one day when the
20   inmate went there, the security guard apparently
21   didn't move fast enough for him, and the inmate ran
22   over his foot and then proceeded to go through the
23   gate and went about his business.  The inmate and his
24   friend, Mr. Harrington, both belonged to the Sports
25   Connection, and they were always picking fights with
26   people at the Sports Connection, and as a result, the
27   manager basically rescinded their contract because of

108

1    the violence of both individuals.  There was an 80-
2    year-old man who lived -- and this is after the inmate
3    moved out of 303 Doheny -- who lived in an apartment
4    near where the inmate was living, and he mentioned
5    something to the inmate about the fact that his dog
6    was defecating and he wasn't cleaning it up, and the
7    inmate was assaultive to him and said to him, "I can
8    do whatever I feel like," and -- and so, again, he was
9    assaultive toward him.  So we have those many
10   incidents.  With respect to the life crime, the inmate
11   in the long, rambling letter that he wrote as
12   explanation for this crime, talked about the
13   relationship between him and Dillers and makes it seem
14   as if there was a long relationship involving both
15   families.  The truth is that the inmate met Michael
16   Diller at UCLA sometime around 1979, and at that
17   point, yes, he became close to the Diller family.  The
18   Diller family took them under their wing because they
19   thought that Mr. Diller [sic] came from an
20   impoverished -- impoverished background.  They allowed
21   him -- they gave him a job initially, then they
22   allowed him to live rent-free in an apartment, asking
23   only that he do minimal managerial duties.  They gave
24   him a car to use whenever they needed, they allowed
25   him to come to the house for high holy days.  And so
26   he was basically taken in by the Dillers.  At some
27   point there was a falling out, or just basically a

1    separation of the ways between Michael Diller and the
2    inmate, and they're the ones who were actually close
3    friends.  And sometime around January of 1980, the
4    inmate decided that it wasn't enough that he had
5    gotten all these things from the Dillers, he was going
6    to embezzle from the Dillers, and that was when he
7    contacted Dr. Landy and basically took money -- took
8    cash from him, indicating on the records that the
9    apartment was empty, however, accepting money from Mr.
10   Landy.  Initially it was for one month for 200
11   dollars.  Then he received I think it was over 1100
12   dollars in cash, and again, as Commissioner Biggers
13   indicated, the receipts that he gave were in
14   fraudulent names.  When this was brought to Dr.
15   Landy's -- when he was made aware of this, he
16   basically called Mr. Liebb and made him sign the
17   receipts indicating his correct name.  And even after
18   the inmate was going to be moving out, asked to move
19   out of that particular apartment complex, he continued
20   in the embezzlement, repeatedly contacting Mr. -- Dr.
21   Landy and indicating to him that he could give him a
22   really good deal, get -- letting him live there for a
23   hundred dollars a month for an additional six months.
24   According to the testimony by Dr. Landy, the inmate
25   repeatedly contacted him, but Dr. Landy decided that
26   he didn't want to continue living at the apartment
27   complex.  In March of 1980 is when Mr. Altschuler, who

110

1   was the person hired by Mr. Diller to basically take
2   care of funds, contacted the inmate and told him he
3   was going to have to move out.  It is no coincidence
4   that at the end of March the inmate goes to
5   Altschuler, because in a letter that the inmate sent
6   to Mr. Altschuler, he indicated to him that not only
7   was he not going to pay rent but that he wasn't going
8   to move out until the end of March, and that is when
9   he goes there.  And according to everybody's
10  testimony, not just Mr. Gold, not just Mr.
11  Altschuler's, but the staff who were at the hospital,
12  Dr. Nessin, who happened to have an office in the same
13  building, everybody saw the inmate assaulting Mr.
14  Gold.  And with respect to that, Mr. Gold did file a
15  complaint.  It did go to the City Attorney's Office,
16  and after that, the inmate contacted Mr. Gold,
17  contacted the Schulers [sic], apologized, asked them
18  to withdraw the -- the complaint, and Mr. Gold did in
19  fact withdraw the complaint.  This is in March.  By
20  May -- by April the inmate has moved out, and it is in
21  April -- well, actually it's not until May that Mr.
22  Gold becomes the manager, and when Mr. Gold becomes
23  the manager, he realizes that the embezzlement that
24  had been going on, and it is on May 11 when Mr. Gold
25  and Arthur Diller and Michael Diller go basically to
26  lock up the apartment because they don't know who's
27  living there, they don't know what's going on, that

1    the inmate is hiding behind a bush, according to the
2    testimony of Mr. Gold, and as Mr. Gold comes down the
3    steps, he's attacked by the inmate.  Sometime after
4    May, Mrs. Diller -- that's Arthur and Michael Diller
5    [sic], did in fact contact the inmate's family,
6    basically letting them know about the assaults by the
7    inmate to different people, and also the embezzlement.
8    After that, according to the testimony, the inmate not
9    only calls Mrs. Diller and is abusive to her, but he
10   also threatens that if she doesn't stop calling his
11   family that he going to kill her and the rest of her
12   family, and it's not long after that that he carries
13   out that threat by killing Michael Diller.  After the
14   call to Mrs. Diller, Arthur Diller did in fact go to
15   the inmate, that's basically to -- to reason with him
16   and tell him to leave his mother alone, and he did in
17   fact have a hammer, but this is after the inmate had
18   assaulted Gold and Mr. Diller with a bat, so he was
19   concerned for his safety.  And there wasn't just the
20   one bat, there wasn't just the one hammer, the inmate
21   in fact had a pipe that he was carrying with him, and
22   according to the testimony, it was -- there were
23   assaults by both, one using a hammer and the other
24   using the -- the pipe.  As to the life crime itself,
25   the inmate's story has never made sense because for
26   the longest time he adhered to the story that Michael
27   Diller had tried to run him off and it was because of

