# EXHIBIT A



NOT FOR PUBLICATION
IN THE OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR



| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | 2d Crim. No. 44162 |
| ) | |
| Plaintiff and Respondent, ) | (Super.Ct.No. A-083014) |
| ) | |
| v. ) | COURT OF APPEAL SECOND DIST. |
| ) | |
| STEPHEN LIEBB, ) | FILED |
| ) | |
| Defendant and Appellant. ) | NOV 5 - 1984 |
| ) | CLAY ROBBINS. JR.    Clerk |

Deputy Clerk

APPEAL from a judgment of the Superior Court of
Los Angeles County.  Charles H. Woodmansee, Judge.  Affirmed.

Ephraim Margolin and Sandra Coliver, for Defendant
and Appellant.

John K. Van de Kamp, Attorney General, Robert F.
Katz, Stephen M. Kaufman and Frederick G. Grab, Deputy
Attorneys General, for Plaintiff and Respondent.

2.

Appellant, Stephen Ira Liebb, appeals the judgment, after jury trial, convicting him of first degree murder (Pen. Code, § 187),[1]/ with personal use of a deadly weapon (§ 12022(b)), and assault by means of force likely to produce great bodily injury and with a deadly weapon (§ 245(a)).

We affirm.

### PROCEDURAL HISTORY

On September 9, 1981, an information was filed charging appellant with the murder of Michael Diller with the use of a knife (§ 12022, subd. (b)); with intentional infliction of great bodily injury (§ 1203.075); and with the special circumstance of lying in wait (§ 190.2(a)(15)). He also was charged with assault by means of force likely to produce great bodily injury and with a deadly weapon (a baseball bat) against Joseph Martin Gold (§ 245(a)), with intentional infliction of great bodily injury (§ 12022.7).

On October 28, 1981, appellant filed a section 995 motion seeking to set aside the information, and particularly the special circumstance allegation on the ground that no special circumstance was alleged at the preliminary hearing, and the allegations of intentional infliction of

---

1.    References to sections hereafter are to the Penal Code, unless otherwise indicated.

great bodily injury. Appellant also filed a motion to sever the murder charge from the assault charge. (§ 954).

On November 17, 1981, his section 995 motion was granted as to the section 12022.7 allegation on the assault charge. His motion to sever was denied.

On February 4, 1982, the special circumstance allegation was stricken on the People's motion.

The great bodily injury allegation on the murder charge was ordered not read to the jury.

On June 17, 1982, on defense motion, the court appointed psychiatrists William Vicary and John M. Stalberg to examine appellant and report their findings to defense counsel.

On July 21, 1982, the defense filed a motion to admit at trial the results of a polygraph examination taken by appellant.

On August 4, 1982, the defense motion to try the case under pre-Proposition 8 rules was granted. Jury selection commenced.

On August 12, 1982, the defense motion to admit the results of appellant's polygraph examination was denied after a hearing.

During trial, the People moved to admit evidence of the good reputation for peacefulness of Arthur and Stanley Diller, the homicide victim's family members, and of Michael Diller, the victim. The court denied the motion as to Arthur

and Stanley Diller, and granted it as to Michael Diller,
subject to certain limitations.

On August 16, 1982, defense counsel moved for a
mistrial on the ground that the victim's mother, Dorothy
Diller, had made an outburst which would prejudice the jury.
That motion was denied.

After two days' deliberation, the jury returned its
verdicts of guilty on September 9, 1982.

On November 9, 1982, appellant filed a motion for new
trial, based, in part, on an allegation that there was a newly
discovered insanity or diminished capacity defense.  In his
declaration in support of the motion, defense counsel alleged
that he had not realized before trial that appellant was
psychotic and had he so realized, he would have insisted on
presenting an insanity defense despite appellant's resistance.
A supplemental report by Dr. William Vicary, one of the
psychiatrists appointed before trial to examine appellant, was
filed in support of the motion.  In that report, Dr. Vicary
alleged that appellant suffered from chronic psychotic illness
and would have qualified as having been insane at the time of
the murder.  He was competent to stand trial, but his psychotic
state resulted in his withholding information about his mental
condition from his attorney and the appointed psychiatric
experts.  Dr. Vicary's post-trial report stated that appellant

had revealed little of the symptoms of his mental illness in the pretrial examinations, but that his psychological testing profile indicated that he was psychotic.  Dr. Vicary throught that a paranoid illness was responsible for appellant's actions towards the Dillers and their friends and for his failure to reveal his mental illness to the appointed experts.

At the hearing on the motion for new trial, the People moved to discover the reports of the psychiatrists who examined appellant before trial, to refute appellant's post-trial contention that those reports were inaccurate because appellant had not revealed full information before trial.

The court ruled that the previous reports would be discoverable unless the defense could show that Dr. Vicary did not rely on them in forming his opinion.

The People called Dr. Vicary to examine him as to his report, and waived the motion to discover the contents of the other reports.

In cross-examination, it appears that the results of the psychological testing of appellant were ready before trial, and that Dr. Vicary would have had an opportunity to examine appellant for a second time before trial.  Dr. Vicary testified that he did not read the reports of the other doctors, and that he did not interview the other doctors when preparing his post-trial report.  He testified that appellant had possible

rational motives for the murder, including fear of disciplinary action by the state bar arising out of the embezzlement of rent, and desire for revenge against the Dillers for reporting him to the state bar. Dr. Vicary was examined as to several incidents appearing in the police reports regarding appellant, including an incident in which appellant had threatened an 80-year-old man who asked him to curb his dog; had threatened a young woman by telling her he was a member of the Mafia; had threatened other patrons at his health club; had run over the foot of a security guard after a disagreement; and had kneed a security person in the groin at UCLA law school. Dr. Vicary concluded that desire not to have these incidents revealed might have reasonably motivated appellant not to seek an insanity defense.

Dr. Vicary also testified that he was not aware of some of these incidents when he prepared his report.

In conclusion, Dr. Vicary testified that, in light of the additional information he had received during the new trial hearing, he felt that there was evidence that appellant was not capable of committing first degree murder at the time of the killing of Michael Diller, but, on the other hand, that there was also evidence that appellant was a bully capable of acting in an anti-social way with minor provocation.

The court ruled that the claim of newly discovered evidence of insanity was not credible; that Dr. Vicary's opinions were based on conjecture and second guessing; that

from observation of appellant during trial, appellant had

rationally participated in his defense; that appellant had made

a tactical decision before trial not to pursue a defense of

insanity or diminished capacity; that the reports of the other

psychiatrists had not been introduced by appellant; that the

motion appeared to be an attempt after an unfavorable verdict

to get a new trial; and that the jury would not have reached a

different conclusion even if Dr. Vicary's post-trial opinion

had been before it.

     The motion for new trial was denied.

     On January 28, 1982, appellant was sentenced to 25

years to life, with a one-year deadly weapon enhancement on the

murder charge, and to the middle term of three years on the

assault, to run concurrent with the other sentence.

     This appeal followed.

<div align="center">CONTENTIONS</div>

     Appellant contends on appeal that: "I.  The trial

court erred in instructing the jury on the theory of first

degree murder by means of lying in wait"; "II.  Even if the

evidence was sufficient to support a lying in wait instruction,

the instruction given was inadequate in light of the

prosecutor's misleading statement of the law in closing

argument"; "III.  The court erred in denying defendant's motion

to sever Count I from Count II . . . ."; "IV.  The court erred

in denying defendant's motion for mistrial based upon the
prosecution's improper argument regarding defendant's character
for violence and in failing to instruct the jury that evidence
of prior bad acts had been admitted for the limited purpose of
showing intent and motive"; "V. The court erred in admitting
testimony regarding the character of the deceased for
non-aggressiveness"; "VI. The trial court's reasons for
excluding exculpatory polygraph evidence were inadequate and,
therefore, exclusion of the evidence was error."