112

1    that that he followed him, but by everyone's
2    testimony, the inmate had just purchased the bike
3    shortly before this particular incident, and according
4    to everybody, the inmate was wearing a helmet so he
5    was not recognizable, there wouldn't have been any way
6    that Michael Diller would have known that it was the
7    inmate on the bicycle, and the inmate did not take his
8    helmet off. While he was waiting for Michael Diller,
9    he didn't take his helmet. While he jumped in the car
10   and assaulted Mr. Diller, he didn't take the helmet.
11   As he was running after Michael Diller, he didn't take
12   the helmet off. As he went through the window and
13   stabbed Michael Diller, or as he left that particular
14   area, so his story doesn't make sense. And with
15   respect to the testimony, it is clear the -- he was
16   convicted of first-degree murder based on the theory
17   of lying in wait. There was testimony, strong
18   evidence that prior to Michael Diller even arriving at
19   the location, the inmate was there waiting for Michael
20   Diller, and he had obviously been stalking Mr. Diller
21   because Mr. Diller had gone to that location just on
22   days prior to that, so he would have known that Mr.
23   Michael Diller was in fact seeing somebody, so he went
24   to that location and waited until Michael Diller came.
25   As to the offense itself, it was a very cold, callous
26   and brutal killing of Michael Diller. According to
27   several people who were at the location, one of them

113

1   being Mr. Ernie McKery, he testimony, along with

2   somebody else, that Michael Diller comes running

3   through the park saying, "Help me, help me, he's going

4   to kill me." He then sees an open window. Apparently

5   it's a small concession stand that is connected to

6   this building. He throws himself into the concession

7   stand, and there is only the counter with very little

8   space, and as he's pinned against the wall, the

9   witness, Carrie McKery -- Laurie McKery sees the

10  inmate lunge through with the knife in hand. At that

11  point he sees Michael Diller reach up in -- in a

12  defensive posture, and he gets cut in the hand

13  initially. Then he sees -- Mr. McKery sees the inmate

14  again stab, and this time he stabs the inmate [sic] so

15  forcefully that it goes through the lung and through

16  the heart, and according to the coroner's testimony,

17  after it is lunged into the victim, the inmate twisted

18  the knife inside the victim before withdrawing the

19  knife. After he withdrew the knife, the inmate got

20  out of the window and he went back to the area where

21  his motorcycle was, calmly talked to several different

22  people, got on his motorcycle and he drove away.

23  According to Miss Popkin, according to all the

24  witnesses, the initial incident occurred at

25  approximately two o'clock, and that was the time that

26  Miss Popkin said that the victim, Michael Diller, was

27  -- had arranged to meet her there. According to Mr.

114

1    Bixby, just one to two hours later, the inmate calls
2    him, and they make arrangements that he's going to
3    meet them for dinner that night, and he does in fact
4    go to West L.A. where he has dinner.  So after having
5    killed this person who claims is his friend, he calmly
6    sits there and has a chicken dinner, and then he goes
7    back to the Bixby's residence, he changes clothes, he
8    calmly gets in a cab, and he goes back to his
9    residence.  And again, this -- this shows part of the
10   callousness: the inmate is more concerned about his
11   dog than he is about Michael Diller who he stabbed to
12   death.  As he goes back to his apartment, the only
13   thing he does, according to the police, is he goes
14   through the window, he gets his dog, he comes back out
15   of the window, and it is at that point that the police
16   let themselves -- police let him know that they're
17   there.  The inmate drops the dog and takes off
18   running.  As I said, it was a very cold, deliberate
19   killing of Michael Diller.  It is clear that this was
20   a premeditated killing.  The inmate had gone to long,
21   careful maneuvers to plot this out.  Shortly before
22   the killing, he buys a helmet.  Shortly before the
23   killing, he buys a new motorcycle.  All of this is
24   planned.  As he's standing there waiting, the reason
25   the woman, Miss West -- the reason she made note of
26   him is because he's standing there with a motorcycle
27   helmet on, and she talks about having noticed that

115

1    about him.  So again, he did everything he could
2    basically to conceal his identity when he goes there
3    to kill Michael Diller.  The inmate certainly has
4    programmed in some respects, he's an intelligent
5    person, but he was an intelligent person before he
6    came to the prison.  Certainly that's borne out by his
7    educational accomplishments both at Syracuse and being
8    a graduate of UCLA law school, passing the bar.
9    However, with respect to the self-help, I believe
10    during the last hearing one of the things that they
11    talk about was the fact that most of the self-help
12    that he's done was one-on-one and there was very
13    little group self-help prior to -- since the last
14    hearing.  For the longest time the inmate has denied a
15    lot of what happened with respect to this crime, and
16    today I think he's made some admissions that are
17    relatively new with respect to what occurred; however,
18    whatever insight he has is recent.  With respect to
19    the psychological report, one of the problems with the
20    psychological report is that in the report, again,
21    they talk about this crime as being aberrant and that
22    there is no history of violence on the part of the
23    inmate, but clearly if the psychologist had read the
24    appellate decision -- and I went through the file, and
25    Dr. Vicary's report was not in there; however, I do
26    note that in looking at my file we did send a copy of
27    that report a long time ago, so I'll make sure that

1   there is a new copy in the file.  But it is clear that
2   his propensity for violence was manifested long before
3   the killing of Michael Liebb [sic], it was
4   uncontrolled violence that he has never dealt with,
5   and until we can be sure that that has -- that is
6   something that he does admit, does acknowledge and has
7   dealt with, he could continue to pose a threat to
8   society, and in particular to the Diller family.
9   Thank you.
10          **PRESIDING COMMISSIONER BIGGERS:**  Thank you.
11  And just a correction for the record, the last
12  indication should have been "Diller," rather than
13  "Liebb."
14          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I'm
15  sorry.  Thank you.
16          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Mr.
17  Brosnahan?
18          **ATTORNEY BROSNAHAN:**  Thank you.
19          **PRESIDING COMMISSIONER BIGGERS:**  Okay.
20          **ATTORNEY BROSNAHAN:**  Commissioners --
21          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Just one
22  -- I'm sorry.  Before -- when commissioner was reading
23  the letters, there are letters in the confidential
24  file that I've been made aware of from different
25  individuals who ask that their letters not be made
26  public, so I would ask the commissioner to make sure
27  that she is aware of those.  Thank you.

117

1        PRESIDING COMMISSIONER BIGGERS:  Okay.  Mr.

2    Brosnahan.

3        ATTORNEY BROSNAHAN:  Do we have copies of

4    them?