## FACTS

In 1977, appellant moved from his family home in
Brooklyn, New York, to Los Angeles, to begin attending UCLA Law
School. During the summer of 1978, he met the murder victim,
Michael Diller, who was an undergraduate at UCLA. They
remained friends until appellant's completion of law school,
and during that time, appellant met Michael's brother Arthur,
his other brother and sister, and his parents.

In 1978, appellant began managing an apartment
building owned by Michael's father, Stanley Diller, at 303
South Doheny, in Beverly Hills, in exchange for a rent-free
apartment in the building. Stanley Diller, who was Chairman of
the Board of Los Angeles New Hospital, also hired appellant as
a clerk at the hospital.

Appellant had another friend named Joe Hariton, whose
fiancee rented an apartment in the building appellant managed.

In October 1980, Michael Diller, his brother Arthur, and their cousin Gary Canter, went to Joe Hariton's fiancee's apartment to deliver a package to appellant which Arthur had picked up from appellant's parents in New York. Arthur and Gary testified that the package was delivered without incident.

In November 1980, David Altschuler began to work for Stanley Diller at the hospital and to supervise management of the apartment building. Altschuler decided that appellant should pay a reduced rent, rather than no rent, for the apartment, and, after getting Stanley Diller's approval, sent a letter to appellant, dated February 9, 1981, explaining this position. Altschuler began to feel some resentment from appellant.

By letter dated February 23, 1981, appellant informed Altschuler that it took more time to manage the building than the proposed rent reduction was worth; that his time was worth $100 an hour; that he had not been given 30 days' notice of the change; and that he would continue to act as manager in exchange for free rent until March 31, 1981, when he would voluntarily vacate the apartment.

In fact, appellant did not move out on that date. Shortly before March 31, 1981, appellant spoke with Joseph Martin Gold and said that he did not intend to move out of 303 South Doheny in the near future.

After appellant vacated his apartment, at the end of April 1981, Altschuler found the apartment to have been badly damaged with chairs turned over, windows broken, stains on the floor, and the sinks and fixtures filthy.

Ms. Joyce Rutherford, a tenant at 303 South Doheny, was first selected to replace appellant as manager, but Joe Gold was finally selected.

In February, 1981, Sarah Hardman rented apartment 103 at 303 South Doheny on behalf of Dr. Eugene Landy. Appellant signed a receipt for deposit monies as "Stephen Claymore," and said that he was a professional boxer.

On May 4, 1981, after he had moved out, appellant called Dr. Landy and said that to close the deal for a longer rental, he would take $100 per month for rent. On May 11, he called and left a message about the same rental and said that soon he would not be the manager, and he wanted Dr. Landy to get a good deal. When Dr. Landy paid appellant for six months rent in advance, Ms. Hardman noticed that appellant had signed the receipts with different names. Dr. Landy had appellant make out a new receipt, which he signed as Stephen Liebb.

After February, 1981, appellant's accounts showed apartment 103, which he had rented to Dr. Landy, to be vacant. Appellant never told Altschuler that 103 was rented or turned over any of the rent paid by Dr. Landy.

On March 31, 1981, appellant went to Altschuler's office across the street from Los Angeles New Hospital. Altschuler heard a commotion in the outer office, and heard the secretary, Mrs. Tillen, tell appellant not to go in but to let her call Mr. Altschuler. Mrs. Tillen was a very small woman in her late seventies. Immediately thereafter, appellant came into Altschuler's office. Both Altschuler and Mr. Kamornick, an attorney who shared the office, asked appellant to leave, but he continued to deride and insult Altschuler and refused to leave. He left after a few minutes but, as he was leaving, he spoke angrily to Joe Gold, saying "Do you want it next?" Altschuler told Gold not to answer an angry man, then Gold stopped talking to appellant and went back to work.

After Mr. Gold had remained at his desk for about 5 minutes, he went to the elevators in the hall to go to another floor on business. As he was standing there, appellant came out of the office lobby and started threatening and swinging at him. Gold ran back into the lobby of his office. Appellant followed, and hit Gold hard on the side of the head. Gold believed that appellant had hit him as hard as he could. Several people tried to pull appellant away from Gold, and appellant fled.

Gold filed a complaint against appellant, and appellant telephoned him three times to try to talk him into withdrawing the charges. Gold eventually did so because he felt appellant was penitent.

Dr. Jose A. Nessim witnessed appellant put his hands around Gold's neck and push him towards the door of the waiting room with great force. Gold was not attempting to defend himself.

After Gold began managing 303 South Doheny, he discovered that apartment 103, which was marked vacant on appellant's records, was occupied. On May 11, Arthur Diller, Bernard Dick and Gold entered the apartment and found that some one was living there. They changed the locks. Moments later, Dana Turner, Dr. Landy's secretary, appeared and demanded access. They refused, and she left a few minutes later. Gold told her that the apartment was listed as vacant on the accounts and that the owners had received no rent.

On May 11, at about 3 or 4 p.m., appellant had telephoned Dana Turner and told her that some one was fooling with the locks on Dr. Landy's apartment and that she should go check it out. Ms. Turner drove to 303 South Doheny and found that the key no longer worked at apartment 103. She went across the street to a phone booth to call Dr. Landy. Later she saw a fight near 303 South Doheny, but could not identify the participants.

At about 7 p.m. on May 11, Joe Gold left 303 South Doheny with Arthur and Michael Diller. Arthur and Michael left a few seconds earlier. It was still light at the time.

As Gold walked out the front door, he saw appellant charging up the front stairs, out of the bushes next to the front door. He was wearing a white shirt, a suit vest, and slacks, and carrying a baseball bat. He hit Gold 15 times over the head with the bat. He also hit various parts of Gold's body, very hard. Gold could not run away because of the 8 to 10 foot tall bushes beside the front door. He kept his hands over his head to prevent brain damage. Arthur Diller came back and tried to get appellant away from Gold. Appellant turned and hit Arthur, then Gold pushed appellant away, and Gold and Arthur fled. Michael had fled already.

Appellant pursued them for half a block, then turned and ran to his car, which was parked in the alley just beyond the building. He put the baseball bat in the back seat and drove away.

Lance La Certe, a tenant at 303 South Doheny, saw appellant near the entrance to the building, wearing a suit vest and matching pants, swinging a baseball bat, and then saw Joe Gold return to the entry way holding his head, which was very bloody.

Joe Gold went to Los Angeles New Hospital after the attack, where a soft cast was put on his left hand and arm. He had five bumps on his head, and was still suffering headaches as a result. Joe Gold filed a complaint and pressed charges, and the case was still pending when Michael Diller was murdered.

During the attack on Joe Gold, Arthur Diller tried to approach appellant, but was unable to stop the attack. Appellant hit Arthur Diller on the thigh and several times on the shoulder.

Arthur Diller ran away, and appellant began striking Joe Gold again. Arthur ran back again to help Gold, but appellant chased him away. However, Gold was able to get away then. Appellant chased him about 30 yards, then turned and left the scene.

After the attack on Gold, Michael Diller's mother telephoned appellant's father in Brooklyn, New York, to tell him about the attack and ask him to come out and check into the matter. She also said that appellant had embezzled money from her husband. She testified that, during that conversation, she did not call appellant a "fag," and that appellant's father did not offer to pay back the money.

On July 9, 1981, appellant bought a Suzuki motorcycle and a blue motorcycle helmet.

On that same day, he telephoned Mrs. Diller four times, starting at about 1 p.m. Appellant denied hitting Arthur and Gold with a baseball bat, and Mrs. Diller told appellant that she wanted nothing to do with him. At about 6 p.m., appellant called again and denied hitting Arthur or embezzling money. Mrs. Diller responded the same way. At 10 p.m., appellant called again and Mrs. Diller hung up. Close

to midnight, appellant phoned again.  He said that if
Mrs. Diller would not call his parents and retract what she had
said, he would have to take her family into his own hands and
do what he had to with them.  She refused, and appellant told
her that her daughter had performed a sexual act with him.
Appellant then threatened to kill the entire Diller family.