5        PRESIDING COMMISSIONER BIGGERS:  No, not --

6    not --

7        DEPUTY DISTRICT ATTORNEY DELAGARZA:  I don't -

8    -

9        PRESIDING COMMISSIONER BIGGERS:  -- they're

10   confidential.

11       DEPUTY DISTRICT ATTORNEY DELAGARZA:  -- I

12   don't -- I didn't get copies either.

13       ATTORNEY BROSNAHAN:  Oh.

14       PRESIDING COMMISSIONER BIGGERS:  Nobody gets

15   copies.

16       ATTORNEY BROSNAHAN:  Okay.

17       PRESIDING COMMISSIONER BIGGERS:  Okay.  Mr.

18   Brosnahan.

19       ATTORNEY BROSNAHAN:  Thank you very much,

20   Commissioners.  I appreciate the thoroughness of which

21   you went at this, and -- and I meant it when I said

22   that it left less for me to say.  Counsel has just

23   given a final argument, partly based on the record,

24   partly based on things that were not in the record,

25   and party on inferences and conclusions that she draws

26   about an event, a horrible, horrible event, that

27   happened 25 years ago, about which Mr. Liebb, and this

1    is his day to try to convince you that which we want.

2    We want him to get a date, and the reason we want him

3    to get a date: he's earned it.  He hasn't given up,

4    and he hasn't gone to the back edges of the California

5    prison system, he hasn't said he doesn't care about

6    other people, he hasn't said, "I guess I'm a violent

7    person and I'm going to take it out on somebody in the

8    yard."  For 25 years, basically, his record is that

9    he's tried to held -- hold it together and he's been

10   successful.  That helps to make up a little bit -- a

11   little bit for what he did.  What he did is horrible

12   to listen to.  It's terrible.  It's terrible.  But it

13   isn't a complete picture either, and I -- I do know

14   that it's very hard sometimes when things are in the

15   record --

16          PRESIDING COMMISSIONER BIGGERS:  Excuse me,

17   sir.

18          ATTORNEY BROSNAHAN:  I'll pause, sure.

19              [Thereupon, a new tape began.]

20          ATTORNEY BROSNAHAN:  Thank you very much.  So

21   I would like to start in 2006 with the report of the

22   psychiatrist -- the psychologist, a Ph.D., trained

23   person, dated July 20th, '06, in terms of looking

24   inside his mind.  And I've read a lot of these reports

25   over the years, and I'm sure you must read them all

26   the time, I mean a lot of them, and you've read --

27   you've read reports that sat on this table which said,

1    "You know, I talked to this person but he was trying

2    to manipulate me, he was trying to do this, he's a

3    sociopath, he's got psychiatric problems, he's prone

4    to violence. If you'll let him out he's going to do

5    it again." You must get a lot of those just by the

6    nature of the work that you are so nicely doing. This

7    is not that kind of report. This report is very, very

8    clear. She talks in detail about his history, and, of

9    course, it is his history that makes, if you will, the

10   story of this so sad, first, for the Diller family,

11   the sadness of it is for the Diller family. They

12   can't have their son, their brother back. It's

13   horrible. But it's also for the Liebb family. He --

14   he went through high school. He went through --

15   there's no evidence of anything wrong in high school.

16   He gets through high school, he goes to college, goes

17   to Syracuse, he goes through college, he comes out, he

18   goes to Los Angeles, he goes to law school. He's do -

19   - what is he doing? What did he have to do to do

20   that? He must be an unusual prisoner to come before

21   you. And his story struck me, when I first heard it,

22   as something that if he had then committed himself to

23   a life of violence, your decision would be the easiest

24   thing in the world: you'd just have to feel righteous

25   about saying this guy has no chance. He has a chance.

26   This is someone that can do some good out there. This

27   is someone who the psychiatrist says is -- is not

120

1    prone to violence, talks about him being a paralegal.
2    There's no evidence of a thought disorder.  His
3    intellectual functioning appeared to be in the above
4    range to superior range.  There was no evidence of
5    mood instability or depressed mood.  His judge -- and
6    -- and here he is in San Quentin and there's no
7    evidence of a depressed mood.  He's looking at life as
8    something that he's going to try to deal with.  That's
9    a commendable trait in anybody, whether they're in
10   here or outside.  That's a good thing.  He
11   demonstrated capacity for insight into external
12   forces.  That's what makes it so hard when the
13   district attorney weaves together a picture of -- of
14   what happened, which is bad enough, it doesn't need
15   any embroidery, but because we don't want to sound for
16   a second like we don't understand the problem.  We do
17   understand the problem.  Of course we understand the
18   problem.  But he has day in and day out dealt with it,
19   and it shows up in this report.  His progre -- his
20   prognosis is good for maintaining present mental
21   status as he has no major mental illness.  Puts him
22   above some people in the population who are out there.
23   I mean, that's pretty good.  "Remorse for his crime
24   and some insight into the attitudes and behavior that
25   lead to his crime."  This is a trained interrogator
26   saying this.  She -- she's certainly talked to other
27   people and been less impressed.  "He's gained maturity

121

1    and insight during his years of incarceration." He's
2    50 years old, not 25. And he -- you heard him talk
3    about how he would deal with stresses in the outside
4    world. It should be noted that that quality is not
5    evident in him today. In other words, she's talking
6    about his aggressive, hyper, macho attitude that he
7    had. His assessment for dangerous: level one, very
8    low. I -- I -- I think that all these things by
9    themselves are a basis for you to give him -- give him
10   a date. Secondly, his record in jail for 25 years has
11   been very good. You've -- you've covered things that
12   happened. You should. I understand that. But
13   there's very little of it. There's very little of it
14   in this record, and what there is is a long time ago.
15   He took various classes, starting in '85. He -- he
16   took a psychological therapy session of -- of some
17   kind, and then in '02 he was in the fathers' program,
18   and then he did start -- and -- and here I am struck
19   by the work that you have to do, and I've only been to
20   one of these before and it was in opposition, so I'm
21   not an experienced person, there are lawyers who know
22   more about this than I do. But -- but here's -- you
23   become, like it or not, somewhat involved in other
24   people's lives, and when -- when it is said, as it was
25   in '03, that you should do this and this and this, if
26   he came back and he hadn't done it, you would say,
27   "Well, you see, he's stubborn, he hasn't changed."