After talking with his mother about the phone calls
from appellant on July 9, Arthur Diller went to talk with
appellant at 8:30 or 9 a.m. the next morning.  He took Janice
Fox with him as a witness.  Arthur took a hammer with him
because he was afraid of appellant.  Arthur went to appellant's
building in Beverly Hills--he did not know which apartment
appellant lived in--where he saw appellant's car parked, and
waited for appellant to come out.  He did not know that
appellant had purchased a motorcycle.  Arthur got out of Ms.
Fox's yellow Porsche, which she then parked nearby.  Appellant
came into view on foot, walking his dog.  Arthur called to him,
and appellant came at him with clenched fists.  Arthur hit
appellant two or three times, and appellant hit Arthur several
times.  The hammer was still in Arthur's pocket.  Appellant
fell to the ground.  Arthur then tried to flee, but appellant
came after him.  Arthur pulled out the hammer, and appellant
stopped, then took two steps back and fell again.  Arthur tried
to get to the Porsche, running away from where appellant was

located.  As he reached the passenger door, appellant was running at him from five feet away.  Arthur then continued to run, as he did not have time to get in the car.  Appellant caught up with Arthur and started hitting him with a piece of pipe.  Arthur fell, and appellant stopped hitting him.  Then Arthur went to the Porsche, and was driven to Los Angeles New Hospital, where he received a number of stitches around his face.  He also had a broken nose.  That night, he stayed with Michael, who lived in a security apartment building.

Jesse Rodriguez, a Sparkletts Water truck driver, saw Arthur Diller and Ms. Fox standing near a yellow Porsche at about 9 a.m. on July 10, 1981.  He did not see how the fight started, but he looked back and saw two men wrestling on the ground for a hammer.  Mr. Rodriguez ran over, and both men saw him and ran away.  Arthur Diller got the hammer and was waiving it at appellant.  Arthur ran, followed by appellant.  Ten minutes later, appellant returned and reported his version of the incident to a traffic officer who had seen the last part of the fight.  Arthur told the officer that appellant was lying.

On July 12, 1981, at about 2 p.m., Mrs. Mary West was sitting on her patio, facing the street.  She saw appellant standing by a tree across the street, wearing a blue motorcycle helmet, red sweatpants and a blue sweatshirt, with a motorcycle behind him, on the sidewalk.  He stood there for from three to

ten minutes. A car then came down the street and stopped in front of the building across the street. Jody Popkin, a young woman whom Mary West had known since Jody was 12 years old, got into the car two or three seconds after it arrived. Appellant ran towards the car and got in. Mrs. West heard a crash, then saw Michael Diller and appellant get out of the car and run towards La Cienega Park, with appellant chasing Michael.

About half an hour later, Mrs. West saw appellant, wearing the motorcycle helmet, standing in the street in front of her patio, talking to another young man. Appellant then left on his motorcycle.

Mrs. West was 71 years old and had a hearing problem, but had good eyesight with glasses. She had lived in her apartment for 12 years.

On the evening of July 11, 1981, Jody Popkin saw Michael Diller. She had known him for about three years and had dated him, but she had last seen him three months before July 11. On that evening, he picked her up at her residence and took her to his apartment. Arthur Diller, Joe Gold, and two other friends were there. Michael took her home at 1 a.m., and they made plans that Michael would pick her up at her apartment at 2 p.m. the next day. She said she would come downstairs because there would be no parking space.

That afternoon, she came downstairs and entered the passenger door of Michael's car just after Michael drove up. Appellant grabbed the door and pulled it open before she could

close it.  He jumped on her lap and hit her and Michael.
Michael looked frightened and repeatedly asked, "Stephen, what
are you doing?"

Appellant had the tinted face shield of the motorcycle
helmet covering his face.

Michael accelerated the car, and appellant grabbed the
wheel, causing the car to crash into a condominium building.
After the crash, Michael jumped out the driver's side and ran
towards the park.  Appellant got out and ran after him.

Ms. Popkin fell out of the car and was carried across
the street, where she waited for an ambulance.  She saw
appellant walk calmly back, as if nothing had happened, and
ride away on his motorcycle.

When Michael and appellant got out of the car,
appellant chased Michael towards the park.  Michael was
yelling, "I didn't do it," and, "He's going to kill me.
Somebody help me."  One witness called the police.

Michael ran to the park office and dove through a
half-open window.  Appellant had a helmet on, and lay on the
window sill, facing Michael.  Appellant had a knife, and
Michael grabbed it and cut his hand.  Michael was pleading with
appellant, saying that he had not done anything, but appellant
was quiet.  Appellant pulled the knife away from Michael and
stabbed him through the chest, then ran.

A park employee who was inside the office and witnessed the stabbing called for the police. Michael was dead by 2:10 p.m.

The deputy medical examiner testified that Michael died of loss of blood from a stab wound through his lung and heart. The knife, a three and three-quarter inch blade, had been given a hard thrust and twisted inside Michael's chest. There was also a cut on the right hand made by Michael's grabbing the knife.

Mr. Filiberto Vigil, who was at La Cienega Park on July 12, 1981, testified that he saw a man in a motorcycle helmet, red sweatpants and a blue sweatshirt chase another man into the park office, grab him by the shirt, and release him. Mr. Vigil approached the office and saw a large amount of blood coming from the chest of the man inside. Mr. Vigil screamed, and the man wearing the sweatclothes turned and faced him, raised both hands, and moved his hips forward. The man then ran away. Vigil followed, and saw the man talking to people around a crashed car. Vigil yelled, then the man rode away on a motorcycle.

Mr. Kelly Bixby, an attorney who had employed appellant since the fall of 1980, and for whom appellant still worked as an attorney at the time of the killing, received two phone calls from appellant on July 12, 1981, and as a result,

met appellant on Wilshire Boulevard in Santa Monica between 3 and 4 p.m. that afternoon. Appellant was wearing a sweatshirt and sweatpants. Bixby, his wife and appellant had dinner at a restaurant. Appellant had chicken At about 10 p.m., appellant left Bixby's residence, and at 12:30 a.m., Bixby phoned the police.

On the evening of July 12, Beverly Hills police officers began surveillance of appellant's apartment. Appellant arrived in a cab at about 10:40 p.m., and entered his apartment through a window. When appellant exited through the window, carrying a dog, three police officers ordered him to "Freeze." He dropped the dog and ran about 80 feet, then stopped and raised his hands and was placed under arrest.

Appellant's car and apartment keys were found inside Michael's car after the killing.

On July 13, the police searched Kelly Bixby's residence pursuant to a warrant and seized appellant's sweatclothes and a motorcycle key. Blood on the clothing matched the victim's blood.

A search of appellant's car, pursuant to a warrant, yielded a baseball bat and a knife sheath. The knife, the motorcycle helmet, and the motorcycle were not found, but a nearly identical knife was purchased from a sporting goods store by a police officer.

## THE DEFENSE

Appellant testified that he had been friends with Michael Diller and his family while he and Michael were both on the UCLA campus. However, in November or December of 1980, appellant was in the apartment of Joe Hariton's fiancee when Arthur and Michael Diller, and their cousin Gary Canter arrived. Joe extended his hand to Arthur, but Arthur refused to take it, saying, "I don't want to shake your hand. You might get a bone." In the discussion that followed, Arthur talked in a loud voice, used profanity and challenged Joe to go outside. After that, the relationship between appellant and Arthur and Michael was strained.

Joe and his fiancee largely corroborated appellant's account of the incident.

Appellant admitted renting apartment 103 to Dr. Landy and keeping the money, although he did not need it.

He testified that Joe Gold came to his apartment before the incident at Los Angeles New Hospital and told him to move out within three days. As to the incident at the hospital, appellant testified that he had not been loud in the hospital office, but that Joe Gold had attacked him as he was standing near the elevators, and that he had punched Gold in response. Then Gold started flailing at him, but he did not hit back.

22.

Appellant denied ever apologizing to Joe Gold for the incident.