122

1   You could say a lot of things.  He -- he's done it

2   all.  He did everything that he was told to do, and he

3   did it without violence or anything else.  He took a

4   Violence Prevention Workshop -- you read some of these

5   yourself, I won't repeat them -- how to read people,

6   relationships, dynamics and so forth, but all that is

7   just an introduction to the fact that when he's in the

8   yard, when he's out there, when he's in this place, he

9   is not reacting violently.  People die in this prison.

10  I don't know what the numbers are, but it's not small.

11  They die.  He is not dead.  He's not up on charges.

12  He's not charged with murder.  The -- the words of the

13  DA, which I appreciate, and she's doing her job, she's

14  a very able counsel.  Twenty-five years ago, for 25

15  years he's survived in this jail.  If he can do that

16  here, in terms of anger management, if he can show

17  you, as he has, I hope that he can do that, then he

18  can do it outside with this supportive group.  And

19  he's -- he's done the Paralegal.  In fact, you know, a

20  lot of things have changed in the law, as you know, in

21  25 years.  It's a lot different.  We -- I don't think

22  we had computers 25 years ago when -- or anything.  I

23  don't know what we did.  I don't know how we made

24  copies 25 years [sic].  But he studied all that.  He

25  studied the computers.  He knows how to do it.  And

26  real people have come and said, "You know, if you let

27  him out, in San Francisco, for example, we'll put him

1    to work.  We can use this man."  They see the value in
2    him.  Unlike many prisoners that you feel bad for,
3    they lose all contact, they don't have the family
4    support, the -- the family turns away, or dies, or is
5    gone, he has all that.  He has maintained that here.
6    Why is that?  Because he has the qualities of a person
7    that people see those qualities in him and they want
8    to support him, and that's very, very important.  At
9    the bot -- there's a lot more, but at the bottom of
10   this, this is not going to happen again.  And in -- in
11   deference to the Diller family, who is obviously still
12   in an unforgiving mode, I -- I daresay that it would
13   be a good thing if they would forgive him.  The Bible
14   says you should.  The Bible says you should.  But
15   that's for them, it's not for me to say.  I am sure --
16   and I've studied this record, and without even a hint
17   of justification what he did, not even the slightest
18   hint, I will say that I imagine the Diller family is
19   sorry that they went after him with a hammer, or that
20   they called him whatever the Jewish word for means
21   faggot.

22          **PRESIDING COMMISSIONER BIGGERS:**  Well, yeah.
23   But please address us and not look at the --

24          **ATTORNEY BROSNAHAN:**  Yeah.  No, no.  I -- I'm
25   -- I'm saying only I'm sure that healing is in every
26   religious tract, healing is the thing that's good for
27   people, putting this behind, and after 25 years, Mr.

124

1    Liebb has worked terribly hard for this day.  I don't

2    think there's a risk here, and I would think that's

3    got to be the number one question.  I understand the

4    legal standards reflect that.  That's got to be the

5    number one standard, the real standard.  And so we ask

6    you to set a date for him because he has complied with

7    what he was told three years ago, because he's 50

8    years old, because he's a man that could have a life

9    outside, he could -- he could do good things.  And you

10   got an awful people in the prison system, and I -- I

11   got to believe that he's right there where he should

12   get a date.  And I thank you for your attention.

13   Thank you.

14          **PRESIDING COMMISSIONER BIGGERS:**  Thank you

15   very much.  Now Mr. Liebb, you have the opportunity to

16   tell us why you feel you're suitable, or you can rely

17   on what your counselor has said.

18          **INMATE LIEBB:**  I'd like to speak briefly,

19   and --

20          **PRESIDING COMMISSIONER BIGGERS:**  Please.

21          **INMATE LIEBB:**  -- you know, I -- I think the

22   points in my favor, that they've been well covered

23   here.  There's only a couple things that, you know,

24   I'd like to add.  I'm -- you know, that's that I'm

25   grateful, you know, for the support I have here, but

26   it's sad that I need -- I mean, I'm at a point where

27   had I not done this I would be supporting my family.

1   So, you know, I've wronged my family, and I've wronged
2   the Diller family, and in our beliefs, you know, we
3   believe that all Israel are brothers, so I didn't just
4   kill a friend, I took a brother's life.  You know, for
5   that, you know, I could only hope for forgiveness.  In
6   all the letters you have there is two from my sisters,
7   and my sister, Rose, tried many times to travel to Los
8   Angeles to ask for forgiveness.  No one would talk to
9   her.  So this isn't something we take lightly.  The
10  other point is something that my sister, Ester, wrote
11  in her letter for me.  She said that, "On the wall of
12  the Jewish museum there are two inscriptions.  One
13  says, 'Remember, do not forget,'" which to me means in
14  my situation I can't forget what I did.  But the other
15  phrase inscribed says, "There is hope for your
16  future," which is a promise from the prophet Isaiah.
17  So if we believe that a person could be redeemed, I'm
18  asking for the opportunity to show that I've done
19  that.  To all the Diller family I can only say words
20  that have been said to me recently, because my father
21  passed away, and that is that, you know, may God
22  comfort you among all the mourners of Zion and
23  Jerusalem.  Thank you.

24          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  At
25  this point we have Mr. Arthur Diller here who will
26  speak for the family.

27          **MR. DILLER:**  My name is Arthur Diller.  I'm

1    the brother of Michael Diller that was viciously

2    murdered by the inmate, Stephen Liebb.  Not only was

3    my brother murdered on that day, but I myself am a

4    victim two times from beatings from Stephen Liebb, one

5    when he came after me two days before with a pipe, and

6    this is what I look like after the pipe beating, you

7    can see there's so many different versions of stories

8    over here.  I'm just looking for the truth.  This is

9    what I looked like after the pipe beating in which he

10   was carrying the pipe, and so you can see over here,

11   this is what my brother looked like, a human being,

12   that purpose for mankind.  I will never forget when

13   Beverly Hills PD knocks on my door and they say to me,

14   "Your brother was just murdered."  If that wasn't

15   enough, I then -- I then had to go be that -- I then

16   had to go and tell my mom -- my mother was the mother

17   of the family, the mother of my brother, and tell her

18   that Stephen Liebb murdered her beautiful Michael.