As to the baseball bat assault, appellant testified that after he moved out of 303 South Doheny to a nearby apartment, he was out jogging, wearing sweat clothes, when he came upon Joe Gold and Arthur and Michael Diller, near 303 South Doheny. Joe Gold had a baseball bat, and appellant did not. As appellant approached, someone said, "There he is," and as he went by, Joe Gold hit him on the shoulder with the bat. Appellant tried to grab the bat away; he did so and swung at Gold, hitting him no more than three times. Michael said, "He's got the bat," and ran. Appellant ran back to his apartment and tried to call the police. He reached the Los Angeles police, and they said they could not take a report.

Joe Hariton testified that the bat found in appellant's car was one he had used in Little League and that he left it in appellant's car because they used it when playing sports. He also testified that he saw Joe Gold several hours after the bat incident, with his arm in a sling, carrying a baseball bat.

Appellant's father, Harry Liebb, testified that Mrs. Diller called him on or about July 5, 1981, and said that appellant owed the Dillers $2,200, called appellant a "fag," and threatened to have him disbarred. Mr. Liebb testified that he offered to repay the money.

When Mr. Liebb spoke with appellant, appellant said that he would straighten things out.

Appellant testified that on July 10, 1981, Arthur Diller had attacked him without provocation and hit him with a hammer. Arthur ran away, and appellant chased him. When appellant got the hammer away from Arthur, Arthur pulled out a lead pipe and tried to hit him, but he took it away and hit Arthur with it. Appellant then reported the incident to a meter maid.

A defense investigator testified that the Sparkletts truck driver said that Arthur had attacked appellant with the hammer.

Before the stabbing, Mr. Diller had filed a civil suit against appellant for the rent money. Appellant testified that he did not know why he kept the rent money from apartment 103; that it had "never occurred" to him that he could be suspended or disbarred for doing so; and that his professional responsibility course had never indicated that he could be disciplined for such behavior.

Appellant denied that he called Ms. Turner on May 11 and told her that the locks were being changed on Dr. Landy's apartment.

A few days before the stabbing, appellant purchased contact lenses, which he was wearing on that day instead of his usual glasses.

Appellant bought the knife used in stabbing Michael Diller at a Big Five Sporting Goods store on July 10, 1981, because he was afraid when he went out to walk his dog, and wanted to protect himself after the baseball bat and hammer incidents.

Appellant's account of the stabbing was that at about 1 or 2 p.m. on July 12, 1981, he was riding on the motorcycle he had bought a few days earlier, when he noticed Michael Diller driving behind him. Michael forced him off the street onto the sidewalk. Appellant went off the road, but his motorcycle was still upright and running. Appellant then took off after Michael and followed him several car lengths behind. When Michael stopped, appellant put his motorcycle near a tree and waited to see what Michael was doing. He waited while Jody Popkin came out. He testified that he had never seen her before. He grabbed the passenger door and jumped over Jody to get at Michael because he believed that Michael had tried to run him off the road and wanted to confront him. Appellant denied hitting Jody or Michael. He chased Michael.

He testified, "I wanted to stop him. . . . He was trying to kill me. . . ."

When appellant caught up with Michael in the park office, Michael moved towards him, and appellant believed that Michael would kill him. He stabbed Michael in the chest and then Michael grabbed the knife with his hand. He did not believe that Michael was seriously injured.

Appellant returned to the scene of the car crash and told bystanders that "somebody had tried to run him off of his motorcycle and tried either to hurt him or come at him with a hammer."

Appellant testified that he left the motorcycle unattended near the apartment of a friend in Santa Monica and threw the knife in a dumpster in the alley behind the building. He testified that he left the motorcycle because it was not running well and threw away the knife because he knew that he would never use it again.

When the police told him to "Freeze" at his apartment, he ran because he was afraid it was the Dillers or Joe Gold.

When asked whether he was afraid Michael Diller would kill him at the time Michael stopped to pick up Jody Popkin, appellant testified that Joe Gold had threatened to break his arms and legs. He also testified that it was his opinion that Michael participated in attacking him with a baseball bat; that Michael had tried to run him off the road on his motorcycle; and that he did not have the opinion that Michael was the kind who would never assault anybody.

Appellant testified that he left the scene of Michael's stabbing because there were people there and it would look very bad for him. When asked whether he felt that he was justified in what he had done, appellant replied that he thought that if he did not stop Michael, that Michael or Joe Gold or Arthur would kill him.

26.

DISCUSSION

## I.  The Lying in Wait Instruction

Appellant's contention that there was insufficient evidence to support a lying in wait instruction on first degree murder is devoid of merit.

Lying in wait requires waiting, watching, and concealment.  (People v. Harrison (1963) 59 Cal.2d 622, 631; cf. People v. Merkouris (1956) 46 Cal.2d 540, 559.)  Waiting requires no minimum time period.  (People v. Thomas (1953) 41 Cal.2d 470, 473-474.)

In the present case, appellant purchased a knife, a helmet, a motorcycle, and contact lenses shortly before the killing.  Appellant's newly-purchased motorcycle and helmet were unknown to his former friend and victim, and provided a disguise.  He threatened to kill all of the victim's family. It is a reasonable inference that appellant could have learned the victim's destination on July 12 either by following him the night before and overhearing his plans or guessing his destination.  Appellant followed Michael several car lengths behind, for several blocks, by his own version of the facts. For lying in wait, the perpetrator need not be completely hidden or stationary, as long as he creates a situation where the victim is taken unawares.  (People v. Benjamin (1975) 52 Cal.App.3d 63, 82.)

In any event, appellant was observed by one witness, at least several minutes before the victim arrived, standing on the sidewalk, with his motorcycle on the sidewalk, hidden a short distance down and across the street from the victim's destination. His helmet face plate was covering his face, and he waited until the passenger door was open to approach the car and force his way inside.

This court cannot reweigh the credibility of the testimony, and that testimony alone was sufficient to sustain a finding of lying in wait. (See People v. Scott (1978) 21 Cal.3d 284, 296; People v. Williams (1970) 10 Cal.App.3d 638, 642.) Additionally, the other circumstances preceding the killing permitted a reasonable inference that appellant was lying in wait with the intent to kill the victim. Accordingly, the court properly instructed the jury on first degree murder by lying in wait. (See § 189.)

II.  CALJIC No. 8.25

Appellant contends that the third paragraph of CALJIC No. 8.25 on murder by lying in wait, combined with certain statements made by the prosecutor in his argument to the jury, misled the jury by implying that "they could find the defendant guilty of first degree murder if they found that he lay in wait, even if they did not find that he harbored malice either at the time of the waiting and watching or at the time of the actual stabbing."

Appellant complains that the instruction "nowhere specifies that defendant must have the intent to inflict bodily harm posing a high risk of death at the time that he lies in wait." (Emphasis in original.)

Appellant also contends in his reply brief that the lying in wait instruction was improper because there was no evidence that appellant formed the required intent while he was lying in wait. Appellant bases this contention on appellant's own testimony about his intentions and actions before the killing. It is elementary, however, that the jury was entitled to disbelieve that testimony in its entirety.

The jury was instructed according to CALJIC Nos. 8.10, 8.11, 8.20, and 8.25, regarding murder and the degrees of murder.

The instructions, in relevant part, were as follows:

[CALJIC No. 8.10]

"The crime of murder is the unlawful killing of a human being with malice aforethought. [¶] In order to prove the commission of the crime of murder each of the following elements must be proved: [¶] . . . That the killing was done with malice aforethought."

[CALJIC No. 8.11]

"'Malice' may be either express or implied. [¶] Malice is express when there is manifested an intent unlawfully to kill a human being. [¶] Malice is implied

when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness. . . . [¶] 'Aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

[CALJIC No. 8.20]

"All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word 'willful,' as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a

sudden heat of passion or other condition precluding the
idea of deliberation, it is murder of the first degree.
[¶]  The law does not undertake to measure in units of time
the length of the period during which the thought must be
pondered before it can ripen into an intent to kill which
is truly deliberate and premeditated.  The time will vary
with different individuals and under varying
circumstances.  [¶]  The true test is not the duration of
time, but rather the extent of the reflection.  A cold,
calculated judgment and decision may be arrived at in a
short period of time, but a mere unconsidered and rash
impulse, even though it include an intent to kill, is not
such deliberation and premeditation as will fix an unlawful
killing as murder of the first degree.  [¶]  To constitute
a deliberate and premeditated killing, the slayer must
weigh and consider the question of killing and the reasons
for and against such a choice and, having in mind the
consequences, he decides to and does kill."