19   Well, I come into the house, and I go to my mom, I

20   say, "Mom, Michael is murdered --

21          **PRESIDING COMMISSIONER BIGGERS:**  Do you need

22   some time, Counselor?

23          **MR. DILLER:**  I -- I -- I -- I don't want any

24   time.  I've been waiting all this time over here and

25   listening to one lie after another lie after lie of

26   deception over here.  It was -- I won't ever forget --

27   I'll never forget the shriek my mom made, and how she

127

1    collapsed right there in front of me.  After that,
2    needless to say, that was the beginning of the
3    destruction of my family.  We had a very strong-
4    knitted family.  I had a brother Michael that was an
5    angel.  He had magic in him.  If I tell you he was
6    able to touch us as a child people like Sugar Ray
7    Robinson, the -- the -- the -- the famous boxer.
8    We're back and this was in the '70s over here.  He
9    went down to South Central Los Angeles and volunteered
10   to give up his own time in South Central Los Angeles.
11   People didn't do that.  They didn't have the character
12   of what my brother had.  This was Mike.  People like
13   Jerry West, the basketball player.  He was at my
14   brother's bar mitzvah.  Hank Aaron.  Hank Aaron had a
15   relationship with my brother.  My brother used to take
16   him to the Dodgers Stadium when he used to play ball.
17   This was my brother.  He was loving, he was giving.
18   But what can I say?  July the 12th started something
19   which I sit over here today and it's just impossible
20   for me to get over.  My family soon after -- both my
21   mother and father, they -- they soon shortly divorced
22   after a few years, and after the trial, and everyone
23   was blaming the other for how come they didn't see the
24   deception and the dangerousness of Stephen Liebb,
25   because he's very, very convincing.  And as we look
26   back, there were little signs, but -- but -- but no
27   one picked it up, and my mother was blaming my father,

```
 1   and my father was blaming my mother, and I was being
 2   blamed, and my sisters were blaming my mother, and my
 3   mother -- it just -- what can I say?  The only thing I
 4   can say over here is like this is -- and I don't have
 5   a family.  I'm denied a family, and I don't have my
 6   brother Mike over here, and I think of all that
 7   happened to him and how he's twisted the knife inside
 8   my brother.  It wasn't enough that he stabbed him, but
 9   he twisted the knife, and afterwards he was seen
10   gyrating, he was gyrating after the event, and then he
11   went for dinner, and this is something that all of us
12   over and over, it works on me, it works on my mom,
13   because right now there's just me and my mom.  We
14   don't have a brother.  I don't have my sisters
15   anymore.  Everyone's afraid to be together over here.
16   Everyone went their own separate way.  My sister,
17   Brigette, that went out with Stephen Liebb when she
18   was 16 years old, our family was so believed in
19   Stephen Liebb, just like his attorney over here sits,
20   and he is just talking about -- everyone talks about
21   the world of Stephen Liebb here.  You've got numerous
22   amount of letters over here.  It's right on target.
23   It's exactly on target.  When we first met Stephen
24   Liebb, we were just sitting in the same room just like
25   this over here.  I was sitting on one side of the room
26   with my mother, and my brother and my father, and
27   Stephen Liebb was on the other side over here, and --
```

```
 1   and he was talking, and -- and just -- he -- talking
 2   about his family and talking about this and how he
 3   came and how he was educated, that he graduated with
 4   honors and it was at UCLA and he runs and he's an
 5   athlete, and he did this thing for the Jewish cause
 6   and that thing for the Jewish cause.  It's -- it's --
 7   it's -- it's just like a deja vu with the letters over
 8   here.  It seems like almost nothing has changed, he
 9   had that strong convincability over here, and he would
10   brag about being able to convince.  He would say to
11   us, we were one time at Las Vegas, his brother had
12   come out over here and we were at the university back
13   then, and he went into one of the hotels, and he all
14   of a sudden he started to tell the maitre de over
15   there that -- that we're part of the Las -- the   --
16   the Law Vegas athletic department, and by the time he
17   got done talking to the guy, the guy comped all our
18   meals.  Of course at that time it seemed like a pretty
19   slick thing to do.  But if he's starting to look good
20   over here, a little bit of a character assessment of
21   what's going on, it starts all of a sudden show itself
22   on what's going on.  So I understand we're over here,
23   and I understand, but what -- what I need you to
24   understand over here is the fear that we live with
25   every single day.  My sisters are free of their life.
26   My mother's a half a vegetable half the time.  She's a
27   mother over here, and all of a sudden you look in her
```

130

 1    eye and you can see she's snapped.  There's something
 2    -- she's a broken woman.  My mom is half gone.  Right
 3    now she's in a wheelchair.  Half the time I got to
 4    take her in a wheelchair, and most of this is all
 5    because of the trauma and the stress.  This is my mom.
 6    My mom was -- she was the personification of -- of --
 7    of -- of life, of energy.  She always had a smile, she
 8    -- she always took in people, she always donated her
 9    time in hospitals.  She -- she didn't know what to do
10    for people.  This is how we were raised.  And all of a
11    sudden to see my mom all of a sudden over here as she
12    questions God, as she sits and she talks to herself,
13    and -- and -- and she looks at pictures of Michael,
14    and -- and it's -- it's one of the most difficult
15    things to see.  This is my mom.  Where did she go?
16    Where did my mom go?  I want to have my mom back.  I
17    want my brother back.  But I don't have my mom back.
18    The only thing I have over here right now is myself,
19    and I have my mom and -- and -- and -- and I'm doing
20    everything I can to possibly protect her.  As -- as
21    everyone took sides with the family over here, my
22    father and me unfortunately became estranged, and --
23    and -- and I don't have a dad, and I -- I want to have
24    a dad.  I -- I -- I do want to have a dad, because
25    it's -- and it's important to have a dad, it's
26    important to have sisters around and see their kids.
27    And -- and I often wonder and I often sit and ponder

131

1    over here about not just was Mike brutally murdered on

2    that certain day but it's Mike's kids.  This is

3    generation after generation and after generation over

4    here of what happened on that one moment.  My sisters

5    today, as I say, they have very little to do with my

6    mom.  They have little to do with me.  Everyone's

7    afraid.  They live in fear all the time.  But all's --

8    all's I can say over here is I sit over here again and

9    -- and -- and -- and I beg you and I pray and -- and I

10   hope to -- to make aware of what's going on over here.