    [CALJIC No. 8.25]

    "Murder which is immediately preceded by lying in wait
is murder of the first degree.  [¶]  The term 'lying in
wait' is defined as a waiting and watching for an opportune
time to act, together with a concealment by ambush or some
other secret design to take the other person by surprise.
The lying in wait need not continue for any particular

period of time provided that its duration is <u>such as to</u>
<u>show a state of mind equivalent to premeditation or</u>
<u>deliberation</u>. [¶] To constitute murder by means of lying
in wait there must be, in addition to the aforesaid conduct
by the defendant, an <u>intentional</u> infliction upon the person
killed of bodily harm involving a <u>high degree of</u>
<u>probability that it will result in death</u> and which shows a
<u>wanton disregard for human life</u>." (Emphasis added.)

When the prosecutor was beginning his argument, he
said the following, as he was describing the possible verdicts
to the jury:

"We will talk about what malice aforethought requires
and finally get up to first degree murder which has
premeditation, deliberation, malice aforethought as its
requirements or may also have been committed by one who is
lying in wait."

This was obviously a descriptive statement, rather
than a statement of law, and was not untrue or misleading, in
any event.

In argument to the jury, the prosecutor said the
following about degrees of murder:

"We are now up to murder. Murder has two degrees.
Murder is of either the first degree or second degree.
Murder requires, whether it is first degree or second

degree, it requires malice aforethought. . . . Malice aforethought may either be express or implied. Malice aforethought is express when there is an intent to kill. Malice aforethought is implied when the act is done with a wanton disregard for human life and a high probability the act will result in death. . . .

"    . . . .

"[C]ircumstantial evidence is critical in this one area of the case, and that is intent, for you to decide what the defendant's intent was when he stabbed Michael Diller and also the circumstantial evidence regarding premeditation and deliberation.

"    . . . Look at the facts in this particular case which support malice aforethought. Implied, the use of a deadly weapon. . . . This is a deadly weapon thrust at the chest of the victim is, [sic] quote, 'an act involving a high degree of probability that will result in death when it is done with a base anti-social purpose and with a wanton disregard for human life.' That is implied malice aforethought. And if you believe that the defendant used this deadly weapon with a high degree of probability, it would result in death and with a wanton disregard for human life, then that is malice aforethought implied.

"    . . . .

33.

". . . [R]emember, again, murder is in two degrees:
First degree murder -- malice aforethought plus
premeditation and deliberation, or lying in wait; . . . We
want to know now if there is enough evidence to convict him
of first degree murder.

"When we talk about premeditation and deliberation, we
may proceed under two theories to prove first degree
murder. Either one is sufficient. The second theory is
lying in wait. Lying in wait is waiting and watching <u>for
the opportune time to act</u>, together with concealment, by
ambush or some other design to take the person by
surprise. In addition, there must be an <u>intentional
infliction</u> upon the person killed of bodily harm involving
a high degree of probability that it will result in death
and which shows a wanton disregard for human life.

". . . What that says is if the defendant waited and
watched and <u>he concealed himself with the intention to take
Michael Diller by surprise, and if he then committed malice
aforethought, wielded the knife at the victim and thrust it
at his chest area, that is first degree murder, too.</u>

"We don't have to <u>show</u> premeditation and
deliberation. All we have to <u>show</u> is <u>the defendant waited,
watched and concealed himself for the purpose of taking the
victim by surprise, and then committed an act of implied
malice</u>. . . .

34.

".  .  .  .

"Now, I didn't say he intended to kill him at that point. All he had to do is intend to stab him in the chest with the knife. If you believe that the defendant intended to stab the victim with the knife and did so following waiting, watching, and concealment, that is first degree murder, first degree murder coming either from premeditation and deliberation plus malice aforethought or lying in wait.

".  .  . [D]id the defendant murder Michael Diller with malice aforethought and premeditation and deliberation or lying in wait and malice aforethought? . . . (Emphasis added.)

" . . . and the murder was of the first degree because the defendant is guilty under the facts by either theory, premeditation and deliberation or lying in wait.

".  .  .  .

"So we're talking about first or second degree murder. Second degree murder with malice aforethought, first degree murder, malice aforethought, premeditation, deliberation, or lying in wait."

We have reviewed the phrases quoted in appellant's opening and reply briefs as alleged misstatements of the law on lying in wait, and we find that when these phrases are taken in context, as we have set them forth herein, there is no error.

In People v. Benjamin, supra, 52 Cal.App.3d 63, 82-84, the court rejected appellant's contention that CALJIC No. 8.25 was inadequate because it erroneously implies that specific intent to kill is unnecessary for first degree murder by lying in wait. The court found that the last paragraph of the instruction, which requires a finding of an intentional infliction of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life, is "essentially a definition of implied malice."

By providing that all murder perpetrated by means of lying in wait or by "any other kind of willful, deliberate, and premeditated killing" is murder of the first degree, section 189 represents a determination by the legislature that killing by lying in wait is the logical equivalent of premeditated and deliberate killing.

Before the jury may find that a killing was first degree murder by lying in wait, it must also determine that the killing was murder, that is, that there was express or implied malice aforethought. (See Id., at p. 84; People v. Dickerson (1972) 23 Cal.App.3d 721, 727.)

When the prosecutor's argument and the jury instructions are viewed in their entirety, there is no reasonable possibility that the jury was misled to believe that appellant need not have harbored malice aforethought.

CALJIC No. 8.25 also requires that the jury find that defendant was lying in wait "to act."

There is no reasonable possibility that the jury would find that appellant was guilty of first degree murder if he was lying in wait without the intent to kill or inflict bodily harm involving a high probability of killing, which is the intent required for murder.[2/]

Appellant's contentions regarding the lying in wait issue are without merit.

III.  Denial of Appellant's Severance Motion

Appellant contends that the court abused its discretion in denying his motion to sever the murder and assault counts.

The motion to sever was properly denied.

Joinder of charges is authorized where there is a common element of substantial importance in their commission (People v. Scott (1944) 24 Cal.2d 774, 778), even though the crimes do not relate to the same transaction and were committed at different times and places and against different victims (People v. Chessman (1959) 52 Cal.2d 467, 492).

---

2.   Additionally, the jury was instructed on second degree murder, and that if there was any reasonable doubt as to the degree of the murder, it was required to find the murder to be of the second degree.

37.

Also, assault and murder charges may be joined as they are of the same class of crimes. (People v. Rhoden (1972) 6 Cal.3d 519, 524-525.)

The common elements in the assault and murder joined in this case were appellant's attacks on members of the Diller family and their close associates during a period in which there was a pattern of threats and other incidents of violent conduct by appellant against the two victims of the charged offenses. The two crimes were part of an ongoing course of conduct by appellant.

Where joinder was proper, as it was here, it is very difficult for defendant to show prejudice from denial of severance. (People v. Matson (1974) 13 Cal.3d 35, 39.)

Where the charged offense would have been admissible as an uncharged offense, there is no prejudice from denial of severance. However, where the uncharged offense would not have been admissible, denial of a severance motion still is not necessarily an abuse of discretion, as the court may also take into account the waste of public funds which would result if the same general facts were to be tried in separate trials. (Williams v. Superior Court (1984) 36 Cal.3d 441; People v. Matson, supra, 13 Cal.3d at pp. 39-41.)

The test for the propriety of severance, as for admitting evidence of prior uncharged acts, is whether the probative value is outweighed by the prejudical effect. (Id., at p. 40.)