11   You've seen the letters over here, and there's

12   numerous amount of letters, and all of sudden he has

13   an attorney over here, and that's wonderful, because

14   it flashes back over here that his love of how he's

15   able to convince people and how all of sudden the side

16   over here -- I mean, people don't really know.  We

17   didn't know.  And I consider myself a pretty smart

18   person, so does my mother and my father over here.  He

19   was in our house over here, and he was doing all these

20   things, all the right things.  It's just -- it's a

21   display of what he's doing right now.  It seems like

22   to be all the right things, but -- but we got to ask

23   ourself the question over here.  This is on the

24   external side, you see all the right things, but

25   what's really going on under here?  What's really

26   going on under all that over here?  We were deceived

27   over here.  Many people were deceived here about his

1   actions over here because he uses the intelligence

2   over here as -- as -- as a weapon, and uses his evil -

3   - he's a -- he's a master of disguise.  He can deceive

4   people left and right.  You really don't know as

5   you're sitting with him.  You want to believe him.  We

6   believed him.  We did everything for him.  My father

7   gave him a job.  When he came to us he was crying the

8   blues, he was poverty, poor stricken, the family could

9   barely make a living.  He came over here and what was

10  the weapon that he used?  He came over to my brother

11  that was wearing a skullcap, a yama at UCLA, and he

12  uses disguise to ask my brother over here, "Oh, you're

13  Orthodox?"  And my brother says, "Yes, yes, I am

14  Orthodox."  He says, "Well, I'm Orthodox too, and

15  (inaudible) was a kosher butcher over here."  To make

16  a long story short, we found out he was never

17  Orthodox, it was just an angle how to angle in over

18  here.  It's the same angle he's working over here with

19  everybody else.  Sure there's the psych reports.

20  There's risk report, and there's that report, but

21  let's look at really what's going on.  My brother was

22  his friend.  My father and I -- my brother not only

23  was a friend of his but he got a key to the house, he

24  had steaks over there for him.  My father wrote him

25  letters of recommendations.  He got jobs.  He had

26  money.  He cried the blues.  He was all of a sudden

27  given to be a manager to live -- to live for free in -

1    - in an apartment house.  So what is the thank you?

2    What -- what is this thank you to all this?  He wants

3    to say that to get out.  He -- he has the audacity

4    over here today to besmirch my brother's name and talk

5    about -- he said that my brother was at odds with Joe

6    Harrington.  My brother over here was never at odds

7    with anybody, not with anybody.  He was a gentle soul

8    full of kindness, and he gave to the world, and he

9    gave to Stephen Liebb over here, and he went out of

10   his way to help, but this is the problem over here.

11   You got to look at the focus when people go out of

12   their way to help Stephen Liebb.  There's something

13   which happens over here.  He comes back and he takes

14   matters into their own hands.  He doesn't care, he --

15   he doesn't care that he has a relationship or doesn't

16   have a relationship.  The -- the problem, he has a

17   problem with his impulses.  He cannot control his

18   impulses.  Sure, you see is as time goes on, as he was

19   here in prison, there were different interesting

20   accounts, and he was involved with all kinds of

21   activity.  I believe he was also suspect to someone

22   being murdered over here.  I think that what we're

23   talking about.  But this was early on --

24        **ATTORNEY BROSNAHAN:**  George [sic], we object.

25   That -- just that part.  I don't mean to interrupt.

26   We object to that.

27        **PRESIDING COMMISSIONER BIGGERS:**  Please

134

1    continue.

2        **MR. DILLER:** Yes. Interesting --

3    interestingly enough over here, it's somehow that the

4    charges were dropped against him, because I was here

5    one time when he was complaining years ago that they

6    had him locked up in -- I don't know what the word

7    was, in the hole for 41 days, and he was talking that

8    the guards didn't treat him well. That was his major

9    concern, that the guards didn't treat him well. But

10   what I'm trying to bring into focus in over here is we

11   have to see who Stephen Liebb really is. He never had

12   one thing against my brother, my brother never, never

13   did anything against him, ever, and all of a sudden if

14   you look at that, you take someone that befriended

15   you, that takes you out and you claim you have no

16   money, and he brings you into your own house and he

17   gives you steaks and he gives you a car, I gave him a

18   car, my parents gave him a car, they gave him money,

19   they showered him with good, but let's look at how he

20   pays back my brother. If you think about it, that

21   would never -- none of those reports would even touch

22   on the (inaudible) element over here. But what does

23   he do? He stalks my brother, he's lying in wait,

24   okay. What does he do a few days beforehand? He buys

25   a motorcycle. Nobody talked about the mysterious

26   motorcycle. Where is the motorcycle? He buys a

27   knife. He buys all this before my mother even makes a

1    call -- and by the way, my mother never ever called

2    him a fagala like he says over here.  It's just ridden

3    with lies everything he says.  Never ever.  That's not

4    my mother.  My mother would never do that.  You can

5    see the picture of my brother over here.  That's just

6    something he's concocted over here to show you way why

7    all of a sudden he'd have to do what he did.  And the

8    second thing I wanted to bring out over here was that

9    I also never went after him with a hammer.  Not ever.

10   He did not have one bruise on him with the hammer.  I

11   brought the hammer as protection.  We exchanged blows

12   with our hands, I then got out of there, I waved the

13   hammer as he tried to approach me after he fell on the

14   ground, and I took off.  I was in fear of him, he

15   could probably lift about four or five hundred pounds,

16   that's the kind of strength that he has, and he's a

17   marathon runner.  I'm not out of my -- out -- out --

18   out of my mind here to go and -- and -- and -- and try

19   to do something with a hammer to him and get -- but

20   what happens is, he then pulls out a pipe.  He's

21   always equipped somehow with something.  He pulls out

22   the pipe and then he goes to work on me.  And then all

23   of a sudden after the pipe incident on Friday, on

24   Sunday, Sunday he's lying in wait for my brother.  But

25   getting back to what I said over here, what does he

26   do?  What does Stephen Liebb do?  Before my mother

27   even makes the phone call that he claims triggered

1    this all here on Thursday night, he's already bought

2    the knife and he's bought a motorcycle.  Why?  For

3    what reason?  There's nothing even happening over here

4    between my family and his family over here.  And when

5    my mother does call his family over there, they didn't

6    even know what's happening with Stephen Liebb.  They

7    haven't -- they hadn't heard from Stephen Liebb.  And

8    like he says to you over here today that I was -- one

9    time he says he was in constant contact with my

10   parents, and then you asked the question over here,

11   "Well, if this was going on, why then didn't you speak

12   to your parents?"  And then all of a sudden he forgets

13   what he says, and he then says, "Well, I didn't want

14   to trouble them with it because all of a sudden they

15   were caring for my brother."  Well, which story is it?