Under Evidence Code section 1101, evidence of defendant's conduct is inadmissible to prove his conduct on a specified occasion, but evidence that defendant committed a crime, civil wrong or other act is admissible when relevant to prove a fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, other than his disposition to commit such acts.

Evidence of prior crimes may show intent to kill. (See People v. Durham (1969) 70 Cal.2d 171, 186-188.)

Prior assaults and threats aimed at a certain group of victims is admissible to show malice aforethought, and to rule out accident or self-defense. (People v. Wells (1949) 33 Cal.2d 330, 342; threats and assaults against prison guards followed by assault with malice aforethought on guard; disapproved on other grounds in People v. Wetmore (1978) 22 Cal.3d 318.)

Evidence showing prior quarrels and antagonism between defendant and the victim of a violent offense is admissible to show motive. (People v. Daniels (1971) 16 Cal.App.3d 36, 46.)

Additionally, evidence of prior crimes is admissible to show the existence of a continuing plan. (People v. Lynn (1971) 16 Cal.App.3d 259, 268.)

Since motive usually provokes criminal behavior, wide latitude is permitted in admitting evidence of motive. Prior conduct from which the jury reasonably can infer the existence

of animosity between defendant and the victim is admissible.
For example, in an assault prosecution, evidence of a prior
fight between defendant and the victim's brother, followed by
the brother's testimony against defendant in a prosecution
arising out of that fight, was properly admitted to show
animosity between defendant and the victim's family which
supplied a motive for the assault. (See People v. Lopez (1969)
1 Cal.App.3d 78, 85.)

Evidence of the assault was relevant to negate
appellant's defense that he was provoked and acting in the heat
of passion or in self-defense when he attacked Michael Diller.
The assault tended to show that appellant had developed
animosity and a desire for revenge against the Diller family
and its close associates, and to support Mrs. Diller's
testimony that appellant threatened to kill the Dillers.

Evidence of the assault would have been admissible in
a severed trial on the murder, and evidence of the murder would
have been admissible in a severed trial on the assault to
negate appellant's story that he had been attacked by Joe Gold.

IV.  Denial of Motion for Mistrial Based on the Prosecutor's
Argument to the Jury

Appellant urges as error that the prosecutor argued to
the jury that appellant's commission of bad acts before the
killing indicated that appellant had the "character" to

premeditate and deliberate before committing murder.  Appellant
contends that the court also erred in limiting CALJIC No. 2.50,
on evidence of uncharged offenses, to the offense of theft, so
that the jury was not advised that it could consider other bad
acts only to show motive, intent, and the like.

Appellant complains of the following portion of the
argument:

"There are some other facts, too, which are beyond the
acts on this particular chart which would demonstrate the
defendant's premeditation and deliberation.

". . . .

"Let's look at the kind of person we know the
defendant is.  The kind of person who would take the life
of Michael Diller.  He is ungrateful.  Here he is having
been given so much by the Diller family, and the gratitude,
he steals from them.

"Think about -- by the way, when we talk about
premeditation and deliberation, the kind of person weighing
the consequences back and forth and thinking about it
beforehand is capable of arriving at this kind of decision
to take a human life.  He is dishonorable.  He has not only
embezzled money in a position of trust which he had, but he
violates his duties as a lawyer which he knew what he was
doing and he admitted to when he committed that

embezzlement.  He had the privilege to practice law, and he violated that privilege as well as violating the privilege and the right of what he owed the Diller family.

"He is deceitful.  He lies to Mr. Landy and continues to try and lure him well past the time he is no longer in control of that building.  He is arrogant.  The letter from the defendant to Mr. Altschuler on February 23 reeks of arrogance, and you will be able to read that letter, that he feels he is entitled to $100 an hour for managing the building, which is just an arrogant aside from a person who is contemptuous of everybody.  He is hostile and aggressive.  He committed batteries against Joseph Martin Gold on March 31st, against Arthur Diller on March 11th, continues to be hostile on July 11th when he attacks Arthur.

"He is merciless.  The victim, Michael Diller, is trapped inside the recreation building, helpless with nowhere to go, with no one to help him, and he has Michael Diller trapped and kills him, showing no mercy.  He is cunning.  After he commits the murder he leaves.  It is reasonable he didn't anticipate that the car would crash, and there is a crowd out on the street.  These people don't know what he has done in the park.  He has to say something, so he says, 'The man tried to run me over.' Quick thinking.  And then he flees again, of course, after Mr. Vigil comes out of the park.

"He is callous because after he assaults Arthur on
July 10th he goes to the Hamburger Hamlet and, most
incredible, after he murders Michael he goes to the La
Barberas and eats a dinner of chicken.  How many people do
you think can murder someone and then go out and eat.
Heartless, which I don't have down here, because he cares
more about his dog than he does about a human life.  That
is the character of the man that murdered Michael Diller,
that is the character of the man that premeditated and
deliberated prior to murdering Michael Diller, and that is
why his character is relevant as well in determining
premeditation and deliberation.

"Remember again, the word 'deliberate' means formed or
arrived at or determined upon as a result of careful
thought in weighing of consideration for and against the
proposed course of action.  Premeditated means considered
beforehand.  The question is:  Do the facts which I have
presented to you, the character of the defendant, the acts
before, the act itself and the acts after demonstrate that
this individual formed or arrived at or determined upon as
a result of careful thought in weighing of consideration
for or against the proposed course of action, the death of
Michael Diller, and did he think about it beforehand?  The
evidence says yes." (Emphasis added.)

Defense counsel objected when the prosecutor first used the word "character."

Following the argument, he moved for mistrial on the ground that the prosecutor had used prior bad acts to show appellant's character or predisposition and to show premeditation and that such argument was impermissible because appellant had not placed his character in issue.

However, defense counsel did not request that the jury be admonished about use of evidence of prior bad acts.

The court denied the motion for mistrial, with the following statement:

"Sometimes the use of specific words can have a different meaning in the mind of counsel than those words used in common vernacular or common use of words. The particular area of calling witnesses to establish specifically the character or character trait of the defendant as listed, for example, in CALJIC 2.40 is a specific area of the law in which the defendant's character is specifically placed in issue by the defense for a particular reason, and that of course invites cross examination and rebuttal evidence as to the defendant's bad character. That was not done in this case. As we have known from the outset, very near the outset, the defendant did not place his general character in issue. Now, that is one category of concern I think to this discussion.

44.

"There is a second, separate and totally different area, it seems to me, and that is whether the failure of the defendant to introduce evidence, character evidence as such, under the formal outlines of CALJIC 2.40 and sections from which it derives, whether failure of the defense to put the defendant's character in issue in this fashion prevents the District Attorney from using the word 'character' or adjectives describing the defendant then based upon evidence that is in the record, and this is a specific quote, 'defense character evidence,' close quotes, presented by the defense or rebutted.

"It seems to me that there is sufficient admissible evidence in the record of specific acts of the defendant and of circumstantial evidence that can be argued to show the motive and intent which do lend themselves to permissible argument including adjectives, and of necessity those adjectives could be, as was here done, described as the defendant's character.

"I would have preferred the word 'character' not be used because it is a trigger word. It is, you might say, a legal word that brings into mind a specific set of laws, but in view of the method in which the District Attorney explained what he meant by his description of the defendant, namely, motive and intent and the things he

based it on, I find that there has not been an abuse of the
prosecutorial right to argue the circumstantial and direct
evidence in the case, and the motion for mistrial is
denied."

We agree with the trial court's reasoning.

It is apparent that the prosecutor was asserting that
appellant's pattern of conduct showed his intent when he chased
and stabbed Michael Diller.  (See Evid. Code, § 1101, subd.
(b).)  Other events showed his motive.  (Ibid.)

When the relevant portion of the prosecutor's argument
is read without the references to "character" or "kind of
person," it is also apparent that those references were
logically extraneous to the argument.  The substance of the
argument was that specific instances of appellant's conduct
towards the victim and his family and friends tended to show
that appellant murdered the victim with premeditation.