16   We're here 20 some odd years after the fact.  That's

17   what's so scary.  Everything is right in place.  But

18   all of a sudden -- and all of a sudden here, the

19   attorney says to him about -- Alexis over here asks

20   the question over here, but -- and there he looks over

21   there, solemn, and you lying in wait for minutes

22   beforehand.  This should have never happened.  Mary

23   West doesn't know what to hap -- what took place.  I

24   mean, we're 25 years.  Look at the letters over here.

25   These are the letters that he's well, he's made a

26   remarkable -- he's made a remarkable recovery from

27   everything, he's remorseful.  Well, if someone is

```
 1   remorseful, why don't we just start with the truth?
 2   Why don't we just start with the truth?  What's wrong
 3   with the truth?  What's wrong with it?  Can't we just
 4   say over here, "Yes, yes, I did brutally murder him,
 5   yes, I did twist the knife in him, yes, Mary West did
 6   see me come and everything."  That's what's so scary.
 7   And the scary part is, when my mother called up his
 8   parents over here and told his parents over here that
 9   you just -- you -- he -- your son just embezzled all
10   this money over here and he went after my son with a
11   baseball bat, that's when all of a sudden his parents
12   contacted him in shock and then said to him, "What
13   were you doing?"  She the called up my mother, and he
14   threatened my mother, and said to her, "If you don't
15   call up my mother and say to her that these events
16   never happened, that I never went after your son with
17   a baseball bat, and that I never embezzled money, then
18   I'm going to kill your family and I'm going to take
19   the whole family into my own hands," over here, and
20   that's what happened, what you -- and besides that,
21   the -- the thank you is, he then tells my mother on
22   the phone, when my sister -- showing you how much we
23   trusted him, okay, he -- he -- he was, I don't know,
24   in his twenties, and my parents let him go out with my
25   16 year old sister.  If I look back on that, I mean,
26   where -- where was that coming from other that his
27   convincability over here of who he is.  He wants you
```

138

1    to see that he's a paragon of truth and virtue, he's a

2    religious Jew over here.  He's only angling with the

3    religious Jew over here is because he's trying to gain

4    all kinds of vantage points in San Quentin that he

5    could be isolated for his -- for his own -- for his

6    own means.  That's all he's going with this whole

7    thing with the Jewish thing.  One time I'm here and

8    all of a sudden he's an atheist.  Another time I'm

9    here, "I'm a Seventh -- Seventh Day Adventist."  All

10   of sudden now, well, he's Stephen Liebb and he's very

11   cool and calm, and he's very calculated in what he

12   said.  I see him all the time.  When I was at UCLA, he

13   would brag about "I could get anyone to do what I

14   want, I could convince them about anything, because

15   I'm smarter than anybody, I'm very, very light-

16   skinned," he said, "and I got the blue eyes, I look

17   very, very innocent," and that's exactly what he's

18   doing here today.  Nothing has changed over here, but

19   what's changed for us over here is that that threat

20   that he said he's going to take the family in his own

21   hands, that's very scary over here.  That's very scary

22   to me, it's very scary to my mom.  My mom has great-

23   grandchildren, and she's never seen the great-

24   grandchildren.  She hasn't even seen grandchildren

25   that she has because of what happened with the

26   alienation of my sisters and my mom.  I mean, my mom

27   is in her seventies, and every day she worries, she

1    worries all the time, and she's says, "Arthur, please,
2    when you go there, please, please come back with some
3    good news because they're not going to understand him
4    in just one session, he's too tricky for them."  I
5    said, "Mom, I'll try to do what I can do."  But
6    anyways, all -- all's -- all's I want to say over here
7    is he means what he says, and it's not just out of
8    coincidence he's getting these letters.  He needs to
9    get these letters, he needs to get out over there.
10   And all these letters over here, where -- how do all
11   these things come from?  Because he's under the
12   strictest supervision, that's why.  He's under the
13   strictest supervision.  We all know what happens when
14   he's not supervised, he can't control his impulses
15   because he has a different side to him, he's
16   diabolical, and I guarantee you he's diabolical as the
17   day is long.  His behavior shows it.  He went after my
18   brother when there was nothing to do with him, at all.
19   My brother was innocent.  He happened to be at that
20   place, and he came after him, and it wasn't enough.
21   My brother was pleading for his life, he was asking,
22   "Please, someone help me, he's going to kill me, he's
23   going to kill me," and in the room with him, he had
24   plenty of time to change his mind.  He's running for
25   hundreds of yards.  This isn't ten feet or 20 feet,
26   this is blocks that he runs, and he corners him over
27   there, and my brother is pleading for his life over

140

1    here, pleading, "Please someone help me."  But that's

2    not enough that he stabs him, he's got to turn it.  So

3    another thing I just want to add as I'm going to wrap

4    this up over here is that when this was filed in the

5    DA's office, it should have been filed with special

6    circumstances.

7            **PRESIDING COMMISSIONER BIGGERS:**  Yeah.  Okay.

8    Thank you.  We will recess.

9                        R E C E S S

10                        --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3       **DEPUTY COMMISSIONER BLONIEN:**  Okay.  We're on

4       record.