Adjectives used to describe appellant were likewise
based on specific instances of prior conduct, and, in fact,
those adjectives described appellant's behavior and attitude,
rather than actually describing his "character," in the sense
that the word is used in the Evidence Code.  Nor was there an
attempt to show that appellant had a propensity to commit the
crimes charged.  (Cf. People v. Thompson (1980) 27 Cal.3d 303,
321.)

Use of an epithet or description of defendant or his behavior which is based on evidence that was properly admitted at trial is not error. (See People v. Benton (1979) 100 Cal.App.3d 92, 97-98; disapproved on another point in People v. McCullough (1979) 100 Cal.App.3d 169, 180.)

Appellant contends that the prosecutor's argument was rendered more prejudicial by the court's failure to give the second paragraph of CALJIC No. 2.50 and failure to include all uncharged offenses in the instruction. However, CALJIC No. 2.50 was given as requested by the People, modified by the court, and approved by defense counsel, including the second paragraph.

Defense counsel requested that the second paragraph of CALJIC No. 2.50 be given, to indicate how evidence of uncharged offenses should be used, because of the references to character in the prosecutor's argument. The record reflects that the second paragraph of CALJIC No. 2.50 was given, as printed in CALJIC. [3/]

---

3. CALJIC No. 2.50, as modified, states:

"Evidence has been introduced for the purpose of showing that the defendant committed theft, a crime other than that for which he is on trial.

"Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

(Continued)

Second, when discussing CALJIC No. 2.50, defense counsel consented to limiting the instruction to the effect of the uncharged offense of theft and not including the battery offenses. The court's reasoning in thus limiting the instruction was that appellant had admitted the theft (by embezzlement), but that it would unduly prejudice appellant to imply that the batteries of Joe Gold or Arthur Diller were necessarily crimes.

The defense initially did not request CALJIC No. 2.50. Instead, the defense proposed an instruction stating that appellant was on trial only for the offenses charged, and that he could not be convicted upon the jury's belief that he had committed some other crime. That instruction was given with slight modifications.

---

(Fn. 3 continued)

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"The existence of the intent which is a necessary element of a crime charged;

"A motive for the commission of a crime charged.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose."

Limiting CALJIC No. 2.50 to theft could be considered error only if the court had the duty on its own motion to instruct on the limited use of evidence of all uncharged crimes.  The trial court does not have a duty to give such an instruction sua sponte.  (People v. Collie (1981) 30 Cal.3d 43, 63-64, disapproving cases to the contrary.)

V.  Evidence of Victim's Character for Non-aggressiveness

Appellant contends that it was error for the court to determine that Michael Diller's character for peacefulness was placed in issue and allow testimony of three witnesses as to Michael Diller's character for non-aggressiveness on rebuttal.

The People moved to be allowed to introduce testimony as to Michael and Arthur Diller's character for peacefulness. The defense contended that Michael and Arthur's character had not been put in issue, and that only evidence of specific instances of their conduct had been introduced.

The court reviewed the evidence and ruled that character evidence would be admissible in rebuttal as to Michael, but that as to Arthur, the prejudicial effect of admitting such evidence would outweigh its probative value. (See Evid. Code, § 352.)

The court announced its ruling as follows:

"In reviewing all of my trial notes, not just those of Mr. Marcus on cross-examination that I focused on yesterday when we discussed this, there are other instances I find of

evidence introduced by the defense that do show that the
defendant has placed Michael Diller's trait of character
for being an aggressor in issue to prove conduct in
conformity with that trait.

"For example, they -- the trial testimony shows that
the defendant testified on direct examination, but before
that he called other witnesses. The defendant called
Zoeller and offered evidence that Zoeller was told by the
defendant that, quote, he was trying to run over me with
the car, close quote. The defense offered evidence on
direct examination of Kelly Bixby that defendant said he
was attacked by Arthur on the 10th, when will they stop
this, and evidenced his fear.

"Though [sic] Hariton was called by the defense and
testified, among other things, that in late 1980 the care
package incident, Arthur was insulting Joe Hariton in
defendant's presence. Michael was there. Arthur
challenged both and sundry, and that Michael, too, was
present.

"And as to those last two bits of testimony, I've had
occasion to consider People versus Lopez, 1969, 1
Cal.App.3d 78, page 85, in which a defendant previously
fought with victim's brother who testified against
defendant in an assault case, and there was a defense

objection as to showing of uncharged crime. Testimony was
admitted, and the point was made in Lopez that where there
was animosity between the two families that equated to
motive, so on the last two things I mentioned about
defendant's testimony from Bixby and Hariton, it does
appear to be circumstantial evidence admissible to motive
and it may also spill over into this character issue that
we're discussing.

"To continue, the evidence shows from my trial notes
that the defense introduced evidence that Joe Hariton saw
Michael, the deceased, on May 11th with Arthur and Joe
Gold, and that Hariton who came up on the same later said
they were saying 'Come on' to defendant. Hariton testified
when called by the defense that the defendant later told
him, Joe Hariton, what had happened earlier on May 11th
before Joe got there and that Michael was one of the three
in a barrier against his running, and Joe Hariton testified
when called by the defense that on July 10th the defendant
said that he was in fear that they wouldn't let him alone.

"The defense called Diane Manzo who testified on
direct that Michael was there when Arthur and Joe in late
'80 came with the care package.

"Bruce Kasten testified that Michael said in effect
that the guy who came back who is the defendant said that
the other guy who is Michael ran over him on his -- or

tried to run over him or referred to running over him when he was on his motorcycle and made some comment about coming at him with a hammer.

"The defendant on his testimony testified on May 11th that when he was jogging, the ball bat incident, that Michael was with Arthur and Gold and that someone said 'There he is,' that Gold attacked him, that Michael said 'He's got the bat.' He also said that Michael ran.

"The defendant has testified that Michael tried to kill him by trying to run him over with his car when he defendant was on his motorcycle. Defendant testified several times that Michael tried to kill me, I wanted to stop him and confront him with it, I knew it would go on.

"The reference was to Michael and/or Diller family or agents trying to kill him.

"He testified specifically, though, that Michael came towards me in the equipment room and that he thought then that Michael would kill me. Defendant testified that Michael was a danger to me because he tried to run me over. He was a participant in a fight with the three others."

Appellant testified to at least one specific instance of Michael Diller's violent conduct when he testified that Michael intentionally ran him off the road just before the murder. Also, the other instances cited by the trial court are supported by the record.

Evidence Code section 1103, subdivision (a), makes evidence of the victim's character for peacefulness admissible in rebuttal when defendant introduces evidence of "the character or a trait of character (in the form of an opinion, evidence of reputation, <u>or evidence of specific instances of conduct</u>) of the victim of the crime . . . to prove conduct of the victim in conformity with such character or trait of character." (Emphasis added.)

Appellant contends that the defense carefully avoided "commenting upon the victim's character" at trial. However, it is apparent from Evidence Code section 1103 that evidence of the victim's character in the form of specific instances of conduct also will permit the People to introduce rebuttal evidence.

In homicide cases, evidence of the victim's character, in the form of specific acts or threats by the victim against the defendant, has always been admissible in California to show defendant's reasonable apprehension of danger. Evidence Code section 1103 codified that rule. (See Witkin, Cal. Evidence, § 334.)

Appellant's defense to the murder charge was that he reasonably, or unreasonably but actually, feared that he would be attacked by Michael Diller or his family if he did not confront and stop Michael. That defense was supported by testimony tending to show that the Diller family and their

associates, with the cooperation of Michael, were the aggressors, and appellant was the innocent victim, in previous violent incidents.  Such evidence constitutes evidence of the victim's character in the form of specific instances of conduct, sufficient to satisfy Evidence Code section 1103.

In People v. Fitch (1938) 28 Cal.App.2d 31, 42, the court said:

"'[T]he attack on the character of the deceased need not be directed as to his general reputation to render admissible evidence of his good character . . . . If the issue is raised by the defense at all, the state may meet it by evidence of general reputation as to good character. [Citations.]  No general rule can be laid down for the determination of what will be held to constitute an attack by the defendant on the character of the deceased . . . , but each case must be decided according to its own circumstances or facts.  [Citations.]'"