5       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Let the

6       record reflect that everyone in the room, with the

7       exception of our observer, is currently back in the room

8       in the matter of Stephen Liebb, L-I-E-B-B.  CDC number is

9       C-60825.  The panel has reviewed all the information

10      received from the public and relied on the following

11      circumstances in concluding that the prisoner is not

12      suitable for parole and would pose an unreasonable risk

13      of danger to society or a threat to public safety if

14      released from prison.  This is going to be a one-year

15      denial.  The panel looked at the offense, which was

16      carried out in an especially cold, cruel, callous and

17      calculated manner in that you murdered your friend, Mr.

18      Michael Diller, age 23, after you had befriended him

19      while going to school, and he took you to his place, he

20      took you to his family's place.  Just shows a real

21      callous disregard for not only the family but also for

22      this man that -- that -- that befriended you.  The

23      offense was carried out in a manner which demonstrated an

24      exceptional callous disregard for human suffering in that

25      you were waiting for the individual, you had the

26      opportunity to stop, you chased him, you ran him down, he

27      **STEPHEN LIEBB C-60825  DECISION PAGE 1    7/27/06**

1    went into an area, the shed, or a building somewhere on
2    the park, wherever you were, pleaded for his life, and
3    you still stabbed him with the knife into the chest.  It
4    was very trivial.  The whole crime was trivial because
5    this whole incident started over the fact that you being
6    asked to move out of the apartment that they had given
7    you for free for quite some time, and it just escalated
8    to a point where a young man, 23 years of age, Mr.
9    Diller, Michael Diller, lost his life.  These facts were
10   taken from the appellate decision.  We -- the panel also
11   looked at your record of assaultive behavior, and this
12   was evident by the -- the two attacks on Mr. Gold and the
13   one attack on Mr. Arthur Diller.  There's an indication
14   to us that you did have this pattern of -- of violence
15   that was building up to the time that you committed the
16   other act.  You have programmed extremely well.  You have
17   a lot of certificates.  You -- we note that you have
18   Paralegal course that you completed.  But one thing that
19   the panel wanted to point out to you is that we noted
20   that you didn't really get involved with the self-help
21   programs that would have assisted you in determining
22   those causative factors that would convince this panel
23   that you will not do this again.  You just started doing
24   that three -- three years ago, after the panel told you
25   that you needed to do that.  It's our opinion that you
26   should have probably started that earlier so that you
27   STEPHEN LIEBB C-60825    DECISION PAGE 2    7/27/06

143

1   could determine what made you do what you did. This was

2   also supported by the psychological report, which was

3   dated 7/20 of 2001, authored by Dr. Inaba, which again

4   was not totally supportive, and she indicated, and I

5   quote, that you demonstrated a capacity for insight into

6   external -- external forces that were operating at the

7   time of -- of your offense but had much less

8   understanding of internal dynamics that contributed to

9   this homicidal act. Again, you should've started this a

10  long time ago, and, you know, you've been in here almost

11  20 something years, you should have gotten the self-help

12  to find out what those causative factors were. Your

13  parole plans are good. You've got a -- a tremendous

14  amount of support out there, from all over, from New

15  York, California, Israel, the whole thing. We -- on the

16  3042 responses, we did note that the District Attorney of

17  L.A. County, the Sheriff Department, Beverly Hills Police

18  Department, and the victim's brother, Mr. Arthur Diller,

19  all voiced a opposition to a finding of parole

20  suitability. The bottom line, sir, is that this panel

21  feels that your gains are recent and you must demonstrate

22  ability to maintain these gains over an extended period

23  of time. Nevertheless, you should be commended for

24  completing that Paralegal training, the numerous

25  commendations that you got, not only from correctional

26  staff but also from the people that you've been working

27  STEPHEN LIEBB C-60825  DECISION PAGE 3   7/27/06

144

1    with, your work chronos, all those are excellent.

2    However, those positive aspects do not outweigh the

3    factors of unsuitability, which means that, as I said

4    before, that you need to show and demonstrate to us that

5    you won't go out there and do this again by looking at

6    the causative factors.  Again, this is a one-year denial.

7    And that con -- con -- do you have anything you want to

8    add, ma'am?

9            **DEPUTY COMMISSIONER BLONIEN:**  I -- I just wanted

10   to say that your sentence was life with possibility of

11   parole, and you've done a lot of things while you've been

12   in the institution, and I would say the last three years

13   for sure you've really started working on yourself, and

14   that's not easy to do because there's a lot that you have

15   to -- a lot that you've done that you have to cope with,

16   and you have to be able to express to us the insights

17   that you have into those terrible decisions that you

18   made.  And you are intellectually superior, there's

19   nothing wrong with that, and you've used those talents in

20   the institution, so you have to go forward and keep it

21   up.

22           **INMATE LIEBB:**  Thank you.

23           **DEPUTY COMMISSIONER BLONIEN:**  Good luck.

24           **PRESIDING COMMISSIONER BIGGERS:**  Okay.  In

25   addition, the panel wants to recommend that you remain

26   disciplinary free, continue to participate in self-help,

27   **STEPHEN LIEBB C-60825    DECISION PAGE 4    7/27/06**

145

1    and continue to go the routes that you're going right

2    now.

3         **INMATE LIEBB:**  Thank you very much, sir.

4         **PRESIDING COMMISSIONER BIGGERS:**  That

5    concludes --

6         **ATTORNEY BROSNAHAN:**  Thank you.

7         **PRESIDING COMMISSIONER BIGGERS:**  -- the hearing.

8         **ATTORNEY BROSNAHAN:**  Thank you very much.

9         **PRESIDING COMMISSIONER BIGGERS:**  That concludes

10   the hearing.  The time is now --

11        **ATTORNEY BROSNAHAN:**  Okay.

12        **PRESIDING COMMISSIONER BIGGERS:**  -- 1445.

13                   - A D J O U R N M E N T -

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

                                        NOV **2 4** 2006
24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **STEPHEN LIEBB C-60825   DECISION PAGE 5   7/27/06**

146

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Berenice Billington, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total three in number and cover a total of pages numbered 1 - 145, and which recording was duly recorded at SAN QUENTIN STATE PRISON at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of STEPHEN LIEBB, CDC No.C-60825, on JULY 27, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated October 28, 2006, at Sacramento County, California.

*B Billington*

_____
Berenice Billington
Transcriber
**Northern California Court Reporters**