It has been held that defendant does not open the door to admission of such evidence merely by attempting to establish self-defense.  (See People v. Hoffman (1925) 195 Cal. 295, 311.)  In that case, the only evidence of decedent's violent character was the one instance directly leading to his death, at which he had advanced upon defendant using profane language.

In the present case, there was evidence of several instances of conduct.  The court did not abuse its discretion in allowing rebuttal evidence.

## VI.  Polygraph Evidence

Appellant contends that the trial court erred in excluding polygraph evidence.

The defense made a motion in limine to admit the result of a polygraph examination which appellant had arranged for, and which was administered by Theodore Ponticelli.

An extensive hearing was held on admissibility of the polygraph test.  Mr. Ponticelli testified that he was a polygraphist by profession, with 16 years' field experience. He was trained in the field at a federal government school.  He had worked for the Marine Corps, the Los Angeles Police Department and other agencies as a polygraph examiner, and had instructed in polygraph techniques at various schools and agencies.

He testified that the polygraph test is 96 percent accurate, and that it is possible for a test subject to attempt to control the results by holding his breath, but the operator can detect it.

He also testified that the more educated the test subject is, the more difficult he is to test.  If the subject does not fear detection, the test will not work, and it also would not work on a pathological liar or a sociopath.

If the subject knew that unfavorable results could not be used against him, it would produce inconclusive results.

He agreed that the questions asked should be unambiguous, unequivocal, and understandable.

55.

He disputed that questions should not be compound, and that the control questions should be of the same factual nature as the questions actually used to test veracity.

The test results indicated that appellant was telling the truth when he said that he had no idea that Michael Diller died as a result of the stabbing; that Michael ran him off the road; that he chased Michael to the park because Michael attempted to run him off the road; and that the hammer and bat incidents were initiated by Arthur and Michael Diller and Joe Gold, which appeared to be a conspiracy.

The test was not tape recorded, which would have been the preferred procedure.

David T. Lykken, an expert in psychophysiology, the science which underlies polygraph testing, testified for the People that polygraph results cannot detect lies, but can show only whether a question disturbs the examinee.

He testified that the theory behind the polygraph exam is that the guilty subject will be less disturbed by a control question which he will probably answer falsely (such as, "Have you ever stolen anything?") than by a question relating to the specific criminal act of which he is accused. The opposite would be true for an innocent subject. He was of the opinion that the theory was unsound psychologically, and that most examiners would not have the skill always to make up useful control questions.

In one controlled study, the test was 72 percent correct.  In another study, the test was 63 percent correct, and in another, 69 percent.

Where the tests indicated innocence, they were accurate 76 percent of the time.

Taking a tranquilizer before the test enabled a majority of guilty subjects to beat the test.  Also, a guilty subject can beat the test by deliberately stimulating his nervous system (by biting his tongue or pressing his arm on the chair, etc.) to produce a stronger reaction to the control questions than the guilt questions.

A friendly polygrapher can also produce favorable results through the creation of a favorable atmosphere, even unconsciously.  More socialized, conscientious, or religious people are more likely to fail the test than undersocialized people.  Also, the form of the question can influence the reaction.

Tape recordings of the test are needed to measure background noise, which affects performance on the test and to ascertain how the questions are put to the examinee.

Mr. Ponticelli did not ask appellant whether he intended to stab or kill Michael Diller.  The control question asked appellant was whether he recalled "making up serious lies to get a particular person into trouble."  This question

did not relate to the same kind of activity as the guilt questions. 4/

---

4.    Mr. Ponticelli described the questions as follows:

"Question 3-A in the sequence of ten, did you lie when you said you had no idea Mike died as a result of that stabbing incident.

"Numerical evaluation, I had a total score of plus eleven which is indicative of truthfulness.

"Question 5 in the sequence, did you lie to me when you said Mike ran you off the road on July 12th.  He responded no to that, and my numerical evaluation was a plus seven which is indicative of truthful.

"Question 8 in the sequence of ten, did you lie when you said you chased Mike to that park area because Mike had attempted to run you over with his car.  His response was no, and my numerical evaluation of that was a plus three indicative of truthfulness.

"Question 9 in the sequence of ten, did you lie when you said that both the hammer and bat incidents were initiated by Arthur Diller, Joe Gold, Mike Diller, which appeared to be a conspiracy.  His answer was no.  Numerical evaluation of that particular question was a plus four which is indicative of truthfulness."

"[Question 6:]  Before 1981, do you recall ever making up serious lies to get a particular person into trouble. As it was, the physiological responses present at question 6 were far greater than the physiological responses at question 3-A which is indicative of truthfulness to 3-A.

"Question 5 was again computed with question 6, 5 being a relevant question, 6 being a control, and I found that the physiological responses were greater to 6 than it was 5, again reinforcing the truthfulness to 5.

"Then I compared 8 which is a relevant question to question 10 which is a control question.  The physiological responses were greater to 10 than they were at 8, so, therefore, again, it was rendered truthful.

"And I made a comparison to question 9 with 10, and 10 was greater as far as physiological recordings, so, therefore, I rendered my opinion that he was truthful to 9."

58.

The court made extensive findings in ruling on the motion, including the following: (1) that there is in California no professional standard for polygraph tests or examiners; (2) that the guilt-oriented questions on appellant's test were ambiguous or grammaticaly complex in phrasing; (3) that no tape recordings were made of the test; (4) that 11 months went by between the homicide and the test; (5) that appellant, as an attorney, knew that the test results could not be used against him if unfavorable, thus increasing his calmness and control; (6) that polygraph testing is not a reliable scientific methodology for determining the truth; and (7) that the control questions were not reliable to produce the intended comparison result.

The court ruled that under Evidence Code sections 402 and 403, appellant did not establish the reliable personal knowledge of Mr. Ponticelli; that the evidence was not sufficiently based on scientific fact and was not relevant because it was not the proper subject of expert testimony; that the particular evidence offered did not meet the criteria of People v. Kelly (1976) 17 Cal.3d 24, for scientific techniques; and that under Evidence Code section 352, its probative value was outweighed by its prejudicial effect.

Trial took place before July 12, 1983, the effective date of Evidence Code section 351.1, which provides that polygraph evidence is inadmissible except on stipulation of all parties.

We find no error in following the trial court's ruling on the polygraph results on two bases:

(1) Appellant's evidence was insufficient to show that polygraph results are sufficiently accepted as reliable by scientists to qualify as relevant evidence (see People v. Kelly, supra, 17 Cal.3d at p. 30);

(2) The results of the particular examination in this case were not established as reliable because of the friendly polygrapher problem, the lack of a tape recording, and the nature of the control questions used and the guilt questions posed (see People v. Witherspoon (1982) 133 Cal.App.3d 24); and

In view of the unreliability of these particular examination results, the court did not abuse its discretion in excluding them pursuant to Evidence Code section 352 (see Id., at p. 27). [5]/

As for appellant's contention that Proposition 8 mandates admission of his polygraph results, we note that the

---

5.    On July 26, 1984, the Supreme Court granted a hearing in People v. Johnson (1984) 155 Cal.App.3d 241, a case in which this division held that Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) does not mandate admission of favorable polygraph test results without a hearing, and that defendant had failed to show that polygraph evidence generally was reliable enough to be admissible.  (Crim. 23867.)

In the present case, additional facts supported the determination that the particular test results were unreliable and that their probative value was outweighed by their prejudicial effect.

60.

defense sought and obtained a ruling that the case would be tried under pre-Proposition 8 rules.  (See also <u>People</u> v. <u>Smith</u> (1983) 34 Cal.3d 251, 260-263.)

DISPOSITION

The judgment is affirmed.

<u>NOT FOR PUBLICATION IN THE OFFICIAL REPORTS</u>

ARGUELLES, J.

We concur:

KINGSLEY, Acting P.J.

McCLOSKY, J.